```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE SOUTHERN DISTRICT OF TEXAS

 3                            HOUSTON DIVISION

 4    ALANIZ                          §     CASE NO. 4:22-CV-1991
                                      §     HOUSTON, TX
 5    VERSUS                          §     WEDNESDAY,
                                      §     MAY 10, 2023
 6    HARRIS COUNTY, TEXAS, et al.    §     10:40 AM TO 11:39 AM

 7                          CONFERENCE HEARING

 8              BEFORE THE HONORABLE CHARLES ESKRIDGE
                    UNITED STATES MAGISTRATE JUDGE
 9
                             APPEARANCES:
10

11        FOR THE PARTIES:               SEE NEXT PAGE

12        COURT REPORTER:                MAYRA M. MARQUEZ

13        COURT CLERK:                   JENELLE GONZALEZ

14

15

16

17

18

19

20                  TRANSCRIPTION SERVICE BY:

21                  Veritext Legal Solutions
                    330 Old Country Road, Suite 300
22                       Mineola, NY 11501
                    Tel: 800-727-6396 ▼ www.veritext.com
23
          Proceedings recorded by electronic sound recording; transcript
24                   produced by transcription service.

25
```

```
 1                              APPEARANCES:

 2

 3   FOR THE PLAINTIFF:          THE LEWIS LAW GROUP
                                 U.A. Lewis
 4                               P.O. Box 27353
                                 Houston, TX 77227
 5                               713.570.6555

 6

 7   FOR THE DEFENDANTS:         HARRIS COUNTY ATTORNEY'S OFFICE
                                 James Butt
                                 Defensive Litigation
 8                               1019 Congress
                                 Houston, TX 77002
 9                               713.274.5133

10

11                        (APPEARING TELEPHONICALLY)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              HOUSTON, TEXAS; WEDNESDAY, MAY 10, 2023; 10:40 AM
 2              CLERK:  All rise.  The United States District Court
 3    for the Southern District of Texas is now in session, the
 4    Honorable Charles Eskridge presiding.  God save these United
 5    States and this honorable court.
 6              THE COURT:  Thank you, everyone.  Please be seated.
 7              All right.  I call 22-1991, Joe Anthony Alaniz v.
 8    Harris County, Texas, et al.  Can I get appearance of counsel,
 9    please?
10              MS. LEWIS:  Yeah, good morning, Your Honor.  UA Lewis
11    for the plaintiff, Joe Alaniz.
12              THE COURT:  Thank you, Ms. Lewis.
13              MR. BUTT:  Good morning, Your Honor.  Jim Butt on
14    behalf of Harris County -- pardon me -- and Sheriff Ed
15    Gonzalez.  Suzanne Bradley is not here, and I will, if the
16    Court desires, also represent Mark Cannon.
17              THE COURT:  For purposes of argument, is there --
18    she's in your office, correct?
19              MR. BUTT:  That is correct, Your Honor.
20              THE COURT:  Okay.  All right.  Is she okay?  I mean,
21    was there a concern?
22              MR. BUTT:  Yes.  She was going to a CLE in Austin, I
23    believe, so.
24              THE COURT:  Okay.
25              MR. BUTT:  She's there.
```

```
 1          THE COURT:  Okay.  Well, then with that, then yeah,
 2   for any questions that I have, I'm going to need to have you --
 3   you (indiscernible)?  I mean, you're both at the same office.
 4   So, you would be --
 5          MR. BUTT:  Yes, there are issues of conflict in terms
 6   of representation.  That's why we divide them out.  But for
 7   purposes of --
 8          THE COURT:  We'll see where we go.  I don't know that
 9   I'll -- that it will be --
10          MR. BUTT:  Sure.
11          THE COURT:  -- problematic.  All right.  So, we're
12   back again on this one, and we have motions to dismiss again
13   pending.  I am familiar with the background of the case.  So,
14   let's -- let's figure out where we go from here.
15          So, we have claims against Harris County, Sheriff
16   Gonzalez, and Deputy Cannon; is that correct?  Those are our
17   three defendants.
18          MS. LEWIS:  That is correct, Your Honor.
19          THE COURT:  All right.  So, let's start with Harris
20   County.  And I am familiar with the factual background here.
21   On the Monell claims, there are a lot of different angles at
22   trying to state what might be a theory, but a lot of it is
23   specification of the theory with -- without, I'm not sure,
24   enough underlying it to allow it to proceed.
25          So, let's start with inadequate policies on excessive
```

1    force.  What are the policies?

2        MS. LEWIS:  Well, Your Honor, we believe that --

3    well, I believe that the lack of policy is the issue, that

4    there's not -- that there's inadequate training on the

5    constitutional limits of the use of excessive force when a

6    person is not resisting, when they have not committed a crime,

7    and that was the moving force behind my client's --

8        THE COURT:  So, that would be a failure to train

9    claim, because basically a failure to train --

10       MS. LEWIS:  Yes.

11       THE COURT:  All right.  If -- I'm going to -- and I

12   will obviously get to that.  But I just take it right now, you

13   don't have a particular policy in mind.  You're just simply

14   saying there's no policies and that's the problem?

15       MS. LEWIS:  Yes, Your Honor.  There -- the -- on the

16   training aspect, and also as far as the training on arresting

17   individuals that are for -- without -- without -- excuse me,

18   with lack of probable cause that are officer initiated arrests,

19   not where somebody's -- you know, they're investigating or

20   they're calling, where there's no other complaining witness but

21   the officer, there is -- there is a substantial amount of cases

22   that are dismissed in those instances.

23           It's almost like a type of arrest scenario where

24   they're upset with the individual that they encounter out in

25   the street and the officer decides that I will arrest you,

1   punish you by arrest, knowing there's no probable cause, but at

2   least I'll inconvenience you for the moment, although I know it

3   will be dismissed once there is a probable cause evaluation.

4          And we believe that there is a -- a widespread

5   practice of this, and it's evident by some of the -- some of

6   the dismissals in the Harris County Court, which there were --

7   there were -- I mean, there was hundreds.  I couldn't -- I

8   couldn't list them all, but there were hundreds and hundreds of

9   instances where individuals had been dismissed from the -- from

10  their criminal complaints as a result of there not being any

11  probable cause.

12         And we look at what was the basis of the probable

13  cause.  It's all based on essentially a false statement by the

14  police officers to the district attorney or --

15         THE COURT:  But even if we're -- if we're getting to

16  a pattern or practice, my understanding of your pleading is

17  that of 1800 arrests made per year on average, about 5 percent

18  are unlawful false arrests without probable cause, right?

