1            IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF TEXAS

3                   HOUSTON DIVISION

4    ALANIZ                    §    CASE NO. 4:22-cv-1991
                               §    HOUSTON, TX
5    VERSUS                    §    TUESDAY,
                               §    JUNE 6, 2023
6    HARRIS COUNTY, TX, et al.  §   2:48 PM TO 4:14 PM

7                   <u>MOTION HEARING</u>

8         BEFORE THE HONORABLE CHARLES ESKRIDGE
              UNITED STATES MAGISTRATE JUDGE

9                   <u>APPEARANCES:</u>

10

11      FOR THE PARTIES:        SEE NEXT PAGE

12      COURT REPORTER:         AKEITA MICHAEL

13      COURT CLERK:            JENNELLE GONZALEZ

14

15

16

17

18

19

20             TRANSCRIPTION SERVICE BY:

21            Veritext Legal Solutions
            330 Old Country Road, Suite 300
22               Mineola, NY 11501
          Tel: 800-727-6396 ▼ www.veritext.com
23

     Proceedings recorded by electronic sound recording; transcript
24            produced by transcription service.

25

1                          APPEARANCES:

2

3    FOR THE PLAINTIFF:              THE LEWIS LAW GROUP
                                     U.A. Lewis
4                                    P.O. Box 27353
                                     Houston, TX 77227
5                                    713.570.6555

6
     FOR THE DEFENDANTS:             HARRIS COUNTY ATTORNEY'S OFFICE
7                                    James Butt
                                     Suzanne Bradley
8                                    1019 Congress
                                     15th Floor
9                                    Houston, TX 77002
                                     713.274.5330
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          HOUSTON, TEXAS; TUESDAY, JUNE 6, 2023; 2:48 PM

2          THE COURT:  All right.  I call 22-1991, Joe Anthony

3     Alaniz v. Harris County, et al.  Can I get appearance of the

4     one counsel who is here?

5          MR. BUTT:  Yes, Your Honor.  Good afternoon.  This is

6     Jim Butt on behalf of Sheriff Gonzalez and Harris County.

7          THE COURT:  Okay.  And the purpose of today's hearing

8     doesn't even really address your clients anymore, does it, sir?

9          MR. BUTT:  I am relieved of arguing responsibility.

10          THE COURT:  All right.  Ms. Bradley is with your

11     office though?

12          MR. BUTT:  Yes, Your Honor.  And --

13          THE COURT:  And she was not here last today.

14          MR. BUTT:  Well, today I offered her a ride.  We

15     could get a ride, and it's a little warm outside.  And so an

16     hour or so ago I saw her coming back from lunch, and we were

17     outside, and it is hot.  No, I'll walk, and I'll bring some law

18     school interns with me to watch the hearing.

19          THE COURT:  Okay.

20          MR. BUTT:  So the understanding I had from that

21     conversation was that she was walking here with a group of

22     interns.

23          THE COURT:  Okay.

24          MR. BUTT:  Here is Ms. Lewis.

25          THE COURT:  Okay.  And Ms. Lewis is now here.

1          MS. LEWIS:  Good afternoon.

2          THE COURT:  Good afternoon.

3          MS. LEWIS:  Are you guys waiting on me?

4          THE COURT:  Well, it is 20 minutes after the start

5    time I do believe unless I'm mistaking.

6          MS. LEWIS:  I thought it was 3:00.

7          THE COURT:  You had accounted for 3?  Okay.

8          MS. LEWIS:  Yes.

9          THE COURT:  Well, let me see if -- I may be wrong.

10   No, I have it for 2:30.

11         MS. LEWIS:  Yeah, she's --

12         THE COURT:  Well, you're saved by the fact that

13   counsel for Deputy Cannon is also not here.

14         MS. LEWIS:  Okay.  And --

15         THE COURT:  All right.  So your understanding,

16   though, is that Ms. Bradley's going to be here?

17         MR. BUTT:  Yes, Your Honor, and she was prepared to

18   argue the position on behalf of Deputy Cannon.

19         THE COURT:  I know.  And on contention and her status

20   report, but if I rule against her, she's going to take me on

21   appeal, which makes it difficult for me because I'm otherwise

22   inclined to rule against her for not showing up for the

23   hearing.  But I don't know what that would mean as to a

24   qualified immunity assertion on appeal.  I'm going to give it

25   10 minutes.  I'll be back in at 3:00 in accord with your

1   calendar, Ms. Lewis.

2           MS. LEWIS:  I appreciate that, Your Honor.

3           THE COURT:  All right?  All right.  So we'll convene

4   at 3:00 unless -- and why don't you see if you can get ahold of

5   Ms. Bradley --

6           MR. BUTT:  I will.

7           THE COURT:  -- and make sure she'll be here by then.

8   Because it'll be then or whatever later time she is here, all

9   right?

10          MR. BUTT:  Yes, Your Honor.

11          THE COURT:  Thank you.

12          (Recess)

13          BAILIFF:  All rise.

14          THE COURT:  Thank you all.  Please be seated.  All

15  right.  I call 22-1991.  And Ms. Bradley, I understand the

16  numbers down on the first floor are wrong.

17          MS. BRADLEY:  Yes.

18          THE COURT:  All right.  Well, that will be corrected.

19          MS. BRADLEY:  I apologize.

20          THE COURT:  That's all right.  All right.  Well,

21  thank you.  Can I get your appearance for the record?

22          MS. BRADLEY:  Yeah, I'm Suzanne Bradley, and I

23  represent Deputy Cannon for Harris County.

24          THE COURT:  All right.  Thank you.  Are these all of

25  your interns?

1    MS. BRADLEY: Interns, yes, Your Honor. I brought

2 them down here. It's -- even in this post-COVID world, oral

3 hearings are still a little bit rare --

4    THE COURT: Good. Well, I'm glad you're here.

5    MS. BRADLEY: Yeah. And maybe afterwards -- I told

6 them to be on their best behavior and come and introduce

7 themselves.

8    THE COURT: Oh, great. I'll stay in the courtroom

9 and say hello.

10    MS. BRADLEY: Yes.

11    THE COURT: Ms. Lewis, can I get your appearance for

12 the record?

13    MS. LEWIS: Yes, U.A. Lewis for the Plaintiff Joe

14 Alaniz. And they're going to introduce themselves, and I'm

15 going to try to sway them over to my side.

16    THE COURT: Okay, good. All right. So we are here

17 -- as I understand it, we did have a prior hearing on this.

18 And I do have Deputy Cannon's status report and request for

19 hearing. And so as I have prepared for this hearing, I have

20 looked at it in terms of here to argue -- or hear argument on

21 just that motion to dismiss. Is that right?

22    MS. LEWIS: Yes.

23    THE COURT: I think I resolved everything else. Ms.

24 Lewis, do you have any other -- is there anything else

25 outstanding other than that?

1    MS. LEWIS:  Just the order that I replayed by the

2    9th.  Just the specific --

3              THE COURT:  Right.

4              MS. LEWIS:  -- allegations as it relates to Sheriff

5    Gonzalez.

6              THE COURT:  Gonzalez.  Okay.  Thank you.

7              MS. BRADLEY:  I think in his individual capacity?

8              MS. LEWIS:  Correct, yes.

9              THE COURT:  Yeah.  Mr. Butt, you're here to observe

10   and take it easy today?

11             MR. BUTT:  I hope so, Your Honor.

12             THE COURT:  All right.  Okay.  So let's turn to the

13   motion to dismiss.  I do have some questions along the way, but

14   you're here to argue and also impress your interns, so --

15             MS. BRADLEY:  Oh, well --

16             THE COURT:  -- I'm just going to let you start

17   wherever you'd like.

18             MS. BRADLEY:  Well, see, I've already gone to the

19   wrong courtroom, so --

20             THE COURT:  No, that's the court's fault though.  So

21   that's --

22             MS. BRADLEY:  Well --

23             THE COURT:  -- not on you.  Go ahead.

24             MS. BRADLEY:  I should always double check.  Yes,

25   Your Honor.  So as a threshold matter, just to give the Court a

1    little preview, it's my intent to argue qualified immunity.

2    And Ms. Lewis can correct me, but I believe that the two causes

3    of action against Deputy Cannon are excessive force and false

4    arrest because of the lack of probable cause.  And it's my

5    intent that, depending on how the Court rules today, first I'd

6    like to ask the Court for a written order.  It makes my job

7    much easier in terms of any interlocutory appeal if I have a

8    written order.  I've had cases sent back to me by the Fifth

9    Circuit saying we need a written order, and that just can

10   sometimes delay things a bit.  So and even if --

11            THE COURT:  In terms of if I'm granting your relief

12   or if I'm denying your relief?

13            MS. BRADLEY:  Well, I think if you grant my relief,

14   perhaps Ms. Lewis, although I don't speak for her, might want a

15   written order.  But if Your Honor splits the baby, grant it on

16   one cause of action not the other, I think a written order

17   would be helpful.

18            THE COURT:  Mm-hmm.

19            MS. BRADLEY:  And the reasons for doing it.

20            THE COURT:  Mm-hmm.

21            MS. BRADLEY:  So that being said, I know the Court is

22   familiar with the facts of the case, but let me just briefly

23   say -- and we have to accept Mr. Alaniz's allegations as true

24   at the motion to dismiss stage.  And we do.  We accept his

25   allegations as true.  The only thing that Ms. Lewis and I

1  possibly have a disagreement on is what that event was that he

2  was filming out there that day.  And it was the end of May

3  about two years ago that Mr. Floyd was murdered, and he was a

4  former resident of the city, born here --

5          THE COURT:  Right.  Oh, I remember.

6          MS. BRADLEY:  So very important.  And there was

7  protests throughout Houston in the days that followed his

8  terrible death.  And I just want to say at the outset this

9  court can look at matters outside the pleadings.  And I didn't

10  cite --

11          THE COURT:  What would you like me to look at?

12          MS. BRADLEY:  The fact that this was a protest that

13  he was filming.

14          THE COURT:  What do I have on that outside the record

15  that you want me to look at?  Is there video?  Is there --

16          MS. BRADLEY:  There is video, Your Honor, but I think

17  that you can take judicial notice of that -- his -- that event

18  and use that.