19         MS. LEWIS:  Right.  Yes.

20         THE COURT:  So --

21         MS. LEWIS:  And that could be reduced, Your Honor.

22  That could actually be reduced because --

23         THE COURT:  What could be --

24         MS. LEWIS:  -- when we look at the 1800 arrests --

25  excuse me, I'm sorry.  When we look at the 1800 arrests, those

1    aren't 1800 officer-initiated arrests.  And when we -- when we

2    narrow it down to the officer-initiated arrests where they're -

3    - the officer is the complainant, that number gets much more

4    narrow.  And again, that's something that I definitely can put

5    forth evidence at a summary judgment stage.

6            But at this stage, I'm pleading those facts that

7    these officer-initiated arrests, whether it's for -- like

8    there's a bucket of these arrests which are officer initiated

9    like the resisting, the assault of a police officer, the -- in

10   -- in this case, I believe -- well, he didn't even -- he wasn't

11   even charged with a crime in this case.  He was just arrested.

12   There's not even a crime alleged against Mr. Alaniz.  But in

13   any event, the detainment and the arrests are all not dealing

14   with any third party but the arresting officer.

15           THE COURT:  Mm-hmm.

16           MS. LEWIS:  And interference with public duties is

17   also a prime example of these officer-initiated arrests, that

18   ultimately when the body camera footage comes out, whenever

19   it's released in criminal court or the incident report, just

20   based on the facts that are alleged in the incident report,

21   show that there was no probable cause from the onset to arrest

22   these --

23           THE COURT:  You're talking about this case?  Talking

24   about this case or just generally?

25           MS. LEWIS:  Including this -- including this case and

1    in general.  And we don't have -- obviously, we don't have --

2           THE COURT:  So, your -- I mean, your assertion is if

3    I was to look at all the body cam footage that's out there on

4    every arrest, I would agree that there's a lot of arrests being

5    made without probable cause; is that what you're saying?

6           MS. LEWIS:  I wouldn't say every arrest.  I would say

7    there's --

8           THE COURT:  No, and I didn't say that either.

9           MS. LEWIS:  Okay.

10          THE COURT:  I would find it a lot, because I will

11   tell you, I've looked at a lot of body cam footage.

12          MS. LEWIS:  Mm-hmm.

13          THE COURT:  I rarely see anything that I see as like

14   just wholly without probable cause.  There might be instances

15   of, okay, was that sufficient provocation or -- it is not like,

16   you know, when you go look at body cam footage, people that are

17   doing blameless things like just peaceably going along are

18   being taken down by officers.  Is that what you're trying to

19   say happens out in Harris County?

20          MS. LEWIS:  What I'm saying --

21          THE COURT:  Because I've looked at a lot of body cam

22   footage, and that's not what I've seen.

23          MS. LEWIS:  Your Honor, well, what I would say is I

24   would narrow that, your view of the body camera footage, to

25   Harris County sheriff deputies who -- who arrest individuals

1    for officer-initiated arrests, not just general arrests for,

2    you know, traffic tickets or, you know, traffic violations or

3    anything like that.  I mean, specific --

4            THE COURT:  But a traffic ticket is an officer-

5    initiated contact.

6            MS. LEWIS:  It is, and that's why -- that's what --

7            THE COURT:  I mean, that's the thing.

8            MS. LEWIS:  That's why I'm carving that out.

9            THE COURT:  When you're saying officer initiated, are

10   you talking about arrests that officers believe they've

11   perceived something going on and they act as opposed to, hey,

12   we've got a warrant for arrest coming to you, we give this to

13   the officer, now go find and arrest that person?  Is that the

14   distinction that you're making?

15           MS. LEWIS:  No, it's not.

16           THE COURT:  Okay.  What is the distinction you're

17   making?

18           MS. LEWIS:  My distinction, Your Honor, is that these

19   are individuals that come into police contact where there is

20   some sort of discourse, disagreement, and there is no -- excuse

21   me, there's no crime being committed whatsoever.  It's not an

22   investigation.  It's just a matter of we're in disagreement,

23   and as my -- my co-counsel in other cases pointed out, it's a

24   failure to bow down to police officers when there is a

25   disagreement.

1            The trump card is the arrest, and I might take you to

2   jail for the night and you may be -- you may be released the

3   next day, but at least I've disrupted your life for this day.

4   And I -- and I'm saying that the -- and I -- and I know this --

5   and I know you're speaking from your personal experience in

6   viewing the body camera footage.  I don't know if it's from

7   this vantage point of officer initiated, you know, interference

8   with public duties, resisting arrest type of incidents, but I

9   know that I personally have been a victim of that myself.

10           THE COURT:  In the underlying situation here, and

11  again, it's one thing if you're talking about officers going up

12  to people that are walking down the street and nothing else is

13  going on.  On the facts that are alleged here is everything

14  that was happening in this area, like if I look at the body cam

15  and what's going on here, is everything that was going on in

16  the gathering that had occurred there, am I going to see wholly

17  peaceable conduct across all persons in the community in that

18  area at the time?  Is that what I'm going to see if I look at

19  the body cam footage here?

20           MS. LEWIS:  Your Honor, I will -- if I could -- if I

21  could just couch this in this way?  I don't know what the

22  events would be leading up to what Officer Cannon saw in his --

23  his body cam footage, but as far as my client is concerned --

24  and you know, it's -- it should be evidently -- it should be

25  evident that --

1          THE COURT:  Well, but I get ultimately to qualified

2   immunity, and it's not just your client.  It's literally what

3   was going on with the officer.

4          MS. LEWIS:  Right.

5          THE COURT:  That's why there's qualified immunity.

6   What could that officer reasonably perceive was going on and

7   what needed to happen in that situation?  I haven't seen the

8   body cam footage, but if I do see the body cam footage, am I

9   going to see around your client everything is peaceable and

10  there's nothing of any concern that anyone is -- in the

11  community is doing in that congregation at the time?

12         MS. LEWIS:  Your Honor, yes.  To answer your

13  question, yes, as far as my client is concerned, and I think

14  that's what we've pled.  We didn't -- so, I know the defense

15  has tried to interject facts --

16         THE COURT:  I know that you've pleaded that your

17  client was peaceable and he was not participating in the

18  protests.

19         MS. LEWIS:  Right.

20         THE COURT:  I'm asking about the protests.

21         MS. LEWIS:  There was no protests and -- there was no

22  protest in the area where my client was stationed.