19          THE COURT:  Well, no, I can't do that.  That's too

20  non-specific.  We're -- it's Houston.  It's -- there were lots

21  of things going on in lots of different places.  And some were

22  big, and some were small, and we had far less violence in

23  Houston than elsewhere.

24          MS. BRADLEY:  That's --

25          THE COURT:  But -- and so that's the thing.  And so I

1    don't have a context for where this was, how many people there,

2    what they were acting like, what Mr. Alaniz was acting like.  I

3    have no context for that.  So I'm happy to take judicial notice

4    of what I can, but nothing's been put before me.  And there's

5    not just some sort of in-the-ether, well, it was a tumultuous

6    day.

7             MS. BRADLEY:  No, Your Honor.  I think in my brief,

8    and if you give me a minute I'll find it, I talk about how Mr.

9    Alaniz alleges that he didn't know that this was a George Floyd

10   protest.  Even accepting that as true --

11            THE COURT:  Right.  And that's alleged.  I find that,

12   you know, it's not my realm here to just credibility, and an

13   assessment on that doesn't play part of it, but I don't find

14   that to be credible ultimately.  You know, when that is before

15   someone, that you just aren't going to know that it's a George

16   Floyd protest.

17            MS. BRADLEY:  And I'm not asking you to judge Mr.

18   Alaniz's credibility, but I think in the context of what

19   happened that day and what the police officers were doing out

20   there that day, I think that context is important.  And I think

21   given the date of Mr. Floyd's death and the date of this

22   protest a day or two later, I think the Court can take judicial

23   notice of that.  And --

24            THE COURT:  I can, but I have to say that it's --

25   well, not judicial notice of that.  I would say speaking as a

1   person who was aware of and watching news that day, you know,

2   my takeaway impression was Houston was relatively peaceful, but

3   that's because I saw a video in Portland and San Francisco and

4   in Minneapolis, et cetera, that was very different than what

5   was going on here. And so I'm interested in understanding more

6   about the specific context of this place and this incident.

7   But if I was just to be taking judicial notice, my memory in

8   Houston at that time was, wow, we were lucky because it was

9   really not all that violent.

10        But that's a very different question than what any

11   one particular officer was facing vis-a-vis whatever collection

12   of persons and an individual such as Mr. Alaniz might have been

13   presenting him at that time and location.

14        MS. BRADLEY: Okay. Well, all right. Then let me

15   segue a little bit here. I do want to say that I do have a

16   case where it says Rule 12(b) gives a district court complete

17   discretion to determine whether or not to accept any material

18   beyond the pleadings that is offered in conjunction with a Rule

19   12(b)(6) motion.

20        THE COURT: Mm-hmm.

21        MS. BRADLEY: And that's from the Wright and Miller

22   Federal Practice.

23        THE COURT: Right. And I have other motion to

24   dismiss and qualified immunity orders out there where I have

25   gotten video and reviewed the video in conjunction with it. I

1    note that Paragraph 52 of the complaint -- the amended

2    complaint?  Plaintiff's second amended complaint, Paragraph 52

3    says Mr. Alaniz provided Deputy Fostick with the video he took

4    of the incident before his arrest on Friday, May 29, 2020.  So

5    I think he provided it in May of 2020, although maybe that was

6    the date of this incident.  Maybe his arrest was on May 29th.

7    But in any event, do you have that video?

8              MS. BRADLEY:  I do, Your Honor.  I have --

9              THE COURT:  Okay.  Why hasn't it been submitted to

10   me?

11             MS. BRADLEY:  I will get it to you this afternoon.

12             THE COURT:  Okay.

13             MS. BRADLEY:  I can submit to you -- I'll call it the

14   cell phone video, for lack of a better way to -- it's a cell

15   phone video.  Mr. Alaniz gave it to the sheriff's office when

16   he came down to give a statement.

17             THE COURT:  Right.

18             MS. BRADLEY:  So I have that.  I also have Deputy

19   Cannon's bodycam video.

20             THE COURT:  Has that been turned over to the

21   Plaintiff?

22             MS. BRADLEY:  It has not, but I can get her a copy.

23   We're still in this -- but if it will help move things along, I

24   will give Ms. Lewis a copy, and I will give the Court a copy of

25   both what I have as the cell phone video --

1    THE COURT:  Well, let me ask this because you're

2  asking me to take judicial notice of things.  And by that, I

3  take it you're trying to get me to have my own view about the

4  voracity of some things that are pleaded, particularly in

5  Paragraphs 15 through 25 or so of the second amended complaint

6  where --

7    MS. BRADLEY:  Your Honor --

8    THE COURT:  -- I would ask, if I watch the videos, am

9  I going to see things that are at variants to Paragraphs 15

10  through 25 of the second amended complaint.

11    MS. BRADLEY:  I think what you'll see is large crowds

12  moving down streets in Houston.  You'll see signage.  You'll

13  recognize there are Houston signs.  You will see dozens and

14  dozens of police officers, if not more.  You'll see more than

15  100 people.  You'll see -- excuse me, you will see people

16  facing like three and four deep police officers shouting and

17  yelling.  You will see other people arrested, not Mr. Alaniz.

18  You'll see other people arrested.  You'll see them taken away

19  in handcuffs.

20    THE COURT:  And this is on Mr. Alaniz's video?

21    MS. BRADLEY:  Yes.

22    THE COURT:  Okay.

23    MS. BRADLEY:  And it's also on the bodycam video.

24    THE COURT:  Of Deputy Cannon?

25    MS. BRADLEY:  Of Deputy Cannon.  I also have a body

1    camera from another female officer.  I believe it's Ortiz.  She

2    was there.  Now, I want to tell the Court this, that Deputy

3    Cannon has represented to me that he was out there all day

4    long.  And as I understand it, they were trying to control the

5    crowds.  They were trying to keep them from going down onto the

6    major highways in Houston so people wouldn't get hurt.

7              THE COURT:  Mm-hmm.

8              MS. BRADLEY:  And they were trying to steer them up

9    to safer areas, safer streets.  Deputy Cannon's sound does not

10   work because his battery was down.  We have pictures.  Ms.

11   Ortiz's, Officer Ortiz's we do have sound, and you see --

12             THE COURT:  Of Cannon's exchange (indiscernible) --

13             MS. BRADLEY:  Some of it, Your Honor.  Not complete,

14   but you see other people arrested, and you also see the number

15   of police that are -- the lights are on and they're walking

16   streets.  You see the mayhem, Your Honor.  You see the mayhem

17   both on Mr. Alaniz --

18             THE COURT:  Am I going to see any -- or hear

19   anything, actually more precisely, of orders that Deputy Cannon

20   gave to Mr. Alaniz and what Mr. Alaniz said in response?

21             MS. BRADLEY:  Yes.

22             THE COURT:  On who?

23             MS. BRADLEY:  Ortiz.  You will see the video of Mr.

24   Cannon wrestling Mr. Alaniz to the ground and cuffed, and that

25   other officers, and I believe Officer Cannon escort him to a

1  bus, and then another group of officers put him on the bus.

2  You hear more of what Mr. Alaniz said on Deputy Ortiz's.

3          THE COURT:  But on Mr. Alaniz's video, do I also hear

4  it?

5          MS. BRADLEY:  Yes, you do.  You do.

6          THE COURT:  Okay.

7          MS. BRADLEY:  Yes.

8          THE COURT:  All right.

9          MS. BRADLEY:  So does Your Honor -- I mean, just for

10  -- does Your Honor want to see that before you rule today?  Do

11  you want to reschedule?  I could get that to you.  And in --

12          THE COURT:  Well, I --

13          MS. BRADLEY:  -- fairness to Ms. Lewis, if she wants

14  to look at it, you know --

15          THE COURT:  Well, I understand that.  And Ms. Lewis,

16  so you've seen your client's video, right?

17          MS. LEWIS:  I have, Your Honor.

18          THE COURT:  Okay.  And your complaint is written so

19  that from your standpoint it is in accord with and does not --

20  is not contradicted in any way by Mr. Alaniz's video?

21          MS. LEWIS:  The complaint.

22          THE COURT:  The complaint.

23          MS. LEWIS:  Oh, yeah.  No.

24          THE COURT:  Do you see what I'm saying?

25          MS. LEWIS:  Yes.

1    THE COURT: Because I had -- in prior instances where

2  I've done this, standards coming at me from the Fifth Circuit

3  indicate I can look at video. And I don't have to accept

4  written allegations that are contradicted by video. And so I

5  haven't seen the video yet. I just want to make sure that you

6  have pleaded in writing. For instance, I have one case where

7  it was ultimately a -- it was a medical emergency, ultimately a

8  fatality, and even a Houston or Harris County Jail of someone

9  who was brought in when they were intoxicated, and eight hours

10  later they were found unresponsive, and ultimately died in his

11  cell.

12    And the complaint had obviously been written having

13  watched the video, but I wanted -- so all of those eight hours

14  were submitted, and we scanned through the video to see what

15  else we could see. And it's -- it is fine for the Court to

16  review that. So I'm asking you these questions because I just

17  want to make sure that you believe you've pleaded your best

18  complaint in light of the available video evidence.

19    MS. LEWIS: Your Honor, I would say this. I would

20  ask the Court to issue its ruling based on the four corners of

21  the pleadings. And those cases that you have, if you wouldn't

22  mind sharing them with me, I would like to see them because I'm

23  sure I can distinguish them. I was at the Fifth Circuit on

24  issues similar to this, was a reverse and remanded based on

25  Judge Hughes doing this exact same thing, taking -- and I --

1   Mr. Butt was on that case with Harris County.

2          THE COURT: Mr. Butt was on one of these cases --

3          MS. LEWIS: With Houston.

4          THE COURT: -- that I think I'm referring to.

5          MR. BUTT: Collins v. (indiscernible) reviewing of

6   documentary or video evidence that contradicts an allegation

7   and the complaint. So that has been accepted by the Seventh

8   District as authority.

9          MS. LEWIS: Your Honor, if I could add --

10         THE COURT: Because the one thing about where Ms.

11  Bradley's arguing is that going outside the four corners of the

12  complaint, when the complaint references something that in

13  fairness should be considered with it -- well, and you're

14  nodding as if, ah, so that means I can't look at the video.