23         THE COURT:  What - -but he was filming something.

24  So, what was he filming?

25         MS. LEWIS:  Right.  So, the scenario is, is that he

1  was --

2          THE COURT:  And like, when you say the area, are you

3  saying, well, within five feet around him?  Because what if I

4  said, well, within 500 feet of him?

5          MS. LEWIS:  I --

6          THE COURT:  Then am I going to see no conduct that's

7  of any concern?

8          MS. LEWIS:  I don't -- I don't know.  I'm not --

9          THE COURT:  Have you seen the body cam footage?

10          MS. LEWIS:  I'm not -- I don't think I have, but I've

11  seen --

12          THE COURT:  How could you not have seen the body cam

13  footage and be pleading a cause of action in this court?

14          MS. LEWIS:  Well, Your Honor, as -- if you were on

15  the -- if you ever worked on the plaintiff's side of a civil

16  rights case, we don't get any information.  That information is

17  not disclosed to us through public records or through any other

18  means, but I did get a Facebook --

19          THE COURT:  But you're -- okay.  Has the body cam

20  footage been turned over?  I thought it was public.  I mean, I

21  haven't seen it, because it's like it's not attached to the

22  complaint.  I thought -- I thought it was available.

23          MR. BUTT:  I can't answer definitively on that

24  question, Your Honor, but I can certainly provide it.

25          THE COURT:  Okay.  Let -- so, then let me -- we've

1    been talking about footage.  Let me rephrase that.  I mean,

2    your client was there filming things.

3            MS. LEWIS:  Yes.

4            THE COURT:  You viewed that footage?

5            MS. LEWIS:  I was able to view --

6            THE COURT:  Okay.

7            MS. LEWIS:  -- the Facebook footage.  Yes.

8            THE COURT:  All right.  That's -- that's right,

9    because this was streaming live on Facebook.

10           MS. LEWIS:  Yes.

11           THE COURT:  Typically when someone stops to film

12   something and stream it live on Facebook, it's because

13   something concerning or interesting is going on.

14           MS. LEWIS:  Right.

15           THE COURT:  Okay.  What was he streaming?

16           MS. LEWIS:  He was streaming a crowd moving, which he

17   was not a part of, and -- he was not a part of the crowd.  He

18   wasn't near the crowd, filming from a distance, and as the

19   pleading states, he was -- he was -- he didn't even know what

20   was going on.  He has a -- he has a condition where he rides

21   his bike as therapy, and then his normal route was disrupted

22   that day by seeing this, you know, this crowd, and I -- and I'm

23   not going to -- I don't know if I pled it as a protest, but --

24   and I don't know the size of the crowd, but it wasn't that

25   large based -- I guess it was just a disruption from his normal

1    routine to see police activity around and so forth.

2           But at all times, my client was compliant as pled in

3    the complaint.  We -- we have objected to the facts that the

4    defendants have tried to interject at every turn when it -- as,

5    you know, in response saying that this was a protest, he was

6    resisting, and all these other facts that they're not allowed

7    to -- well, they -- they can try to interject but are not to be

8    considered because they are outside of the complaint.

9           And my client just was an innocent bystander here.

10   He was not -- he was not a threat to warrant the use of force

11   and he did not commit any crime.  He -- and so he -- but he --

12   although he was detained and brought to the jail -- and mind

13   you, there were never any charges brought against him.  There

14   wasn't even an incident report to -- to hold him.

15          THE COURT:  Okay.  All right.  Mr. Butt?

16          MR. BUTT:  Well --

17          THE COURT:  And we've actually sort of -- I was going

18   to go claim by claim, but we kind of got inadequate policies on

19   excessive force, pattern or practice of unlawful arrests,

20   pattern or practice of excessive force, failure to train or

21   supervise, ratification.  So, proceed on any or all of those as

22   you'd like.

23          MR. BUTT:  Sure.  Certainly, Your Honor.  In Document

24   39, the plaintiff's second amended complaint, much attention

25   was given to patterns of false arrest, 11 pages of -- on

1    Appendix A.

2           And in my motion on behalf of Harris County, I

3    attempted to address each one of those incidents listed in

4    Appendix A to show that indeed probable cause existed for

5    those.  So, we submit that the plaintiff has not alleged a

6    Monell claim based upon false arrest.

7           And insofar as Monell requires policy, practice, or

8    custom, it appears that plaintiff is relying on this particular

9    incident for excessive force and that is in and of itself

10   insufficient --

11          THE COURT:  So, on -- on the Appendix A which is --

12   it's Pages -- Pages 22 to 33 of Docket 39 --

13          MR. BUTT:  Yes, Your Honor.

14          THE COURT:  -- and there's 15 or so per page, which

15   are titled Cases of Arrest by Harris County Sheriff Dismissed

16   For Lack of Probable Cause, and you're articulating that --

17          MR. BUTT:  In docket --

18          THE COURT:  Well, you can go through those and show

19   that there was probable cause?

20          MR. BUTT:  Yes.  In Document 42-1, I do go through

21   every one of them.

22          THE COURT:  Right.  And that's the thing.  Can I do

23   that on motion to dismiss?

24          MR. BUTT:  It's -- if it's referenced in the motion,

25   it opens the door --

```
 1              THE COURT:  To then --

 2              MR. BUTT:  -- for the other side to show it.

 3              THE COURT:  But -- yes.

 4              MR. BUTT:  And since it's referenced in the motion,

 5    we submit that the Court's consideration is appropriate.

 6              THE COURT:  But these are all, you know -- and you

 7    have attached at 42-1 the very first -- I assume it's, yeah,

 8    they'll probably track an order to Exhibit A to Docket 39, but

 9    it's a form that's been completed as to the April Nicole

10    Leonard matter, and it's titled Probable Cause For Further

11    Detention, Statutory Warnings by Magistrate, and that's a

12    finding that was made.

13              And then the same form as to Jose Melgar followed by

14    his plea of guilty, I guess, and then the next one for Russell

15    Juan Morailles, but that jumps over Dominique Lewis, et cetera,

16    et cetera.

17              And I'm -- I don't know what factually plaintiff

18    would say about each of those in retort or if there's anything

19    that can be said.  It feels like summary judgment to me.  It

20    feels like a very -- it feels like a very good summary judgment

21    to me.  I -- I just -- jumping all the way to that on motion to

22    dismiss is a little tough.

23              MR. BUTT:  Yes, Your Honor.

24              THE COURT:  Any -- I mean, I see where you're going

25    with it.  I'm just sort of like how fast do we get there, if
```

1    that's going to be -- if there's not an explanation for what I

2    ultimately might be taking judicial notice of as to proceedings

3    in Harris County.  What do you think about that?  Well, let me

4    -- let me have you pause and think about that.