15  But you're the one that pleaded in Paragraph 52 to Mr. Alaniz

16  provided Deputy Fostick with the video he took of the incident,

17  which is -- I read that as vouching for the idea that

18  everything I've read to that point is true and accurate

19  according to the video. And that you want me to know that

20  there's a video because if I watched that video, I would sure

21  agree with everything the way that it's depicted in the

22  complaint. And maybe I will. I just haven't seen the video.

23         MS. LEWIS: Yes, Your Honor. And just -- you know,

24  just keeping with the law and in following the law, we don't

25  have a problem with the video because we know that the facts

1 that are stated are -- comport with what's in the video.  But

2 the issue is, is that you can look at a video if it references

3 the video as it relates to supporting the claims.  In this

4 instance, it's -- the video is referenced in order to show that

5 Mr. Alaniz was compliant and trying to be helpful in the

6 investigation.  It wasn't -- that fact was not entered into the

7 complaint --

8             THE COURT:  But that --

9             MS. LEWIS:  -- based on --

10             THE COURT:  -- right there what you just said is

11 something that's in support of your complaint -- claims.  Is

12 that you're saying he was compliant and therefore --

13             MS. LEWIS:  No, Your Honor, that's not -- not at the

14 scene meaning with the investigation.  He tried to -- if you

15 read that section as a whole, you'll see exactly what and why

16 that -- those allegations are made.  It's just to show that he

17 was helping with the investigation, doing what he can to show

18 that Sheriff Gonzalez had all the information he needed, and

19 Sheriff Gonzalez failed to discipline or retrain or do anything

20 as it relates to Cannon and --

21             THE COURT:  But not -- again, I hear what -- the

22 distinction you're trying to make, but that also is an argument

23 that -- though, that Sheriff Gonzalez, if you watched the

24 video, would realized that Deputy Cannon did something wrong --

25             MS. LEWIS:  Absolutely.

1          THE COURT:  Okay, and --

2          MS. LEWIS:  Yes, and it's an --

3          THE COURT:  -- now I have you saying absolutely.  And

4    so --

5          MS. LEWIS:  Absolutely.

6          THE COURT:  -- why shouldn't I be watching the video?

7          MS. LEWIS:  I -- we don't have a problem with you

8    watching the video, Your Honor, but --

9          THE COURT:  Okay.

10         MS. LEWIS:  -- that -- what'll happen is that is at

11   -- that's for summary judgment.  That's for summary judgment

12   stage.  And if they want to attach the video and convert it to

13   a summary judgment, that -- you know, that's their option to

14   do.  And they could've done at the 12(b)(6) stage, but as far

15   as the complaint is concerned, the Fifth Circuit is very clear

16   when it says that you have to look at the four corners unless

17   the video is actually referenced and the information is

18   actually referred to in the complaint, and it relies on the

19   video.  And I literally was at the Fifth Circuit arguing this

20   same issue as it relates to --

21         THE COURT:  Which case?

22         MS. LEWIS:  That's John Allen v. Hayes, and that was

23   reversed and remanded.

24         THE COURT:  All right.  All right.  I'll take a look

25   at Allen v. Hayes.

1          MS. LEWIS:  Yes.

2          THE COURT:  Because I do know that Judge Hughes would

3    make orders in that regard.  So -- but let's --

4          MS. LEWIS:  But this is specific to the video.

5          THE COURT:  -- take a look at that case.

6          MS. LEWIS:  Yeah, this is specific -- this is -- you

7    know, we argued about the fact that the video was not -- it

8    wasn't the basis of the complaint.  That was what we

9    discovered.  And Your Honor, I know that in your order you

10   admonished the Plaintiffs only on the complaint.  And I know

11   Rule 11 applies to everyone, but we take -- I mean, we take

12   great --

13         THE COURT:  I don't feel like at the last hearing I

14   was Rule 11 admonishing you.  Was I?

15         MS. LEWIS:  I didn't think so either until I saw the

16   order.

17         THE COURT:  Oh, okay.  Well, let me look at --

18         MS. LEWIS:  Yes.

19         THE COURT:  -- what I said.  Because I thought it was

20   just --

21         MS. LEWIS:  Yeah, it blatantly says that the Court

22   admonishes the Plaintiffs on the -- specifically the

23   Plaintiffs.

24         THE COURT:  No, no, no.  That was as to -- so this

25   was as to your Appendix A, and we went over some things there.

1  And that was simply that conform to Rule 11 given the

2  responsive court orders that Harris County attached to its

3  motions.  Because a lot of information had been given to you

4  about all the things that you had listed.  And I was simply

5  saying you've got to look at those things if you're going to

6  keep what you gave to me as originally a very big list.  If

7  it's on all fours, great, you can say so.

8           MS. LEWIS:  Mm-hmm.

9           THE COURT:  But that wasn't me saying anything about

10 -- because again, I don't have the video or anything that --

11           MS. LEWIS:  No, and I want --

12           THE COURT:  -- it is in accord, it's not in accord.

13 I just want to make sure that things are in accord with, you

14 know, the objective record of the incident.

15           MS. LEWIS:  My point is, is that we -- you know, we

16 respect the Court at all levels.  We take great respect in the

17 Court --

18           THE COURT:  Yeah.

19           MS. LEWIS:  -- and that was something that I don't

20 have a reputation in all these years in being before the Court.

21           THE COURT:  Well, I put admonishing language and I

22 put Rule -- I reference Rule 11 frequently.

23           MS. LEWIS:  Okay.

24           THE COURT:  That's not -- that was not intended as

25 like an insult or something suspect.  It's just that when I

1    give the chance to clarify things, it's my way of saying make

2    sure that you're paying attention closely to that.

3              MS. LEWIS:  Absolutely.

4              THE COURT:  And I assume lawyers always are, but

5    there are some things as -- when I'm going to come back to it

6    again later, I want to make sure that you knew I thought this

7    was an important point.  And so be accurate in what you relate

8    to me.

9              MS. LEWIS:  Absolutely.

10             THE COURT:  But that has nothing to do with what your

11   take of the factual -- what's factually accurate there.

12             MS. LEWIS:  Absolutely.

13             THE COURT:  It's -- Rule 11 just says you just have

14   to undertake your own personal and independent investigation of

15   it.

16             MS. LEWIS:  Right.  Yes, Your Honor.

17             THE COURT:  And then you're able to form and tell me

18   whatever it is that you believe about it.

19             MS. LEWIS:  Yes.

20             THE COURT:  Okay.

21             MS. LEWIS:  And well, I guess the reason -- my point

22   for bringing that up is that I have concerns about the

23   Defendant making representations.  There's a lot of facts that

24   were put forth before the Court here today which the Court

25   should not be considering in the motion to dismiss.

1    THE COURT:  On which I've already pushed back on.

2    MS. LEWIS:  Yes, absolutely.

3    THE COURT:  I don't know that I can say that that's

4  true.

5    MS. LEWIS:  But it's in the record.  It's in the

6  record.

7    THE COURT:  Yeah.

8    MS. LEWIS:  And if it's going to be in the record,

9  that same admonishment should go for -- I know it's not written

10  and I know they're not signing it, but the fact of the matter

11  is, is that I believe that when the video is viewed it won't

12  show from Mr. Alaniz's interaction --

13    THE COURT:  Yeah.

14    MS. LEWIS:  -- with Cannon.  She said there was

15  hundreds of people, and I want that to be clear.  She said

16  there were hundreds of people around where Mr. Alaniz and Mr.

17  Cannon interacted with one another.

18    MS. BRADLEY:  No, that's not what I said.

19    MS. LEWIS:  I wrote down that you -- there were --

20    MS. BRADLEY:  There were hundreds of people at the

21  protest globally.

22    MS. LEWIS:  Okay.

23    MS. BRADLEY:  I didn't say that there was a specific

24  area where Mr. --

25    MS. LEWIS:  Okay.  Now it's clarified.

1          THE COURT:  That's why I was sort of like -- I don't

2    know why -- what really matters is only what happened between

3    this Plaintiff and these Defendants.  Now it's informed by a

4    bigger picture, but geographically from where he was -- this

5    confrontation happened and he was arrested, I'll just say it

6    that way.  You know, I'm not looking geographically at the

7    whole of Houston to inform me of that.  I'm sort of like within

8    a reasonable area around him what was going on.  What was

9    Deputy Cannon able to objectively perceive at that time, and

10   what did Mr. Alaniz objectively think was going on at that

11   time?  That's -- and I sort of feel like his video from his own

12   cell phone is going to give a picture of that.

13          MS. LEWIS:  Correct.  And yes.

14          MS. BRADLEY:  And again, Your Honor, if you want me

15   to produce it, I will.

16          THE COURT:  Yeah, I do.

17          MS. BRADLEY:  To you.

18          THE COURT:  I do.  And I don't -- is there any

19   reference in the complaint to officer body cameras or anything

20   like that?

21          MS. BRADLEY:  I --

22          MS. LEWIS:  I can look really quick and see.

23          MS. BRADLEY:  I think maybe, but I can't swear.  Ms.

24   Lewis would know.  But Your Honor, I'm prepared to go ahead

25   with argument today.  Or in fairness to everybody, if you'd

1  like me to come back after you --

2       THE COURT:  No, that's why I don't necessarily want

3  the officer body cameras because Ms. Lewis hasn't had that.

4       MS. BRADLEY:  Well --

5       THE COURT:  Ad so if you -- if I was to review and

6  rely on that, she'd have to have a --

7       MS. BRADLEY:  Yes, I agree.

8       THE COURT:  -- chance to see it from that perspective

9  and be prepared to respond to it.  So you all can assume for

10  your arguments that I am going to receive and review Mr.

11  Alaniz's video, and that's going to inform the way that I am

12  reading and judging the complaint on these issues.  So, yes,

13  Ms. Lewis.

14       MS. LEWIS:  Your Honor, the only issue I have with

15  that is that she's asking for qualified immunity for Cannon,

16  and it's supposed to be based on his perspective, not Mr.