5              Ms. Lewis, when you have something facing you like

6    the attachments that are at docket 42-1, you become constrained

7    by Rule 11 as to what you are able to continue arguing about

8    what you've previously put in front of me as to probable cause.

9    You gave me a long list of no probable cause arrests followed

10   by -- Mr. Butt, did you attempt to refute every single one of

11   them or just the ones that you could?

12             MR. BUTT:  Every one, Your Honor, every one.

13             THE COURT:  Right.  And so, there may be challenges

14   as to some, but with what you see in Docket 42-1, does that

15   constrain you in any way as to what you pleaded as to your

16   Exhibit A?

17             MS. LEWIS:  It doesn't, Your Honor.

18             THE COURT:  Why not?

19             MS. LEWIS:  The reason why is because those cases

20   that they cited was to the wrong document.  It was -- that

21   exhibit -- that was for the -- that was from the original

22   complaint that the defendant -- that the -- excuse me, that --

23   obviously you know the history of the case.  That was dismissed

24   and refiled.  That is the response to that.

25             And what I noticed was I actually attached -- I have

1    different cases in different courts where that is applicable,

2    that table was applicable to, and that was during a period of

3    time, I believe it's a lot of 2016 arrests, and this was after

4    --

5         THE COURT:  All right.

6         MS. LEWIS:  -- Sheriff Gonzalez came into office,

7    which was in 2017.  So, that -- they actually responded to the

8    -- the original, which I was able to correct, but they -- the

9    original Appendix A, which is not --

10        THE COURT:  I just -- okay.  There might be some

11   explanation.  I'm simply pairing the fact that you have a chart

12   saying cases of arrest by Harris County sheriff dismissed for

13   lack of probable cause, which has been responded to with a raft

14   of documents showing -- titled Probable Cause for Further

15   Detention and Statutory Warnings by Magistrate.

16        And so, you're saying these -- these things just are

17   ships passing in the night and your statement as to -- it's one

18   thing to say these are all lack of probable cause, and you

19   could believe that at the time.  There's now a raft of court

20   documents that appear to say there was probable cause, and so

21   you can continue to maintain there was no probable cause, but

22   if that opens your eyes as to I may not have stated correctly

23   as to this big list of cases, you need to be careful about what

24   you continue to argue after that.

25        MS. LEWIS:  Yes.  And Your Honor, as I was stating,

1   the actual response given by the defendant was not in response

2   to the live complaint.

3           THE COURT:  All right.  All right.  So, with that --

4   okay.  All right.  I'm going to have to address that on summary

5   judgment.  (Indiscernible) what was the United Airlines case?

6   United Airlines v. Thomas or Thomas v. United Airlines?  No, we

7   don't need the cite.  I have a recent decision.  It's not --

8   it's not in a municipal liability context.  It is as to

9   underlying complaints that a plaintiff's attorney originally

10  thought were true, but which proved not to be true, but which

11  counsel continued to maintain as true.

12          And I have follow-on proceedings going on under Rule

13  11 there, and I'm not saying you have to withdraw this.  I'm

14  just saying it's fine on the information and belief that you

15  have at a time to plead something about what the state of the

16  facts is, but when you are -- that's the thing.  As lawyers,

17  we're educating ourselves about the facts.  If the facts about

18  what you've pleaded are educating you that -- again, we're

19  talking about court documents here.  If it changes what you've

20  previously pleaded, I urge you to not continue to -- to plead

21  it and argue it the same way.

22          MS. LEWIS:  Yes, Your Honor.

23          THE COURT:  And so look at that case because there

24  are follow-on proceedings going there as to what consequences

25  may fall under Rule 11 and whether -- it's a very different

1    case there, whether the client in that case may potentially be

2    referred to the U.S. attorney for making false statements.

3            That was about things pertinent to her personal

4    knowledge.  That's very different than your client here who he

5    just got arrested on the street.  He didn't know anything about

6    all these other cases.  So, I'm not saying he's saying anything

7    wrong about all that.  I bring it to your attention just that I

8    take it very seriously.

9            MS. LEWIS:  I appreciate that, Your Honor.

10           THE COURT:  Okay?  And I know Mr. -- I have Mr. --

11   I've had you in front of me before as well.  I think --

12           MS. LEWIS:  It's been a long time, but yes.

13           THE COURT:  Yeah, but not just on this case, but Mr.

14   Butt does, you know -- he gathers and he -- here's the

15   information we've got, right?  And it's -- we're trying to

16   adjust, you know, what's really going on in the background here

17   as to what claims might be able to proceed.

18           MS. LEWIS:  Yes.

19           THE COURT:  So, Mr. Butt, I don't know what to say

20   beyond that other than that I think I'm going to take it up

21   again on summary judgment.

22           MR. BUTT:  Certainly, Your Honor.

23           THE COURT:  Okay.  How much discovery -- what needs

24   to be done to get to -- a lot of this is -- what discovery will

25   need to be done from your view before we can get to summary

1    judgment?

2            MR. BUTT:  One --

3            THE COURT:  Ms. Lewis may well have a very different

4    view about what discovery is needed.

5            MR. BUTT:  Sure.  I would want to take the deposition

6    of Mr. Alaniz.

7            THE COURT:  Of course.

8            MR. BUTT:  Find out what his medical claims are and

9    get the documentation of his alleged injuries, and further

10    flesh out from the plaintiff what the Monell I guess evidence

11    or appendix really is so I know I'm tracking on where the claim

12    is.

13            THE COURT:  Well, that goes to the ADA claim.

14            MR. BUTT:  Well, the ADA I think under

15    (indiscernible) --

16            THE COURT:  At least the part that you were saying at

17    the end.  I was more like on the Monell --

18            MR. BUTT:  Oh, okay.  On the Monell, I would say if

19    she is going to rely on a chart of an appendix then to give me

20    her best chart or appendix to show a policy practice.

21            THE COURT:  Yeah.  And Ms. Lewis, what do you think

22    you're going to need?