17  Alaniz's perspective.

18       THE COURT:  Mm-hmm.

19       MS. LEWIS:  And so that is going to be a concern if

20  we see it from -- if we don't see it from Cannon's perspective

21  also.  And I know that Cannon's I believe she said didn't have

22  audio.

23       THE COURT:  Mm-hmm.

24       MS. LEWIS:  So we're not going to see the what I

25  believe is --

1          THE COURT:  Well, I guess --

2          MS. LEWIS:  -- the countdown.

3          THE COURT:  -- I'll just say this.  I've heard enough

4   about it.  They obviously were in close proximity to each

5   other.  I'm going to receive and review the video, and if the

6   Fifth Circuit -- if I end up ruling against you -- I don't know

7   if I'm going to or not, the Fifth Circuit tells me that's

8   wrong, then I'm wrong, but I am going to receive and review it.

9          MS. LEWIS:  Yes, Your Honor.

10          THE COURT:  Okay?  All right.  Go ahead.

11          MS. BRADLEY:  Okay.  All right.  So again, just to

12  sort of backstep a little bit, there are two causes of action

13  against the deputy.  False arrest, which Ms. Lewis has alleged

14  there was no probably cause to arrest him, and then excessive

15  force.  I'm going to take probable cause first.  As Your Honor

16  knows, probable cause is not a high standard.  And on Page 16

17  of my brief, I cite the Childers case, and that's the case

18  where Mr. Childers took his car and sort of blocked access to

19  an area that the police were trying to get into it.

20          He was trying to argue that all he did was argue with

21  the police officers, but it was important to note that he

22  failed to comply with an officer's instruction made within the

23  scope of the officer's official duty and pertaining to that

24  physical conduct rather than speech.  So -- and that was the

25  particular issue, that he had a speech right to say what he

1  wanted to say.

2          But the Childers opinion goes on to say several

3  courts have affirmed convictions of Defendants who fail to

4  comply with an officer's instruction to move away from a crime

5  scene.  And I -- then it goes on in Childers to talk about how,

6  based on this precedent, a reasonable officer could've believed

7  that it was a fair probability that Childers had violated penal

8  code -- Texas Penal Code 38.5 by failing to comply with that

9  officer's instructions to move.

10          THE COURT:  Mm-hmm.

11          MS. BRADLEY:  And that's the Childers case 848 F.3d

12  at 414, 415.  So I cite that case because it's a situation

13  where Mr. Alaniz is taking as what he said is true to try to

14  tell the officers that he wasn't part of the protest.  I argue

15  it doesn't matter, that he wasn't interfering with anything.  I

16  argue that it doesn't matter.  Even if Mr. Alaniz felt those

17  things were true and believed those things were true, he was

18  instructed by my client Deputy Cannon and by another officer to

19  move away, to move back.  And --

20          THE COURT:  So I have -- I will have some questions

21  for Ms. Lewis as to that point, the disobeying a reasonable

22  order to move.  As to resisting arrest, what have you got on

23  resisting arrest?

24          MS. BRADLEY:  Resisting arrest --

25          THE COURT:  Because he's refusing to move away.

1    There's -- you cite to cases and have language about where the

2    cases are.  You've pulled your arm away or you've turned away

3    or you've done all sorts of things, and it's like where is that

4    in the complaint.

5            MS. BRADLEY:  I'm sorry.  What?

6            THE COURT:  Where is that in the complaint --

7            MS. BRADLEY:  Oh, towards the --

8            THE COURT:  -- that he did anything, that he jerked

9    away, or that he pulled away, or did anything like that?

10           MS. BRADLEY:  Okay.  That's in the video, but having

11   said that, Your Honor, what probable cause requires is --

12           THE COURT:  So that --

13           MS. BRADLEY:  -- it's not a --

14           THE COURT:  -- you didn't say that in your briefing.

15   Why would you --

16           MS. BRADLEY:  I thought I did, Your Honor.

17           THE COURT:  Why would you in your briefed argument be

18   talking about this, but it's not in the complaint?  I've been

19   looking at it.  I was like where is that in the complaint?  And

20   then be sort of like, well, it's in the video, but I haven't

21   given you the video.

22           MS. BRADLEY:  Here's my reasons, Your Honor.  I talk

23   about resisting arrest because -- well, first, let me back up.

24   Mr. Alaniz was arrested.  There's no question, but he was never

25   ultimately charged because Houston Police lost the paperwork.

1    So he was arrested, but not charged.  I don't know that -- that

2    doesn't matter at the end of the day.

3              THE COURT:  Mm-hmm.

4              MS. BRADLEY:  But I don't know what he was charged

5    with or what he would've been charged with, so I talked about

6    that.

7              THE COURT:  Mm-hmm.

8              MS. BRADLEY:  But in the probable cause cases, it

9    says that it doesn't matter --

10             THE COURT:  Well, let me just ask it this way.  On

11   resisting arrest, there's nothing in the complaint that

12   objectively suggests he's resisting arrest, but you're saying

13   if I watch the video I'm going to see him pull away and resist

14   arrest that way.

15             MS. BRADLEY:  Okay.  Taking the video out of it, Your

16   Honor --

17             THE COURT:  Was that a -- yeah, it --

18             MS. BRADLEY:  Let me just -- let me answer it this

19   way.

20             THE COURT:  I'm going to be looking at the video, so

21   I wish you would just answer my question about that.

22             MS. BRADLEY:  All right.

23             THE COURT:  Am I going to see that in the video?

24             MS. BRADLEY:  Yes.

25             THE COURT:  Okay.  Now what do you want to tell me?

1    MS. BRADLEY:  I want to tell you that it doesn't
2  matter what Mr. Alaniz ultimately would've been charged with as
3  long as a reasonable officer had in his -- had an idea that
4  some crime was being committed.
5    THE COURT:  Well, but I know.  And one of the things
6  that's being argued is resisting arrest.  And so I don't see
7  resisting arrest in the words of the second amended complaint.
8  Do you?
9    MS. BRADLEY:  I do.
10    THE COURT:  Where?
11    MS. BRADLEY:  Where he says he tried to tell the
12  officer that he wasn't part of the crowd.
13    THE COURT:  Okay.  I disagree with that.
14    MS. BRADLEY:  Okay, but I --
15    THE COURT:  That's not going to carry me on the law.
16  You are not resisting arrest by engaging in conversation.  You
17  are failing to obey a reasonable order to move away by doing
18  that, but you are not resisting arrest by having a
19  conversation.  He doesn't indicate whether he was asked to turn
20  around, put his arms behind his back, do anything.  There's
21  nothing about that in the written word of the complaint.
22    MS. BRADLEY:  He was handcuffed, Your Honor.
23    THE COURT:  Ultimately he was handcuffed.
24    MS. BRADLEY:  Ultimately he was handcuffed.
25    THE COURT:  Okay.  But on the resisting -- all right.

1    So in terms of resisting, as far as the written word of the
2    complaint is, it's that as pleaded.  Paragraph 17 -- well,
3    Paragraph 16, Mr. Alaniz tried to explain that he was not with
4    the group, and then Paragraph 17 as Mr. Alaniz tried to
5    explain, Cannon gave him five seconds to navigate, blah, blah,
6    blah.  That's what you see as resisting arrest.
7              MS. BRADLEY:  Yes.
8              THE COURT:  All right.  So --
9              MS. BRADLEY:  Your Honor, if I may, he wasn't --
10             THE COURT:  But I don't need to find resisting arrest
11   if I find disobeying a reasonable order to move.
12             MS. BRADLEY:  True.
13             THE COURT:  Right?
14             MS. BRADLEY:  True.
15             THE COURT:  Okay.  So that's --
16             MS. BRADLEY:  True.
17             THE COURT:  -- all I need there.
18             MS. BRADLEY:  True.
19             THE COURT:  And so then as to what else on the false
20   arrest allegation is that he had a reason to arrest him for
21   that.  That's your argument, right?
22             MS. BRADLEY:  Yeah, and --
23             THE COURT:  He didn't obey a reasonable order to
24   move, and he got arrested, and that disposes of that claim.
25   That's your argument?

1          MS. BRADLEY:  Yes, Your Honor.

2          THE COURT:  Is there anything else qualified immunity

3    wise that I would need to look at on that?

4          MS. BRADLEY:  I do want to address this one issue

5    that they -- in the complaint, they talk about timing that the

6    five-second count was unreasonable.  The case law says, you

7    know, that these are the Graham factors that, you know, you

8    shouldn't.  And that's on Page 18 of my brief.

9          THE COURT:  Mm-hmm.

10         MS. BRADLEY:  The reasonableness of a particular use

11   of force, and this sort of blends into my use of force

12   argument, but must be judged from the perspective of a

13   reasonable officer on the scene.

14         THE COURT:  But that -- I mean, if we're getting to

15   force, we go to the excessive force claim, right?

16         MS. BRADLEY:  Yes, but --

17         THE COURT:  The rest, it's just whether you had the

18   probable cause to arrest him.  The force with which you did it,

19   that doesn't matter.  It's like did you have a reason to arrest

20   the person?

21         MS. BRADLEY:  Yes.

22         THE COURT:  Okay.  So let's move onto the excessive

23   force then.

24         MS. BRADLEY:  Okay.  So in excessive force, there are

25   three things that Plaintiff has to show.  You have to show an

1  injury, and --

2          THE COURT:  And he was injured, right?

3          MS. BRADLEY:  Mr. Alaniz has alleged that his

4  shoulder was hurt.  Number two, the injury resulted directly

5  and only from a use of force that was clearly excessive.  And

6  number three, the excessiveness of the force was clearly

7  unreasonable.  So it's with -- I accept that Mr. Alaniz says he

8  was injured, but I -- where I disagree is that the injury was

9  unreasonable, and --

10          THE COURT:  Okay.  So let me ask this, that the

11  injury -- so he was injured.  Do you disagree that the injury

12  resulted from a use of force?

13          MS. BRADLEY:  No.  He was arrested --

14          THE COURT:  Because then there was also the -- that

15  was clearly excessive.