23            MS. LEWIS:  Your Honor, I would like depositions as

24    well of -- of the defendants as well as standard discovery, my

25    production, and I -- the incident reports primarily of these

```
 1   arrests that -- that I discovered, and I'll give them a list,

 2   I'll give him a list, or --

 3           THE COURT:  I will say one concern I have is on a lot

 4   of the things that -- that you claim are inadequate here,

 5   connecting them as being the moving force behind the punitive

 6   constitutional violation, I guess I would just say pay

 7   attention to that, because I'm not sure that I -- I see it.

 8           MS. LEWIS:  Yes, Your Honor.

 9           THE COURT:  And you know, honestly -- and Mr. Butt,

10   as I said before, you'll be turning over -- if officer --

11   Deputy Cannon had body cam footage, that'll be turned over.

12   But then on summary judgment, I'll be reviewing that.  And have

13   you turned over your client's video to Mr. Butt?

14           MS. LEWIS:  I'm not sure if I turned over the actual

15   video, but maybe the link.  I --

16           THE COURT:  But it's there on Facebook?

17           MS. LEWIS:  Yes, I -- I'm not certain but I can.  I

18   will as well.

19           THE COURT:  I look at it just less technically than

20   that.  The video that's available of the incident from your

21   client's standpoint and whether that's only preserved on the

22   Facebook link or whether there's -- he's got more footage,

23   whatever that footage is needs to be turned over as well.

24           MS. LEWIS:  I can reduce it to a file and -- and just

25   Dropbox it over to them.  I don't think that'll be a problem.
```

```
 1            THE COURT:  Because I'll take -- if you've looked at
 2   my other municipal liability and qualified immunity cases, I
 3   and my law clerks, we -- we sit and watch all the video.
 4            MS. LEWIS:  Nice.
 5            THE COURT:  Yeah.  So, all right.  All right.  Let's
 6   go on to the ADA claim.  So, what proof, what allegation, do we
 7   have as to proof that Harris County -- and I guess that would
 8   be as to knowledge that it derived at the time through Deputy
 9   Cannon had of your client's disability and its limitations?
10   And can you please describe for the record his disability?
11            MS. LEWIS:  Yes, Your Honor.  The disability that my
12   -- my client has is he has a -- a brain tumor.
13            THE COURT:  Okay.
14            MS. LEWIS:  A -- it's a --
15            THE COURT:  Makes him prone to seizures?
16            MS. LEWIS:  Yes, it does.  It's non-cancerous.  And
17   so, it cause --
18            THE COURT:  But it's not something visible?
19            MS. LEWIS:  It's not visible.  It isn't, but it does
20   cause a -- a delay in his responses.
21            THE COURT:  Okay.
22            MS. LEWIS:  It causes, you know, his cognitive
23   ability to be just delayed and slowed down.  And so, it's our
24   position that Mr. Cannon was not -- or Officer Cannon was not
25   trained properly to adequately identify a person with a need
```

1    for an accommodation like Mr. Alaniz, to allow him an

2    opportunity --

3              THE COURT:  Okay.  That would go -- but -- okay, so I

4    hear that as to the Monell claim.

5              MS. LEWIS:  Right.  Yeah, I guess, it does --

6              THE COURT:  But you have a claim.  So, there's that.

7              MS. LEWIS:  Yeah.

8              THE COURT:  But you have the -- you have a direct

9    claim under the ADA, right?

10             MS. LEWIS:  Yes.  And that's the failure to

11   accommodate.

12             THE COURT:  And what is there as to -- like, as

13   opposed to, hey, you don't have a good enough policy to

14   identify potential ADA problems?  That's almost conceding that

15   the ADA itself wasn't violated here.  It's that you needed to

16   have policies to allow officers to better identify with someone

17   who might have a hidden limitation?

18             MS. LEWIS:  Yes.

19             THE COURT:  Isn't that --

20             MS. LEWIS:  I can see -- yeah, I can see where you

21   would -- where it would be perceived that it was kind of a

22   concession, but I will say this.  No matter whether there's a

23   failure to train -- and you're right, I was conflating the two.

24             THE COURT:  Yeah, yeah.

25             MS. LEWIS:  But no -- but no matter, where there's a

1    failure to train, they -- since the county was -- was --

2    interacted with Mr. Alaniz, they did have a -- a requirement, a

3    duty, to accommodate him for his disability.  And the reason

4    why they didn't is not really relevant.  But the fact of the

5    matter is that they didn't --

6              THE COURT:  Well, but it's --

7              MS. LEWIS:  He as not accommodated.

8              THE COURT:  -- it's relevant if the public entity or

9    the person dealing with the one with the disability doesn't

10   know that there's a disability.  That's I think where it

11   becomes relevant.

12             MS. LEWIS:  I understand.

13             THE COURT:  Isn't that correct?

14             MS. LEWIS:  Yeah, I understand that and -- and I

15   guess that -- it -- I don't think that that's an excuse.  It's

16   under the ADA, if a person is trying to explain their

17   disability and they're not able to.

18             THE COURT:  Right.  And that was what happened here.

19   And so, he never -- and he didn't articulate here's what my

20   disability is.  You're saying he didn't have a chance to.