16          MS. BRADLEY:  Yes.

17          THE COURT:  And so I know you're going to say it

18  wasn't clearly excessive, but his shoulder to get injured

19  because of force that was used to subdue him, right?

20          MS. BRADLEY:  Yes.

21          THE COURT:  It's not that there's, well, it was pre-

22  existing.  It was that there was something else going on.

23          MS. BRADLEY:  Yes.

24          THE COURT:  Okay.  All right.  Go ahead.

25          MS. BRADLEY:  Okay.  So focusing on --

1          THE COURT:  So I'm having to judge was it clearly

2    excessive and was that excessiveness clearly unreasonable.

3          MS. BRADLEY:  Yes.

4          THE COURT:  Okay.

5          MS. BRADLEY:  Yes, that's exactly right.

6          THE COURT:  All right.

7          MS. BRADLEY:  So -- okay.  So when we talk about the

8    use of force, on Page 13 in my brief I talk about the Buehler

9    case and the Graham factors.  I cite the Buehler case because

10   it's instructive.  It's very factually similar even though it

11   was in the context of a summary judgment.  And they granted

12   qualified immunity.  And at -- it sets out the three factors,

13   injury directed only from the use of force that was clearly

14   excessive, and excessive -- and the excessiveness which was

15   clearly unreasonable.  The test of reasonableness under the

16   Fourth Amendment is not capable of mechanical application

17   requires careful attention to each case's facts, and that's the

18   Graham.

19         THE COURT:  Mm-hmm.

20         MS. BRADLEY:  Okay.  So and then sort of the subtext

21   for all of that is when you weigh the need for force, you have

22   to talk about the severity of the crime, whether the suspect

23   posed an intermediate threat -- an intermediate theft to safety

24   --

25         THE COURT:  Immediate threat to safety.

1          MS. BRADLEY:  -- safety of the officers or others --

2          THE COURT:  Mm-hmm.

3          MS. BRADLEY:  -- and whether the suspect was actively

4     resisting or attempting to evade arrest.  And that was the Bart

5     case.  So here to me the touchstone is the reasonableness of

6     the force.  To be reasonable is not to be perfect, and so the

7     Fourth Amendment allows for some mistakes on the part of

8     officials giving them leeway to enforce law in the -- for the

9     community's protection.  So Officer Cannon had a right to

10    arrest him.  And for this -- this Court has to decide whether

11    every other officer would find his use of force to be

12    unreasonable under the qualified immunity analysis.  And I

13    don't think you get there, Your Honor.  And that's the Johnson

14    case --

15         THE COURT:  Mm-hmm.

16         MS. BRADLEY:  -- and the Grant case.  Every push or

17    shove, even though it may seem unnecessary later, and the peace

18    of the (indiscernible), not every push or shove violates the

19    Fourth Amendment.  So I would say to you that in the context of

20    that particular day, and the context of accepting what Mr.

21    Alaniz said is what he was doing out there, and that he was

22    given a five-second -- five count to move and didn't move, he

23    was arrested.  And they put him to the ground, and they cuffed

24    him.  The fact that he injured his shoulder is part of that.

25    It's not excessive given the context.

1    THE COURT:  Mm-hmm.

2    MS. BRADLEY:  And I cite those cases.  So --

3    THE COURT:  Okay.  Go ahead.

4    MS. BRADLEY:  Even accepting as true for the purposes

5    of the motion to dismiss that he sustained a shoulder injury

6    during arrest, this court may grant the motion by starting with

7    whether Cannon's conduct violated clearly established law.  He

8    did not.  We have held based on case law from Texas courts

9    interpreting the relevant provision that conduct extremely

10   similar to what Mr. Buehler was engaged in, refusing to obey a

11   police officer's repeated and unambiguous warnings to step back

12   --

13   THE COURT:  And what case is this coming from?

14   MS. BRADLEY:  This is Buehler v. Dean --

15   THE COURT:  All right.

16   MS. BRADLEY:  -- Your Honor -- excuse me, Buehler v.

17   Dear, D-E-A-R, 27 F.4th.

18   THE COURT:  Yep.

19   MS. BRADLEY:  The PIN cite is 992.  And they also

20   cite to Childers, Your Honor, and to Haggarty and to Holt.  So

21   there's a lot of cases here, so --

22   THE COURT:  Okay.

23   MS. BRADLEY:  -- the rest of that quote is the

24   refusing to obey a police officer's repeated and unambiguous

25   warnings to step back so as not entirely to interfere with

1  their duties establishes their probable cause to arrest.  But

2  at the same time, you know, it also says that there's a

3  possibility of injury.  And I think in the context, a shoulder

4  injury is not clearly excessive because he was taken to the

5  ground for not moving quickly enough.

6  THE COURT:  Okay.  All right.  I think that's all I

7  need at this point.

8  MS. BRADLEY:  Okay.  All right.

9  THE COURT:  Was there some other -- I mean, I think

10  you've covered like the main topic points like the --

11  MS. BRADLEY:  I think so.  Your Honor, do you want me

12  to hand deliver the -- I guess it would be a thumb drive to you

13  in chambers, or do you want me to take it downstair and have

14  them bring it up?

15  THE COURT:  Whichever's easiest.  Just so that it --

16  MS. BRADLEY:  I don't mind bringing it here.  I just

17  want to make sure it's part of the record.  And I'll get it to

18  -- I'll send a runner to your office.  If you can tell me when

19  you'll be there, and I'll get it for her.  I also could put it

20  on a link.

21  THE COURT:  I --

22  MS. BRADLEY:  Do you want a link?  I don't have -- I

23  know she can do that.

24  MS. LEWIS:  I like links.

25  MS. BRADLEY:  She likes links.  She's -- yeah.  I can

1   get you a thumb drive.

2             THE COURT:  No, I guess --

3             MS. BRADLEY:  I can give everyone a --

4             THE COURT:  -- file an advisory on the docket with --

5             MS. BRADLEY:  All right.

6             THE COURT:  -- an active link that we can then click

7   and download from.

8             MS. BRADLEY:  Okay.  All right.  And if it doesn't

9   work, I'll get you another one.

10            THE COURT:  Okay.  All right.  Ms. Lewis.

11            MS. LEWIS:  Thank you, Your Honor.

12            THE COURT:  And if you could get me that within -- by

13  the end of the week.

14            MS. BRADLEY:  I'll try to get it to you tomorrow.

15            THE COURT:  Okay.  Thank you.

16            MS. LEWIS:  Okay.  Your Honor, so there's a few

17  things that Ms. Bradley discussed, and I guess first the

18  arrest.  Since she started with arrest, I'll go ahead and

19  follow up with that.  So obviously the arrest has to be

20  supported by probable cause.  I didn't hear any probable cause.

21  I heard that he didn't -- that Mr. Alaniz did not obey a lawful

22  order.  There were no facts in my complaint to support that the

23  order was lawful.  That's the first thing.  We have to

24  determine whether the order was lawful.

25            And what Cannon barked at Mr. Alaniz was not

1  reasonable given the circumstances because there was -- in the

2  video you will see in the radius of where he was, there was, I

3  believe -- and I'm just trying to reflect back on my own

4  memory, not (indiscernible), but in that radius there might've

5  been one other person in that radius between them outside of

6  other officers.  That's what --

7        THE COURT:  How big a radius are you talking about?

8        MS. LEWIS:  I'm sorry.  Probably -- I'm not that

9  great at measurements, but I'm going to say at least 10 to 20

10 feet --

11       THE COURT:  Okay.

12       MS. LEWIS:  -- radius.

13       THE COURT:  All right.

14       MS. LEWIS:  And then there was more people in the

15 distance.

16       THE COURT:  Okay.

17       MS. LEWIS:  Now, so we have to -- and mind you, there

18 is an allegation -- or there is facts pled that he was in a

19 field and not bothering anybody.  He was not a threat to the

20 officers.  So the reasonableness of the order at that time and

21 whether it's -- makes it a lawful order or not.  But

22 notwithstanding that, it doesn't make it an arrestable offense.

23 The fact that an officer comes up to a person in public and

24 says do this is -- that does not warrant an arrest.  And it's

25 just a fact.

1            We as human beings in the United States of America,

2    that is the beauty of being here, that we don't have government

3    officials just coming up to us and basically just --

4            THE COURT:  I think I disagree with you.

5            MS. LEWIS:  Okay.

6            THE COURT:  I think that the statute 42.03 of the

7    Penal Code --

8            MS. LEWIS:  Mm-hmm.

9            THE COURT:  -- accords with a lot of reasonable

10   aspects of asks by police, firemen, other peace officers and

11   things, that it's like if you've got a request to move from a

12   scene where there's concern, you'll comply with that.

13           MS. LEWIS:  Yes.

14           THE COURT:  And we'll see -- there's lots of

15   instances where lots of people think, well, I don't have to

16   comply with that, I'm an American.  It's like, no, actually,

17   you do have to comply with it.

18           MS. LEWIS:  I agree with that, but that's not exactly

19   what I said.

20           THE COURT:  And here, I mean, in the -- it says

21   Subsection A, a person commit an offense if, without legal

22   privilege or authority, he intentionally, knowingly, or

23   recklessly disobeys a reasonable request or order to move

24   issued by a person the actor knows to be or is informed is a

25   peace officer, blah, blah, blah, or person with authority to

1   control the use of premises.  And you are -- seem to be arguing

2   that you get by qualified immunity simply because you want to

3   factually investigate entirely whether it was a reasonable

4   request.

5           MS. LEWIS:  Well, what I want is for the pleadings to

6   support the fact that it was not a lawful order.  And you said

7   that was Penal Code 42.13?

8           THE COURT:  42.03 of the Penal Code.

9           MS. LEWIS:  03?

10          THE COURT:  I believe it's -- I mean, I didn't get

11  that out of thin air.  I believe it's in a provision that's

12  cited in Cannon's brief.  So --

13          MS. LEWIS:  And is that the interference statute?

14          THE COURT:  Yeah, disobeying a reasonable --

15          MS. LEWIS:  Okay.

16          THE COURT:  -- order to move.  I don't know if it's

17  titled that --

18          MS. LEWIS:  Okay.

19          THE COURT:  -- but it's in relation to reasonable

20  orders to move, which is what we've been talking about here.