21             MS. LEWIS:  It was cut short.  Yes.

22             THE COURT:  Okay.  Mr. Butt?

23             MR. BUTT:  Well, Your Honor, it appears that this

24   would be something like an occult condition that would not be

25   obvious, and we rely upon Hainze v. Richards which addresses

```
 1    under 5th Circuit Authority the ADA issue on on-the-street

 2    responses to reported disturbances and states that it really is

 3    not covered by ADA in the 5th Circuit.

 4              THE COURT:  Mm-hmm.

 5              MR. BUTT:  So, I think the plaintiff is stretching

 6    and shoe horning this issue into his complaint, and it doesn't

 7    fit.

 8              THE COURT:  Yeah, and that if it fits anywhere, it

 9    fits in a category of policies that you're complaining about

10    under Monell.

11              MS. LEWIS:  Well, Your Honor, I would like to just

12    make --

13              THE COURT:  Sure.

14              MS. LEWIS:  -- make a distinction with the 5th

15    Circuit case.  So, it's true, the 5th Circuit does say that an

16    officer does have -- on the street does not have to necessarily

17    comply with ADA if they're securing the scene, and I think

18    that's the difference here.  We never pled that this officer

19    was securing any scene.  And you -- before you can assess

20    whether a person has an accommodation need, that is where the -

21    - the officer or the entity is -- is absolved from -- from

22    accommodating an individual that has a disability.

23              But that is the -- that is the only reason why an

24    accommodation is not required on the street, is because the

25    officer has to assess safety and --
```

```
 1              THE COURT:  But leading into -- Paragraph 16 is
 2    Deputy Cannon advises your client to leave the sidewalk.  And
 3    after that, Mr. Alaniz tries to explain, et cetera, but leading
 4    up to that, Paragraph 12 -- so, before that, he -- your
 5    client's riding his bike.  Paragraph 12, he reaches the area
 6    where he's going to begin filming.  He sees -- came upon a
 7    group of unknown individuals who were gathering and a group of
 8    officers.  He stopped to assess the situation and was asked by
 9    a different officer to move along.
10              He tried to keep his distance from everybody and
11    remain safe as he filmed the historical event unfolding in
12    Houston live on Facebook, and unbeknownst to him, the
13    protesters and officers were gathered in the area as a result
14    of the news and cell phone footage released of the killing of
15    Houston native George Floyd that had just been released.  And
16    he's saying he was unaware of the protests and had no
17    intentions of participating, et cetera.
18              I mean, I hear in this, his pleading, that the
19    officers are there securing the scene, making sure that it
20    remains safe and doesn't become a difficult situation that had
21    been seen arising in lots of different places with the release
22    of that footage, right?
23              MS. LEWIS:  Well --
24              THE COURT:  And --
25              MS. LEWIS:  -- I think the body cam would probably be
```

1    the best source to -- to realize the distance.  I -- I tried to

2    plead the fact that he was away from everyone and Officer

3    Cannon actually went over to him, but obviously you're --

4    that's not what you're taking from my facts that I've pled

5    here, and I think the body cam would give us the best

6    assessment of the actual distance my client was away -- away

7    from -- from the officer, and if that was a part of securing

8    the scene.

9            THE COURT:  What is your client going to -- what is

10   your client going to testify that he was unaware of at the

11   time?

12           MS. LEWIS:  He had no idea about George Floyd passing

13   away or any of that -- those events.

14           THE COURT:  Like literally --

15           MS. LEWIS:  I didn't even know.  Yeah, I -- yes, I

16   mean, I do this work and I didn't even know when it -- yeah,

17   when it happened.

18           THE COURT:  Okay.  All right.  This is all on May

19   29th.

20           MS. LEWIS:  Well, maybe I knew by then, but yeah, I -

21   -

22           THE COURT:  What's that?

23           MS. LEWIS:  I said maybe I did know by May 29th.

24           THE COURT:  I was just going to --

25           MS. LEWIS:  I think he died three days -- I think he

1    died like maybe on the 25th or 26th, something like that.

2              THE COURT:  That's what I thought.  May 25th.  So,

3    this is four days later.

4              MS. LEWIS:  Yes.

5              THE COURT:  Although I'm not clearly remembering how

6    quickly things were being publicized, et cetera.  All right.

7              As to the ADA claim, I've already articulated that I

8    hear the policy failure that you're articulating that -- that I

9    would think would fold in as an aspect of your Monell claim,

10   but as to an -- a standalone ADA claim, given the Hainze case,

11   Hainze v. Richards, 207 F.3d 795, 5th Circuit in 2000, what's

12   articulated there vis-à-vis what you've pleaded, which was it

13   is articulating a scene which officers are there in response to

14   secure or make -- make sure that an area stays safe, and that

15   Mr. Alaniz was not able to and did not articulate a disability

16   to them at the time, the ADA claim can't go forward.

17             But Ms. Lewis, the fact that he was unable to

18   articulate his condition remains something that -- that might

19   be a policy concern under the Monell claim that will be

20   proceeding from here, okay?  Does that make sense?

21             MS. LEWIS:  It does, Your Honor.  Thank you.

22             THE COURT:  All right.  All right.  And so, that

23   claim will be dismissed with prejudice.  You've re-pleaded, and

24   my conclusion is the facts as pleaded aren't adding up to a

25   claim.

1          There were claims under Section 1981, 82, and 85, but

2     which aren't really defended in response on the motion to

3     dismiss.  Are those -- there's a motion to dismiss as to those.

4     Are those going -- I don't think --

5          MS. LEWIS:  They're not.  Yes, we're --

6          THE COURT:  Okay.  So, those are withdrawn.  All

7     right; is that correct?

8          MS. LEWIS:  Yes, it is correct, Your Honor.

9          THE COURT:  To the extent that those sections were

10    mentioned, any claim as to them is withdrawn; is that correct?

11         MS. LEWIS:  That is correct, Your Honor.

12         THE COURT:  All right.  So, Sections 1981, 82, and 85

13    are withdrawn.

14         Mr. Butt, as to the supervisor liability and the

15    failure to train or supervise, given that with what's going

16    forward on the Monell claim, is there a reason why I would

17    proceed differently on Sheriff Gonzalez as opposed to taking

18    that up again on a later motion?  There are -- I understand

19    that they're conceptually distinct, but tell me why the sheriff

20    -- why I would be inclined to let the sheriff out when there's

21    going to be policy inquiry going on prior to resolution as to

22    Harris County itself?

23         MR. BUTT:  Well, in his individual capacity, we

24    submit that there's no nexus where he participated in any

25    deprivation of any civil rights in this case.  So, because he

```
 1    as an individual, a human, is being sued in that capacity, we
 2    submit the nexus of personal participation is missing.  So, he
 3    wasn't there, and he certainly is far removed in terms of the
 4    structure of command from a deputy in the field so that a
 5    training claim or a supervision claim would not reach him, Your
 6    Honor.
 7              THE COURT:  But the -- at least as to failure -- I
 8    hear your argument as to supervisory liability, but as to
 9    failure to train or supervise, I mean, a supervisor can be
10    liable for that, correct?
11              MR. BUTT:  Yes, Your Honor.  I think the case law
12    says that liability is at its most tenuous on a training claim
13    --
14              THE COURT:  Right.  It is.  Mm-hmm.
15              MR. BUTT:  And this would be tenuous, quite tenuous.
16    Because the claim is somewhat ill defined, and in general I
17    submit that it doesn't reach him because it has to be specific
18    to show that he has personal involvement, and Harris County
19    would suffice in terms of a defendant in -- in terms of a
20    Monell claim, but the suing of an individual for Monell, unless
21    there is a --
22              THE COURT:  Let me ask Ms. Lewis about that.  Ms.
23    Lewis, I mean, as to that point, do you need -- there's a lot
24    of concern about policies that Gonzalez may have been involved
25    in or aware of, but I'm letting you go forward.  As to that,
```

1    there'll be discovery on that vis-à-vis Harris County.  Harris

2    County obviously can stand behind any potential judgment better

3    than the sheriff could.  Is there a need to go forward against

4    the sheriff given where we are at this point?