21          MS. LEWIS:  Yes, Your Honor.  And what you will find

22  in the complaint, and even in the video, is that Mr. Alaniz

23  actually did comply with the order.  You will find that he

24  actually did, in fact, comply with the order.  The issue here

25  is --

1           THE COURT: Where does it say that in your complaint?

2           MS. LEWIS: Let's see.

3           THE COURT: I mean, in Paragraph 21 you say, "Despite

4   Mr. Alaniz being fully compliant as he attempted to leave as

5   ordered," everything in 15, 16, and 17 is contradictory to

6   that. It does not say that he started to move. It says only

7   that he tried to explain he was not with the group. He -- I

8   think that's it.

9           MS. LEWIS: And he can do both. He can do both. And

10  that's exactly what happened. He did both. He was moving and

11  explaining, and moving and explaining. And so that's what's

12  pled here, and the video will support it.

13          THE COURT: That's not what's pleaded there.

14          MS. LEWIS: Well, I -- you just said that it was in

15  both sections, and I know that they're not together. That's

16  true. However, they -- both sets of facts are pled here, that

17  he was obeying the order, and he was also explaining. And as I

18  stated, with that, we go back to whether the order was lawful

19  or not. And despite whether -- well, I don't think it's

20  relevant, actually, because he did comply.

21          And so that -- if that is the basis for Cannon's

22  arrest -- and we -- you know, we say that. If it's speech

23  only, we know that if it's speech only, that that is actually a

24  defense to an interference is that if it's speech only. And I

25  think that's Section D, that if it's only words, and that's

1  here is words, him trying to explain.

2  THE COURT:  Yeah, well, whatever.

3  MS. LEWIS:  That is the defense.

4  THE COURT:  I'm not very sympathetic to persons in

5  and among a crowd who are basically giving officers a hard time

6  trying to clear the scene.

7  MS. LEWIS:  I understand that.

8  THE COURT:  This just doesn't -- I'm just sort of

9  like qualified immunity is for just that type of situation.

10  Your client doesn't get to make the law enforcement officer's

11  life more difficult in a given instant just because he wants

12  to.  I look at it from the standpoint of the officers.  They're

13  giving orders.  And people are either following them or not,

14  and the consequences follow from that.  But I don't see

15  anything that says, okay, I'm supposed to just shift over and

16  look at it from your client's point of view.

17  MS. LEWIS:  Well, Your Honor, I would say if you look

18  at it from an impartial standpoint that --

19  THE COURT:  It will be impartial.

20  MS. LEWIS:  Okay.  Well, in that instance, what I

21  would say is that --

22  THE COURT:  Which is also why I want to watch the

23  video so that I can impartially judge what I think is happening

24  there.

25  MS. LEWIS:  Yes.

1          THE COURT:  Go ahead.

2          MS. LEWIS:  Yes, but with that being said, looking at

3    it from, you know, from not only the officer's standpoint, but

4    as a citizen of the United States of America that has a

5    constitution applied to it and available to them, that you will

6    see that Mr. Alaniz actually -- if the laws say that he is --

7    he's allowed to, you know, have speech in defense -- and mind

8    you, Mr. Alaniz simply was trying to explain his situation.

9    I'm trying to go.  I'm trying to leave.  He has -- we know he

10   has a disability.  That is pled in the complaint.

11         THE COURT:  Well, you know that he has a disability.

12   I mean, the ADA claims I think are dismissed and nothing was --

13   no one knew.  I mean, and the disability, to be clear, is a

14   brain tumor.

15         MS. LEWIS:  Right.  And --

16         THE COURT:  That is not obvious.

17         MS. LEWIS:  Notwithstanding that, that is -- we know

18   here in this room --

19         THE COURT:  Right.

20         MS. LEWIS:  -- that it's alleged --

21         THE COURT:  Okay.

22         MS. LEWIS:  -- that he has a disability, and that's

23   what I mean by that.  He has a disability.  It has been pled,

24   and I believe that it is a strong ADA claim.  And I understand

25   your position because as an ADA claim, the standard is much

 1  different.  This is not -- you know, this is not like a civil

 2  rights claim.  It's much different on the ADA front.  And we

 3  can deal with that on, you know, another day, another time.  I

 4  know we're not here for that today, but with that being said --

 5          THE COURT:  The ADA claim did get dismissed last

 6  time, right?

 7          MS. LEWIS:  Yes, it did.

 8          THE COURT:  Okay.

 9          MS. LEWIS:  Uh-huh.  It did.

10          THE COURT:  Okay.

11          MS. LEWIS:  And so, Your Honor, the allegation is

12  that he was trying to explain his disability, and he was cut

13  short by Cannon.  He was trying to move --

14          THE COURT:  Mm-hmm.

15          MS. LEWIS:  -- and he had this aggressive countdown

16  that followed.  And I think that is, you know, actually what's

17  complained -- I mean, excuse me, pled in the complaint, that

18  there was this aggressive countdown and almost like a hunt.  As

19  he's counting down, he's after him.  And Mr. Alaniz is still --

20  you will see the camera steadily on the move.

21          THE COURT:  Say what?

22          MS. LEWIS:  You will see the camera steadily on the

23  move.

24          THE COURT:  Okay.

25          MS. LEWIS:  You won't see him standing still.

1          THE COURT:  Okay.

2          MS. LEWIS:  And so as far as the -- excuse me, the

3    false arrest is concerned, there is no probable cause.  And I

4    want to go back to the fact that there was a representation

5    here today that the only reason why he was not charged was

6    because the Houston Police Department lost the paperwork.

7    Well, I want to remind the Court that this is Harris County

8    that arrested Mr. Alaniz and he was taken to Harris County

9    Jail.

10          THE COURT:  Mm-hmm.

11          MS. LEWIS:  Where the Houston Police comes in, in the

12   middle of this, I don't know.  But for them to insert that

13   fact, I would question that fact seeing that we have a direct

14   connection from in the same agency.

15          THE COURT:  Well, from what I need to -- is

16   ultimately he did not stand accused or go forward on a charge

17   against him with relation to any of this conduct, right?

18          MS. LEWIS:  Absolutely.

19          THE COURT:  Okay.  No, I've got that.  I understand

20   that.

21          MS. LEWIS:  Right.  But I just want to clear up the

22   fact that it was represented that the only reason he wasn't

23   prosecuted, or the charges didn't go forward is because Houston

24   lost the -- the Houston Police Department lost the paperwork.

25          THE COURT:  Okay.  Well, yeah.  I've -- that doesn't

--

MS. LEWIS: Okay. I just wanted to clarify.

THE COURT: That doesn't persuade me. Because again, it's more what happened at the time of the incident.

MS. LEWIS: Well, but I think it is important to show that he was never charged. I think that's important, and I don't want that to be --

THE COURT: Okay.

MS. LEWIS: -- minimized or diminished, the fact that he was never charged. There was nobody that ever supported Cannon's assertion that he had probable cause. At the lowest level, they didn't even find that he had reasonable suspicion. That is what that release, that immediate release says to me, that he didn't even have reasonable -- that low threshold level to even detain him on a reasonable suspicion basis.

THE COURT: Okay. All right.

MS. LEWIS: Now, as far as, let's see, going to the use of force, obviously if there's a finding that there was no probable cause, then we go back to the need for force. And if there's no need for the arrest, that makes the need for force --

THE COURT: Got that, but you can still have, even if there's the probable cause to arrest, there can still be excessive force.

MS. LEWIS: Absolutely.

1          THE COURT:  Let's argue it that.

2          MS. LEWIS:  Okay.  Yes.  We will assume that there

3    was probable cause.

4          THE COURT:  Yeah.

5          MS. LEWIS:  And so with that, Your Honor, you have --

6          THE COURT:  I mean, I understand if -- I understand

7    how it adjusts my view of a use of any force at all if there

8    wasn't probable cause in the first place, but --

9          MS. LEWIS:  Yes.

10         THE COURT:  -- the harder argument I think for you

11   is, okay, there's probable cause now as to the excessive force.

12         MS. LEWIS:  Yes.

13         THE COURT:  Or whether it's excessive.  Let's talk

14   about that.

15         MS. LEWIS:  Okay.  We can -- now, as it relates to

16   Mr. Alaniz, he was not resisting.  That's one.  But even if he

17   was resisting, the Fifth Circuit has said that even passive

18   resistance, it still has to be a reasonable use of force even

19   with just the slightest passive resistance.  And they found

20   that even with passive resistance that an -- it has to be

21   weighed against the use of force necessary.

22         And Eckert v. Blair is a very good case, and it talks

23   about the fact that, you know -- well, we know based on the

24   allegations here that the injuries are not deminimis, but Mr.

25   Alaniz suffered a -- he needed surgery.  It wasn't just he hurt

1  his shoulder.  He needed surgery.

2          THE COURT:  Oh, no.  And I think that injury is also

3  established.  I mean, I don't think that there's any contention

4  that --

5          MS. LEWIS:  Yeah, well, but --

6          THE COURT:  -- it's like, well, you can rest assured

7  that I'm not -- of what you've pleaded happened to him in terms

8  of injury --

9          MS. LEWIS:  Yes.

10          THE COURT:  -- that's pleaded.  There are other

11  elements that I have to consider.

12          MS. LEWIS:  But that's to be weighed against the use

13  of force.  Also the level of the injury that --

14          THE COURT:  Yeah.

15          MS. LEWIS:  -- occurred after the use of force.  And

16  I just wanted to be clear that, you know, it wasn't just a hurt

17  shoulder.  It was actually surgery to the shoulder.  And so --

18  and with that, Your Honor, what's interesting there is a -- I

19  think Ms. Bradley discussed a case called -- oh, Childers, the

20  Childers case.  And here we can distinguish that Childers case

21  primarily because there's an actual recent case that followed

22  that also distinguished Childers.