5              MS. LEWIS:  Your Honor, I balance that a lot.

6              THE COURT:  Say again?

7              MS. LEWIS:  I balance that a lot.

8              THE COURT:  Okay.

9              MS. LEWIS:  I do, and just for practical purposes,

10    not for -- not -- because I do -- I do believe that we've pled

11    enough to show his personal involvement.  Case law is pretty

12    clear that when, you know, just the failure to train and the

13    lack of policies, or policies that are in place from the policy

14    maker, which obviously we had to plea, is sufficient to show

15    that there is a -- there is personal involvement, and when I

16    say I balance that a lot, I -- I've been -- I've been to the

17    5th Circuit enough, and if I can avoid it, that would be great

18    and we can get the case moving along.

19              So, I do balance that, and so I've taken the position

20    of continuing with a lot of my cases by pleading in the

21    official capacity as well as the individual capacity, and I

22    have been known to dismiss the individual capacity claims for

23    the reasons that you set forth, that Harris County or whatever

24    entity that I ultimately end up moving forward with -- and

25    that's likely what I'll -- I will do here.

1    But if we're going to go -- if they're appealing the

2    -- and I'm not so quick to do that, I should say.  I'm going to

3    pull that back.  If we're going to be heading to the 5th

4    Circuit based on a Monell claim -- excuse me, a qualified

5    immunity with Cannon, then, you know, we're going to be there

6    anyway.

7    So, if they -- if they end up appealing the denial of

8    qualified immunity as to Cannon, then we'll ultimately be in

9    the 5th Circuit anyway, and I might as well fight it all, but

10    if they don't intend on appealing, and if we're still going to

11    be stalled in this -- in the trial in the district court with -

12    - with -- I think you understand what I'm saying, but if we're

13    going to be stalled here in the -- in the -- the district court

14    because we're waiting for Cannon's appeal, then it's useless

15    for me to go ahead and dismiss the sheriff now.  But if -- if

16    that's not going to happen, if I don't have to deal with an

17    interlocutory appeal, I will do -- I will make whatever efforts

18    I can to not deal with that and move this case forward, which -

19    - which would include dismissing the sheriff in his individual

20    capacity.  So, essentially the ball is in their court.

21    THE COURT:  But that's something that you're saying

22    that you would consider later but not now?

23    MS. LEWIS:  Your Honor, yes.  It would be what I

24    would consider based --

25    THE COURT:  If you're -- you've sued the sheriff in

1      his official capacity and in his individual capacity?

2               MS. LEWIS:  I did.

3               THE COURT:  All right, the official -- and I think

4      we're talking about in his individual capacity here.

5               MS. LEWIS:  Absolutely.  Yes.  And so, for figure

6      purposes, he's still in the case as an --

7               THE COURT:  In his official capacity?

8               MS. LEWIS:  -- in his official capacity.

9               THE COURT:  But, and so then as to his individual

10     capacity?

11              MS. LEWIS:  And as to his individual capacity,

12     there's -- we've pled facts to support his personal

13     involvement, and as I stated, if there is an interlocutory

14     appeal at all --

15              THE COURT:  Okay.

16              MS. LEWIS:  -- then I -- if it's just for the

17     sheriff, I will just -- I will more likely than not dismiss the

18     sheriff's individual capacity claim.

19              THE COURT:  Let me ask Mr. Butt.  Is it -- is it

20     improper -- do you have a problem -- given with what's going

21     forward against Harris County, I -- and I could be wrong, I

22     would think that you don't have a problem with an official

23     capacity claim against Sheriff Gonzalez, because it's the same

24     thing.

25              MR. BUTT:  Absolutely.  It's fine.  But I --

1          THE COURT:  But then the individual capacity -- now,

2    articulate for me why you think the individual capacity ought

3    to be dismissed.

4          MR. BUTT:  Well, Monell liability is not vicarious

5    liability.

6          THE COURT:  Oh, no, I get that.  So, I'm saying, so

7    tell me why what Ms. Lewis has pleaded is not enough to go

8    beyond Monell liability but to tag him for individual

9    liability.

10          MR. BUTT:  She has not attached any of his activities

11    or anything that he did in terms of what happened on May the

12    29th, and the individual's actions are at -- at issue here.

13    She has not shown his personal involvement at the scene of this

14    protest or any involvement he had so that she would have to

15    show he affirmatively participated in acts which caused a

16    constitutional deprivation or implemented an unconstitutional

17    policy that causally resulted in the plaintiff's injuries, and

18    she hasn't shown that.

19          Now, she might be fishing for it, but it's not there

20    in her pleadings.  So, I submit she appears to be gaming,

21    whether or not there might be appeals, that there be no appeal

22    for the county.  It cannot appeal interlocutorily because it's

23    there.

24          THE COURT:  Mm-hmm.

25          MR. BUTT:  But for an individual to be sued, there

1    must be something that the individual did, and she has failed

2    to establish that in her pleadings.  So, I submit that she's

3    failed and has no grounds to sue the sheriff individually, and

4    he asserts his right to qualified immunity, and she has not

5    overcome it.

6         THE COURT:  All right.  As to Sheriff Gonzalez, the -

7    - and again, to be clear, we're talk -- Mr. Butt was talking

8    about -- I'm going to -- there's going to be a dismissal as to

9    Sheriff Gonzalez, but just as to the individual capacity

10    claims, but he stays as a -- an official in his official

11    capacity.

12         MR. BUTT:  Yes, Your Honor.

13         THE COURT:  All right, so.

14         MS. LEWIS:  And is -- so, the -- I'm sorry, I -- you

15    mean dismissal -- a voluntary dismissal by the plaintiff or --

16         THE COURT:  No, no, no, I'm --

17         MS. LEWIS:  -- the Court?

18         THE COURT:  -- I'm doing -- I'm taking kind of --

19    you'll have it for appeal.  That's what I'm trying to

20    articulate now.

21         MS. LEWIS:  I see.  Okay.

22         THE COURT:  If you want to -- Sheriff Gonzalez,

23    you've pleaded him in his official capacity and his individual

24    capacity, correct?