23          And ironically, it's Harris County who was seeking

24  qualified immunity in a case called Gorsky v. -- I don't want

25  to mispronounce it, but it's Guajardo.  Anyhow, with that case,

1   it distinguishes --

2             THE COURT:  Can you give me the cite?

3             MS. BRADLEY:  Your Honor, that's my case.

4             THE COURT:  Well, but you can sit down.

5             MS. BRADLEY:  I can clarify.

6             THE COURT:  I don't want to hear anything from you

7   right now.  That's great that that's your case --

8             MS. BRADLEY:  But I --

9             THE COURT:  -- but it's not your time to talk.

10            MS. BRADLEY:  All right.  I'm sorry.

11            THE COURT:  So go ahead.

12            MS. LEWIS:  And it was not a successful, you know,

13  qualified immunity assertion in that case either.  That case is

14  actually so new that there is not a cite, but I can give you

15  the Lexus cite for it.  I use Lexus.

16            THE COURT:  Go ahead.

17            MS. LEWIS:  You probably use West Law, but it's --

18  the case number is 20-20084 23 -- oh, sorry, 84, 2023 U.S. App.

19  Lexus 13164.

20            THE COURT:  Okay.

21            MS. LEWIS:  And that was just -- excuse me, just

22  issued on May 26 --

23            THE COURT:  Okay.

24            MS. LEWIS:  -- 2023.  And that case actually

25  distinguished Childers case.

1          THE COURT:  In what way?

2          MS. LEWIS:  Well, it -- this was -- the Gorsky case

3  was about a failure -- alleged failure to comply with the

4  officers in that case where officers had came to Mr. Gorsky's

5  home, and was looking for his wife.  I guess there was some

6  allegation she threw eggs at the neighbor or something like

7  that.  And officers showed up, and he wouldn't -- they told him

8  to go get his wife, an alleged lawful command.

9          And he did not go get his wife, and he basically

10  laughed it off, like, you know, you're kidding me.  What are

11  you doing here over this egg-throwing incident?  And my wife

12  didn't throw any eggs.  And so anyhow -- and Ms. Bradley, you

13  probably do know the facts much better, but that's the gist of

14  it.  And so they arrested him based on his failure to comply.

15          THE COURT:  What's the excessive force component of

16  it?

17          MS. LEWIS:  Well, I'm sorry.

18          THE COURT:  I thought we were talking about excessive

19  force.

20          MS. LEWIS:  I did skip over it.  I'm sorry.  I was

21  done with that, and I was --

22          THE COURT:  Okay.

23          MS. LEWIS:  -- going back to distinguish Childers.

24          THE COURT:  Oh, okay.  All right.

25          MS. LEWIS:  I apologize.

1          THE COURT:  All right.

2          MS. LEWIS:  Yes.

3          THE COURT:  Okay.  I'll take a look at that case.

4   What else?

5          MS. LEWIS:  I -- well, I believe that that would be

6   it.  And I would just ask the Court to, you know, obviously

7   continue to refer to our brief.

8          THE COURT:  Yes.

9          MS. LEWIS:  I think we have some decent stuff there

10  --

11         THE COURT:  Okay.

12         MS. LEWIS:  -- for you to look at.

13         MS. BRADLEY:  Just briefly, Your Honor.

14         THE COURT:  In response or reply.

15         MS. BRADLEY:  The Guajardo case, it's a different

16  case.  It's not Gorsky.  Guajardo is also my case.  It was a

17  police officer who tased a young man in a park.  It's currently

18  on its way to the supreme court on the issue of qualified

19  immunity.  Judge Bennett --

20         THE COURT:  On petition for cert.

21         MS. BRADLEY:  Yes, sir.  And the --

22         THE COURT:  I guess so far the Fifth Circuit has said

23  qualified immunity doesn't apply?

24         MS. BRADLEY:  Does apply.

25         THE COURT:  Does apply.  All right.

1          MS. BRADLEY:  It was a tasing, so it's slightly

2    different facts than this, but he was tased.  And Judge

3    Bennett, on a summary judgment for the deputy granted qualified

4    immunity because they didn't show clearly established.  In that

5    case, they just alleged lots of other bad acts.  Because

6    there's really only two dispositive tasing cases, and the court

7    said that's just not enough to let the deputy know that there's

8    clearly established law.  Harris County was let out on a motion

9    to dismiss.

10          On the Gorsky case, Ms. Lewis is correct.  It just

11   came out two weeks ago, and it's an unpublished opinion so it

12   can't be used to determine qualified immunity.  Only published

13   cases can guide this Court.

14          THE COURT:  Mm-hmm.

15          MS. BRADLEY:  And I think Your Honor knows that.  And

16   I encourage you, if you're going to read the Gorsky opinion,

17   look at the dissent.  They say that the other two judges go --

18          THE COURT:  Don't rely on the majority --

19          MS. BRADLEY:  Mm-hmm.

20          THE COURT:   -- of the unpublished, but --

21          MS. BRADLEY:  Yes, but --

22          THE COURT:  -- the dissent --

23          MS. BRADLEY:  Yes.  Yes.

24          THE COURT:  -- I would find quite informative.

25          MS. BRADLEY:  And it --

1        THE COURT:  Who did the dissent?

2        MS. BRADLEY:  Oh, Jerry Smith.

3        THE COURT:  Okay.

4        MS. BRADLEY:  I want to say.  And he faults the court

5   for -- basically the majority opinion says Judge Rosenthal

6   found there were too many fact issues, and it should go to

7   trial.  They said we agree.  Too many fact issues, we should go

8   to trial.  He said there was a problem.  He agreed with

9   everything they said, but he said there was a problem with the

10  excessive force because Mr. Gorsky testified he was hurt.  And

11  then there was an issue with --

12       THE COURT:  But here we have somebody who clearly was

13  hurt.

14       MS. BRADLEY:  Right.  And then the same with Mrs.

15  Gorsky.  Mrs. Gorsky alleges that she was pushed into a chair

16  and roughly handcuffed.  And he said that there's no case law

17  on rough handcuffing.  In fact, there's other case law saying

18  that --

19       THE COURT:  That would be the contrary

20  (indiscernible).

21       MS. BRADLEY:  Yeah.  Yeah.  So I don't know that

22  that's necessarily --

23       THE COURT:  Okay.  It doesn't sound like it's going

24  to be --

25       MS. BRADLEY:  It's interesting.

1        THE COURT:  -- particularly factually on point.

2        MS. BRADLEY:  No, but I want to -- I have one other

3   thing I wanted to say, Your Honor.  I know you know this, but

4   there's two prongs to qualified immunity.  There's --

5        THE COURT:  Right.

6        MS. BRADLEY:  -- you have to establish a

7   constitutional violation (indiscernible) --

8        THE COURT:  And clearly establish.

9        MS. BRADLEY:  -- clearly establish that it has to be

10  case law that the officer would've known at the time.

11       THE COURT:  I understand that.

12       MS. BRADLEY:  Okay.  So anything that happened

13  afterward, even these --

14       THE COURT:  Mm-hmm.

15       MS. BRADLEY:  -- unpublished opinions really

16  shouldn't be considered.

17       THE COURT:  Mm-hmm.

18       MS. BRADLEY:  It should be from the moment of the

19  event back.  That's all I have, Your Honor.

20       THE COURT:  Okay.  All right.  Thank you all very

21  much.

22       MS. LEWIS:  Your Honor, I know that you kind of

23  mentioned, and I just want to make it clear, are -- is -- are

24  we getting the bodycam footage also?

25       THE COURT:  Well, I was saying in terms of what to

1  review here, your complaint, as I noted, does refer to your

2  client's video.  And so I think that I can review that for

3  purposes of assessing a motion to dismiss the amended

4  complaint.  I think on other aspects, it hasn't been converted

5  to summary judgment.  If you oppose me looking at the officer

6  bodycam -- I know you haven't seen it yet.  If you oppose me

7  looking at it in this context, then I won't.  So I don't want

8  it submitted to me now.

9          MS. BRADLEY:  Okay.

10         THE COURT:  The -- any officer bodycam.  The Alanis

11  video I do want because it's referenced in the complaint.

12         MS. BRADLEY:  Okay.

13         MS. LEWIS:  So is -- actually, I'm looking at the

14  complaint and so is the bodycam footage.

15         THE COURT:  Is referenced where?

16         MS. LEWIS:  It's referenced on Page 9, I believe.

17         THE COURT:  So let me look at the context within

18  which that is done.

19         MS. LEWIS:  It's pretty much in the same context as

20  relates to the investigation with the internal affairs

21  department and in Officer -- excuse me, Sheriff Gonzalez

22  reviewing those videos.

23         THE COURT:  That is you talking generally about what

24  I understand your information and belief is about Harris County

25  policy in this regard.  I didn't read that as that there was

1    investigation and review of this body worn camera footage

2    itself.  I mean, do you have information that it was reviewed

3    and et cetera?  Are you assuming that it is?  Do you want me to

4    look at it?  I guess that's the question.

5              MS. LEWIS:  I would like -- yes, I would like for the

6    bodycam -- if we're going to look at Alaniz's video, I think

7    it's only right that all the -- that both videos be admitted.

8              THE COURT:  Okay.  Well, then I'm happy to do that.

9              MS. LEWIS:  Even though I object to all the videos,

10   including Alaniz's.  I think we should stick to the four -- you

11   know, the four corners of the complaint.

12             THE COURT:  Well, okay.  So that --

13             MS. LEWIS:  But I --

14             THE COURT:  I hear what you're saying.  I think that

15   I can appropriately look at Mr. Alaniz's video because the way

16   that it's referenced and used in Paragraph 52.  So you have an

17   objection to that.

18             MS. LEWIS:  Yes.

19             THE COURT:  I understand that, that I'm allowing you

20   to preserve on appeal.  I'm not going to look at the officer

21   bodycam footage if you're thinking by my doing that I'm giving

22   you another appeal point.  What I'm saying is I think your

23   complaint the way it's pleaded as to your client's video allows

24   me to review it.  I don't see anything in your complaint that

25   says the same thing that I should look at the bodycam footage

1  of the officers.  So do you want me to look at their bodycam

2  footage or not?  But that's going to have to be with your

3  consent, not with your objection.