25         MS. LEWIS:  Correct.

```
 1          THE COURT:  Okay.  He stays in.  He's a defendant, he
 2   stays in, in his official capacity.  To the extent that you've
 3   attempted to plead him in his individual capacity, I'm
 4   dismissing that.  I don't see any allegations of his personal
 5   participation in any of the underlying events, and I don't see
 6   any particular policy pleaded that he implemented or that is
 7   the moving force for the claims that you're bringing.  There's
 8   some things that are alleged as to after the fact for failure
 9   to discipline, et cetera, but that's not anything that could
10   have caused the conduct.  That's just limited to what happened
11   to Deputy Cannon after the fact in this incident.
12          So, those are dismissed.  If there's -- it'll be
13   without prejudice, but you would need to seek leave to re-plead
14   -- to assert something in his individual capacity within 30
15   days or the dismissal will be with prejudice.
16          MS. LEWIS:  Yes, Your Honor.
17          THE COURT:  Okay?
18          MS. LEWIS:  Should I supplement with that so there's
19   not -- it doesn't get as sticky as before and -- and everybody
20   -- and all the other defendants would have to respond to an
21   amended complaint?
22          THE COURT:  Yes.  I guess any further allegations
23   that you want to make, if you wanted to plead something as to
24   Sheriff Gonzalez, do it in the appropriate spot in your current
25   complaint, and if it, for instance, would follow Paragraph 32,
```

1    do it is 32-A.  Whatever you need, do it as identified other

2    paragraphs.

3                MS. LEWIS:  Yes.

4                THE COURT:  So that you're not -- not needing to

5    change everything else.  I don't want motions again on

6    everything else.  If you -- and again, if you want to try to

7    replead him in his individual capacity, which --

8                MS. LEWIS:  I may not.  I believe that I have pleaded

9    him to -- you know, to a pretty good extent, but I may -- it's

10   fine I think.

11               THE COURT:  And that's the thing.  If you want to try

12   to replead that in his individual capacity, do it so that

13   you're just supplementing allegations as to him.  If not, my

14   dismissal without prejudice will be one with prejudice, and

15   then you'll have that issue on appeal for whenever you might --

16               MS. LEWIS:  That sounds --

17               THE COURT:  -- have an appeal.  It wouldn't be

18   immediately, though.

19               MS. LEWIS:  I understand.  Yes, I understand.  Thank

20   you.

21               THE COURT:  Okay.  All right.  All right.  As to

22   Deputy Cannon, Mr. Butt, I'm more inclined on these -- as

23   pleaded right now, I'm more inclined to say that

24   (indiscernible) there's enough to get by qualified immunity,

25   but given what you articulated and so it would be more for

1   questions on your side of the bench or side of the bar, and

2   given what you said about representations, do I need to have

3   your co-counsel here to address that?

4           MR. BUTT:  I don't think so, Your Honor.  I agree

5   that on the issue of force, it typically is a question of fact,

6   and without looking at any of the visual evidence, it's

7   difficult to rule on qualified immunity from just the pleading.

8           THE COURT:  Well, so then as to all of this -- well,

9   okay, so let me articulate it like this.  Based on the

10  conversations we've been having, and I do want to see the

11  footage and I want to see the body cam footage and I want to

12  have other thoughts about that, I've articulated that we'll be

13  going forward.  There will be discovery on those aspects, and

14  I'll be revisiting a lot of this on summary judgment.

15          But on qualified immunity, Deputy Cannon, my

16  understanding is he'd have the ability to appeal immediately if

17  he wanted to.  And so, if that's the inclination, I need to get

18  to a ruling that would deny qualified immunity at this instance

19  that could be appealable if that was the inclination.

20          Otherwise, what I'm saying is we're not really -- and

21  I could do that.  But if your -- your client has a right to

22  appeal qualified immunity, right, if I -- if I say no, we're

23  going forward.  If you're saying (indiscernible) to allow it to

24  proceed so that I address this on summary judgment, that makes

25  it easy for me, but I'm not saying that you have to do that.

1  Do you see what I'm saying?

2          MR. BUTT:  Your Honor, I would defer --

3          THE COURT:  I want to know what ruling we need to so

4  that appeal rights, if necessary, are properly preserved.

5          MR. BUTT:  I would certainly want to confer with Ms.

6  Bradley on her plans for Deputy Cannon and not address the

7  issue of his future and so far on qualified immunity.

8          THE COURT:  Exactly.  Exactly.  So, all right, let me

9  hold on argument as to that then.  You will -- Mr. Butt, you'll

10  confer -- is it Ms. -- who represents --

11          MR. BUTT:  Suzanne Bradley.

12          THE COURT:  You will confer with Ms. Bradley about

13  where we are on status and that.  I'm going to have ultimately

14  the body cam footage in front of me.  I'm going to be

15  addressing a lot of this on summary judgment, et cetera, that I

16  was inclined at this point -- if I went through to ruling based

17  on what I've read to this point, I was inclined to deny

18  qualified immunity.

19          If Ms. Bradley, on behalf of her client, would

20  otherwise want to appeal that, I'm happy to have further

21  argument and reduce that into an order that's more appropriate

22  for appeal.  I don't want to be taking action here that's like

23  we're going to go forward under this understanding and then I

24  get appealed.  I -- I want to have further argument and make a

25  different -- probably reach the same decision but a more

1    articulated decision.

2              MR. BUTT:  Certainly.

3              THE COURT:  But if everybody's fine for me to look at

4    it on summary judgment, we'll -- we'll proceed that way.  Okay?

5              MR. BUTT:  Yes, Your Honor.

6              THE COURT:  So, within a week you can let us know?

7              MR. BUTT:  Yes.

8              THE COURT:  And I'll get you all back in front of me

9    very quickly if you want to have further argument or if she

10   wants to have argument.

11             MR. BUTT:  In terms of advising the Court, then would

12   it be a pleading that we submit that --

13             THE COURT:  It could just be a status report.

14             MR. BUTT:  Status report.

15             THE COURT:  Status report.  You'll have my minute

16   entry.

17        (Hearing adjourned at 11:36 p.m.)

18                           *  *  *  *  *

19

20

21

22

23

24

25

1                          I N D E X

2

3                          RULINGS

4                                              Page        Line

5   ADA Claim Dismissed                        29          23

6   Sheriff Gonzalez Dismissed Individually    36           8

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T I O N

 2

 3        I, Sonya Ledanski Hyde, certified that the foregoing

 4   transcript is a true and accurate record of the proceedings.

 5

 6

 7

 8   Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  May 24, 2023
```