4      MS. LEWIS:  Well, Your Honor, I can consent so long

5  as I don't want it later to be construed that this is a

6  conversion to summary judgment because I'm agreeing to this.

7  Because that is actually, you know, allowed under Rule 12 that

8  if you attach a complaint, if I'm doing this --

9      THE COURT:  Right.

10      MS. LEWIS:  -- under consent that it would convert.

11  And if it is going to convert, then obviously I'm going to want

12  my discovery, and so on and so forth --

13      THE COURT:  Exactly.

14      MS. LEWIS:  -- to go along with that.

15      THE COURT:  And so --

16      MS. LEWIS:  And (indiscernible) and so forth.

17      THE COURT:  -- then I'm not going to --

18      MS. LEWIS:  So if Ms. Bradley is --

19      THE COURT:  That's asking me to agree that you've

20  consented in a way that preserved your objections.  And I'm not

21  --

22      MS. LEWIS:  No, not that.

23      THE COURT:  I'm not saying that you're trying to be

24  clever, but like based on what you just said, it means I'm not

25  going to look at the officer bodycam footage.

1    MS. LEWIS:  What I'm --

2        THE COURT:  I'm happy to not do that.

3        MS. LEWIS:  Well, what I'm saying is out of

4    fundamental fairness, that I think that from both perspectives

5    should be that if we're going to look at any perspective,

6    because it -- because obviously qualified immunity is based on

7    the officer's perspective.  And I would like to see that video,

8    and I would like -- you know, if we're going to rate them both

9    -- because I know what Mr. Alaniz's video has on it.  And I

10   can't imagine Cannon's video having -- being anything more than

11   helpful in this decision.

12        If we're going to look at it, we should look at it as

13   a whole from both perspectives.  So that's where I'm coming

14   from.  But again, like I said, I just don't want to agree to

15   convert this.  That's all.  If it's understood that I'm not

16   agreeing to convert this to a summary judgment, then I am -- I

17   would ask the Court that all videos be made available.  I just

18   don't want to walk into this trap that, you know, oh, you

19   agreed.

20        THE COURT:  Well, I'm not trying to set a trap.

21        MS. LEWIS:  Oh, not you, yeah.

22        THE COURT:  I'm trying to do -- like I don't want to

23   look at something if it's not in the proper posture.  And

24   that's what I'm trying to say.  On motion to dismiss, I think

25   it is in a proper posture for me to look at your client's video

1   because of the way it's referenced in a bolstering way to

2   support the allegations in the amended complaint.  I tell you

3   in the other cases where I've looked at the bodycam footage,

4   it's been with both sides saying, yes, you ought take a look

5   at it.  And if you all look at all of my decisions on this,

6   sometimes I find for the Plaintiff, sometimes I find for the

7   Defendant.  I -- it -- I look at the video and make a decision.

8          MS. LEWIS:  Your Honor, can I ask one question,

9   please?  If I could just have an understanding if I were to

10  consent to the officer, is it the Court's intention to convert

11  it?  It's -- I mean, it's just that simple.

12         THE COURT:  To a summary judgment.

13         MS. LEWIS:  Yes.

14         THE COURT:  Well, I guess I have to because -- I

15  would have to be doing that because from what I'm saying is

16  it's not something that I can fairly consider within the four

17  corners of the complaint.  I think it's something that can be

18  easily put before me, but it's outside the complaint itself.

19  Whereas your client's video is squarely referenced.  And what

20  I'm saying is it's like incorporated into your complaint.

21         MS. LEWIS:  But there is no reference to anywhere in

22  the video, in the video.  There's a reference of a video just

23  like there's a reference of the bodycam, but there is no

24  reference in the complaint --

25         THE COURT:  But the reference of any --

1          MS. LEWIS:  -- to the video --

2          THE COURT:  -- bodycam video here --

3          MS. LEWIS:  -- in the context of the video.

4          THE COURT:  -- is just as to Harris County policy,

5   and that whereas you're preserved on this as far as your

6   client's video goes.  But Paragraph 52 references it as being

7   provided in a way that's intended to bolster, hey, if I review

8   that video, I'm going to agree that Paragraphs 15 through 25

9   are pleaded in accord with that video.

10          MS. LEWIS:  Well, Your Honor, I would urge the Court

11  to -- if I could, Your Honor, I can get you that case where

12  there's a distinction between references from what's in the

13  video versus referencing the video itself and contents.  And I

14  think here it's clear there is no reference at all to any facts

15  that say look at this point in the video, look at, you know,

16  timestamp this --

17          THE COURT:  Well, you could --

18          MS. LEWIS:  -- or look at this fact.

19          THE COURT:  Do you have the cite?  I mean, I'll

20  certainly take a look at the cite.

21          MS. LEWIS:  I don't have a cite, but I --

22          THE COURT:  You don't have to look for it now.  You

23  can advise -- you can send an email to my case manager --

24          MS. LEWIS:  If I could, yes.

25          THE COURT:  -- and copy opposing counsel with that

1  cite, and I will take a look at that case.

2         MS. LEWIS:  Okay.  Thank you, Your Honor.

3         MS. BRADLEY:  So Your Honor, at this point I'm just

4  giving you Mr. Alaniz's cell phone video.  That's it.

5         THE COURT:  That's it.

6         MS. BRADLEY:  Okay.  I want to be (indiscernible).

7         THE COURT:  That's it.  All right.  And honestly,

8  what the Fifth Circuit or maybe all courts need to do on

9  qualified immunity in modern times, which always include video

10  and bodycam footage, is that, notwithstanding discovery

11  limitations, it's not really discovery.  It's that the video

12  all gets turned over, and then the complaint gets amended and

13  repleaded in the best way possible in accord with the video.

14         But I understand what you're saying about, oh, if I'm

15  converting it to summary judgment, you want to open up

16  discovery.  I'm not saying that.  I'm just saying the complaint

17  should already conform to what's on available video for here.

18         MS. LEWIS:  Yes.

19         THE COURT:  And it doesn't really matter what any

20  person says about that video.  It's what's the objective record

21  of what happened.  But I'm going to take a look at Mr. Alaniz's

22  here because I don't want to convert this to summary judgment

23  right now.

24         MS. LEWIS:  And Your Honor, if I can just agree with

25  you in a certain way as it relates to what you were saying

1  about the qualified immunity issue, I know because of Carswell

2  v. Camp, it seems as though we don't get discovery. And -- but

3  I ask the Court if that would extend to initial disclosures,

4  which would do exactly what you're proposing, giving, you know,

5  the initial things.

6         THE COURT: Well, my initial disclosures or do say

7  get video out ASAP. I do that on slip and falls at Walmarts

8  and things like that too.

9         MS. LEWIS: And that used to be the normal course --

10        THE COURT: But --

11        MS. LEWIS: -- with these cases also.

12        THE COURT: But we're here even before initial

13  disclosures, right?

14        MS. BRADLEY: Yes.

15        THE COURT: Yeah, and so -- and I understand you

16  don't want to open -- I mean, qualified immunity is to like

17  remove all of the discovery. You're to try and test it on

18  what's pleaded. But I got to say, Ms. Bradley, the real

19  problem here is your argument depends on you having viewed the

20  video, and you construing it and making arguments in light of

21  what you've seen on the video. And you've conceded that, that

22  if I watch the video on the resisting arrest, I'll see him

23  pulling away. And it's like, well, that's just not, you know,

24  pleaded. But I may see that. Maybe I won't. Depends on whose

25  video I'm looking at that. So that's -- I understand you're

1    sort of like, well, I don't want to engage in any discovery,
2    but I want to give you my take on what the video says -- shows.
3    And that's -- you know, I can't do that.
4            MS. BRADLEY:  Your Honor, just if I can, Carswell
5    says that discovery isn't just, you know, a protection for
6    trial.  It's a protection for discovery as well.
7            THE COURT:  Oh, it's a protection from litigation.
8            MS. BRADLEY:  Litigation.
9            THE COURT:  The litigation process.  I understand
10   that.
11           MS. LEWIS:  And that's long-standing.  I mean, there
12   is long-standing.  That's nothing new.  But I think that they
13   have narrowed it, you know, to anything -- but what I wanted to
14   say, Your Honor, is that I don't -- our initial disclosures,
15   mandatory disclosures that the legislation has codified say --
16   is that actually discovery, initial disclosures, and that's a
17   question that needs to be explored.  Because we get back to,
18   you know, your suggestion that if it's just these simple
19   things, that could -- you know, if I don't -- a lot of times as
20   a Plaintiff on this, we don't get --
21           THE COURT:  And that's sort of like what I would see
22   as these low burden type things.
23           MS. LEWIS:  Yeah.  So we would dismiss --
24           THE COURT:  Not harassing.  Because from the --
25           MS. LEWIS:  -- these cases early on.

1          THE COURT:  -- Defendant's -- the municipal
2  Defendant's standpoint is, and the officers, it's to avoid
3  burdensome and harassing litigation if it's not supposed to go
4  forward.
5          MS. LEWIS:  Absolutely.  And if it's limited --
6          THE COURT:  And so honestly, the Supreme Court is
7  going to take up qualified immunity at some point in the near
8  future, and you all are going to have new rules that you have
9  to learn going forward.
10         MS. LEWIS:  Yeah.  And Your Honor, if we knew
11 earlier, trust me, we would not want to waste our time, energy,
12 and all that.  If there was a video that came out and showed
13 our client, you know --
14         THE COURT:  Yeah.  Okay.
15         MS. LEWIS:  -- not complying and all this nonsense.
16         THE COURT:  All right.  Thanks, everybody, and --
17         MS. LEWIS:  Thank you, Your Honor.
18         THE COURT:  -- your interns still interested in
19 meeting me?
20         MS. BRADLEY:  Yeah.  Come on up.
21         THE COURT:  All right.  Great.  I'll come on down.
22         MS. BRADLEY:  Yeah.
23         THE COURT:  We're adjourned on the hearing.  Off the
24 record.
25         (Hearing adjourned at 4:14 p.m.)

C E R T I F I C A T I O N

    I, Sonya Ledanski Hyde, certified that the foregoing
transcript is a true and accurate record of the proceedings.

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  June 26, 2023