# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **JOE ANTHONY ALANIZ,** | § | |
| **PLAINTIFF,** | § | |
| | § | **Civil Action No.: 4:22-cv-1991** |
| **V.** | § | **JURY DEMANDED** |
| | § | |
| **HARRIS COUNTY, TEXAS,** | § | |
| **SHERIFF ED GONZALEZ,** | § | |
| **DEPUTY VANESSA ESQUEDA,** | § | |
| **SGT. ANA ORTIZ,** | § | |
| **DEPUTY MARK CANNON,** | § | |
| **DEFENDANTS.** | § | |

## PLAINTIFF'S RESPONSE TO HARRIS COUNTY AND DEPUTY CANNON'S MOTION FOR SUMMARY JUDGMENT DKT. 97 & 98 (CORRECTED)

**TO THE HONORABLE JUDGE CHARLES ESKRIDGE:**

Plaintiff files this his omnibus response to Defendants, Harris County, and Deputy Cannon's Motion for Summary Judgment due to the overlapping facts and law pursuant to Rule 56 of the Federal Rules of Civil Procedure, and would show the Court the following in opposition to the motion:

## INTRODUCTION

1. Mr. Alaniz attended high school in Houston at two different schools but faced challenges he could not understand at the time. Ex. A

2. It caused difficulty in formally graduating due to a missed requirement, despite having completed the necessary coursework to pass. *Id.*

3. He attempted to earn his GED but was unsuccessful. Following high school, he pursued college courses at the University of Houston and Texas Southern University

1

for about two years without earning a degree. *Id.* He then transitioned into the business world, starting a small company selling beepers in the late 1990s and later focusing on internet services, including Wi-Fi design and hosting, which he operated successfully until 2008. *Id.*

4. His most notable entrepreneurial venture was opening the Press Box Bar in downtown Houston, which he ran for approximately four years but ultimately had to close due to not appreciating the harsh realities of business ownership despite his ambition. I*d.*

5. He had an unknown tumor growing in his body, his brain to be exact. Alaniz's diagnosis of a tumor had a profound impact on his life. *Id.*

6. This health crisis not only affected his ability to maintain employment but also contributed to considerable emotional and financial stress. As he grappled with his medical condition, the challenges of managing his health compounded his existing personal struggles, resulting in a period of instability and uncertainty in both his professional and personal life. *Id.*

7. Alaniz's experience illuminates the broader implications of serious health diagnoses, particularly how they can disrupt not only daily routines but also long-term goals and aspirations, forcing individuals like him to reassess priorities and navigate the complexities of living with chronic health issues. *Id.*

8. The condition he suffered eventually prompted him to step back from work during the COVID-19 pandemic when doctors advised him not to continue due to the risk of illness and complications. *Id.*

9. On May 29, 2020, Mr. Alaniz, a compliant citizen engaged in a therapeutic bike ride, was subjected to unlawful excessive force by Officer Cannon, resulting in significant injuries. *Id.*

10. Despite Mr. Alaniz's cooperation and efforts to avoid any confrontation, Officer Cannon unexpectedly initiated an assault, pushing him to the ground after issuing a countdown without prior indication of the consequences for not complying. Following this, Mr. Alaniz was detained and handled aggressively by Officer Cannon, which led to him striking his head against a rock and suffering a torn rotator cuff due to the manner in which he was restrained. *Id. Ex. G*

11. As a result of these actions, Mr. Alaniz has instituted legal proceedings, seeking redress under 42 U.S.C. § 1983 for violations of his Fourth Amendment rights against excessive force and unlawful seizure related to his arrest.*Ex. A*

12. Alaniz described the impact of his injuries caused by officers as both physical and psychological, detailing that the injuries not only resulted in immediate pain and medical complications, including difficulty with mobility and daily activities, but also led to long-term effects such as anxiety and emotional distress. *Id.*

13. He expressed feeling a loss of trust in law enforcement and the justice system, which contributed to a pervasive sense of insecurity in his environment. Id.

14. The trauma from the incident has affected his ability to engage in social interactions and pursue work opportunities, leading to a sense of isolation. Overall, these experiences have significantly altered his quality of life, provoking a lasting impact that resonates beyond the physical injuries themselves. *Id.*

15. The cumulative effects of his injuries were a significant burden that extended beyond the initial physical pain, highlighting how they disrupted his daily life and activities. *Id.*

16. He conveyed a sense of constant struggle, noting that the persistent discomfort led to limitations in his mobility, making simple tasks feel overwhelming and exhausting. *Id.*

17. Additionally, the psychological toll of living with chronic pain contributed to feelings of frustration and helplessness, affecting his mental health and social interactions. *Id.*

18. He expressed that the overall experience created a cycle of distress that permeated various aspects of his life, from work opportunities to personal relationships, ultimately altering his outlook and ability to engage with the world around him. *Id.*

19. His injuries had a direct negative impact on his therapeutic cycling, a method he used to manage stress and maintain physical fitness. *Id.*

20. He noted that the pain in his back and shoulders made it increasingly difficult to engage in cycling sessions, which he once found enjoyable and beneficial for his mental health. *Id.*

21. The limitations imposed by his injuries hampered his ability to participate regularly in this activity, leading to decreased motivation and feelings of frustration. *Id.*

22. As a result, the absence of cycling in his routine disrupted his established coping mechanisms, exacerbating his emotional distress and creating a sense of loss regarding a vital part of his self-care strategy. *Id.*

## **TABLE OF CONTENTS**

INTRODUCTION                                                                     1
TABLE OF CONTENTS                                                                4
TABLE OF AUTHORITIES                                                             4
OBJECTION TO CANNON'S SUMMARY JUDGMENT EVIDENCE                                  7
OBJECTIONS TO HARRIS COURTY MSJ EXHIBITS                                         7
EXHIBIT LIST                                                                     8
SUMMARY OF THE FACTS                                                             9
   Undisputed Facts                                               9
REMAINING DISPUTED FACTS                                                        24
ARGUMENT AND AUTHORITIES                                                        25
   Summary Judgment Standard                                     25
   Cannon is Not Entitled to Qualified Immunity                  26
   The Prohibition Against The Excessive Use of Force Was Clearly Established Law In May 2020, Constituting a Violation of The Fourth Amendment Under The United States Constitution.                                                                 26
   The Excessive Use of Force Against Joe Alaniz Was Objectively Unreasonable     35
   Arresting A Person Without Probable Cause Was Clearly Established Law In May 2020, as a Violation of The Fourth Amendment Under The United States Constitution     35
   Arresting Joe Alaniz Was Objectively Unreasonable             38
RESPONSE TO HARRIS COUNTY'S SUMMARY JUDGMENT DKT. 97                            40
   Harris County Disputed Facts                                  40
   Municipal Liability                                           42
   Failure to Train                                              43
   Cannon Had No Probable Cause To Detain Alaniz; Cannon Was Never Trained On The Constitutional Limits To Avoid Arrest Without Probable Cause.                          43

County is liable for constitutional violations because a municipal practice, custom promulgated by a policy-maker with deliberate indifference was the "moving force" or direct cause of the injury complained of by Plaintiff ........................................ 44

A causal link exists between Harris County's policy and the plaintiff's constitutional injury 46

Harris County has not disciplined any officer for actions related to arrests without probable cause. .......................................... 47

Ratification .......................................... 47

It is not within Harris County's Policies to Discipline Officers for Their Officer Initiates Arrests Without Probable Cause. .......................................... 48

Municipal Liability based on a Single Incident .......................................... 49

Extreme Circumstances .......................................... 51

CONCLUSION AND PRAYER **52**

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Aguirre v. City of San Antonio,* 995 F.3d 395 (5th Cir. 2021).................................... 35

*Allen v. Hays,* 63 F.4th 307 (5th Cir. 2023)................................................. 39

*Alexander v. City of Round Rock* 854 F.3d 298 (5th Cir. Tex. April 18, 2017)........ 39

*Anderson v. Creighton*, 483 U.S. 635 (1987)................................................. 28

*Barrett v. Orange County Human Rights Com'n,* 194 F.3d 341, 350 (2nd Cir. 1999) 54

*Blakely v. Andrade,* 360 F.Supp.3d 453 (2019)............................................ 42

*Bodzin v. City of Dallas,* 768 F.2d 722 (5th Cir. 1985)................................... 38

*Bone v. Dunnaway,* 657 F. App'x 258 (5th Cir. 2016)................................... 31

*Brower v. Cnty. of Inyo,* 489 U.S. 593, 109 S. Ct. 1378, 1380, 103 L. Ed. 2d 628 (1989)................................................................................................ 38

*Brown v. Bryan Cnty.,* 219 F.3d 450 (5th Cir. 2000)................................... 52

*Brown v. Lynch,* 524 F. App'x 69 (5th Cir. 2013)....................................... 31,51

*Bush v. Strain,* 513 F.3d 492 (5th Cir. 2008)............................................. 36,33

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)............................................. 28

*City of Canton, Ohio v. Harris,* 489 U.S. 378 (1989)......................................................... 48

*Connick v. Thompson,* 563 U.S. 51 (2011)..................................................................... 52

*Covington v. City of Madisonville, Texas,* 812 Fed.Appx. 219 (2020)......................... 50

*Darden v. City of Fort Worth, Tex.,* 880 F.3d 722 (5th Cir. 2018)............................ 28,29,37

*Dennis v. Warren,* 779 F.2d 245, 247 (5th Cir. 1985)...................................................... 37

*Devenpeck v. Alford,* 125 S. Ct. 588 (2004)................................................................... 38,46

*Deville v. Marcantel,* 567 F.3d 156 (5th Cir. 2009)........................................................ 33,35

*Garcia v. Salt Lake County,* 768 F.2d 303 (10th Cir. 1985)........................................... 54

*Glenn v. City of Tyler,* 242 F.3d 307 (5th Cir. 2001)...................................................... 36

*Goodson v. City of Corpus Christi,* 202 F.3d 730 (5th Cir. 2000)............................... 19,34

*Grandstaff v. City of Borger,* 767 F.2d 161 (5th Cir. 1985)........................................... 53

*Graham v. Connor,* 490 U.S. 386 (1989)....................................................................... 31

*Flores v. City of Palacios,* 381 F.3d 391 (5th Cir. 2004)................................................ 31,36

*Florida v. Bostick,* 501 U.S. 429 (1991)....................................................................... 37

*Florida v. Royer,* 460 U.S. 491 (1983)......................................................................... 38

*Freeman v. Gore,* 483 F.3d 404 (5th Cir. 2007).............................................................. 32,40,41

*Hall v. Tawney,* 621 F.2d 607 (4th Cir. 1980)............................................................... 29

*Hanks v. Rogers,* 853 F.3d 738 (5th Cir. 2017).............................................................. 29,36

*Hicks-Fields v. Harris Cnty.,* 138 S. Ct. 510 (2017)....................................................... 52

*Hicks-Fields v. Harris Cnty.,* 860 F.3d 803 (5th Cir.).................................................... 52

*Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cty,* 542 U.S. 177 (2004)................. 38

*Hobart v. City of Stafford,* 784 F.Supp.2d 732 (S.D. Tex. 2011)............................... 53

*Hogan v. Cunningham,* 722 F.3d 725 (5th Cir. 2013).................................................... 31

*INS v. Delgado,* 466 U.S. 210 (1984)............................................................................ 38

*Jamieson v. Shaw,* 772 F.2d 1205 (5th Cir. 1985).......................................................... 30

*Jinks v. Richland County,* 538 US 456, 466 (2003)..................................................... 45

*Johnson v. Glick*, 481 F.2d 1028 (2d Cir. 1973)...................................................... 30

*Johnson v. United States,* 333 U.S. 10 (1948)...................................................... 41

*Joseph v. Bartlett,* 981 F.3d 319 (5th Cir. 2020)................................................ 35

*Kitchen v. Dallas Cnty.,* 759 F.3d 468 (5th Cir. 2014)........................................ 52

*Littell v. Houston Indep. Sch. Dist.,* 894 F.3d 616 (5th Cir. 2018)........................ 52

*Massey v. Wharton,* 477 F. App'x 256 (5th Cir. 2012)...................................... 20,33

*Monell v. Dept. of Social Services of New York,* 436 U.S. 658, 701 (1978)............... 45

*Newman v. Guedry,* 703 F.3d 757 (5th Cir. 2012)...................................... 32,35

*Partridge v. Two Unknown Police Officers of the City of Houston,* 791 F.2d 1182, (5th
Cir. 1986).................................................................................................... 45

*Pearson v. Callahan,* 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565, 21 Fla. L.
Weekly Supp. 588 (2009)............................................................................ 28

*Pena v. City of Rio Grande City,* 816 Fed. Appx. 966, 2020.................................... 36

*Perniciaro v. Lea*, 901 F.3d 241 (5th Cir. 2018)............................................... 29

*Pratt v. Harris Cnty.,* 822 F.3d 174 (5th Cir. 2016)............................................ 20

*Ramirez v. Knoulton,* 542 F.3d 124 (5th Cir. 2008)............................................ 32

*Ratliff v. Aransas County, Tex.,* 948 F.3d 281 (5th Cir. 2020)................................ 53

*Reese v. Anderson,* 926 F.2d 494 (5th Cir. 1991)............................................... 29

*Reichle v. Howards,* 132 S. Ct. 2088 (2012)..................................................... 51

*Sanchez v. Young Cty., Texas,* 956 F.3d 785 (5th Cir. 2020).................................. 53

*Schaefer v. Whitted,* 121 F. Supp.3d 701 (W.D. Tex. 2015).................................. 52

*Sligh v. City of Conroe, Tex.,* 87 F.4th 290 (5th Cir. 2023).................................... 50

*Stroik v. Ponseti,* 35 F.3d 155 (5th Cir.1994)................................................... 29

*St. Louis v. Praprotnik,* 485 U.S. 112 (1988).................................................... 49

*Terry v. Ohio,* 392 U.S. 1, 19-20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)............... 39

*Tolan v. Cotton,* 573 F. App'x 330 (5th Cir.)............................................................... 34

*Trammell v. Fruge,* 868 F.3d 332, 341 (5th Cir. 2017)................................................. 35

*United States v. Bengivenga,* 845 F.2d 593 (5th Cir. 1988)........................................ 41

*United States v. Corral-Franco,* 848 F.2d 536 (5th Cir. 1988)................................... 41

*United States v. Hill,* 752 F.3d 1029 (5th Cir. Miss.May 29, 2014)........................... 38

*United States v. Levine,* 80 F.3d 129 (5th Cir. 1996)................................................... 37

*United States v. Mask,* 330 F.3d 330 (5th Cir. 2003)................................................... 38

*United States v. Mendenhall,* 446 U.S. 544 (1980)...................................................... 39

*United States v. Valadez,* 267 F.3d 395 (5th Cir. 2001)............................................... 39

*Webster v. City of Hous.,* 735 F.2d 838 (5th Cir. 1984).............................................. 48

*Williams v. Bramer,* 180 F.3d 699 (5th Cir. 1999)...................................................... 32

*World Wide Street Preachers Fellowship v. Twn. of Columbia,* 591 F.3d 747 (5th Cir. 2009)................................................................................................................................ 50

*Zarnow v. City of Wichita Falls, Tex.,* 614 F.3d 161 (5th Cir. 2010)........................... 53

*Zinter v. Salvaggio,* 610 F.Supp.3d 919 (2022)............................................................ 42

## OBJECTION TO CANNON'S SUMMARY JUDGMENT EVIDENCE

| Exhibits | Objections |
| --- | --- |
| Exhibit 1 - Alaniz cellphone | No objection and adopts the exhibit. |
| Exhibit 2 - Deputy Cannon's BWC Video | No objection and adopts the exhibit. |
| Exhibit 3 - Sergeant Ortiz's BWC Video | No objection and adopts the exhibit. |
| Exhibit 4 - Defendant Mark Cannon's Motion to Deem The Requests for Admissions to Plaintiff Joe Anthony Alaniz Admitted | The facts requested in the admissions are not relevant, speculative, calls for legal conclusions, and improper. Notwithstanding the foregoing, deemed admissions could never support a summary judgment. |

| Exhibit 5 - Excerpts from Videotaped Deposition of Joe Anthony Alaniz, September 30, 2024 | No objection and adopts the exhibit. |
|---|---|
| Exhibit 6 - Excerpts from Videotaped Deposition of Sergeant Anna Ortiz, May 23, 2024 | No objection and adopts the exhibit. |
| Exhibit 7 - Excerpts from Videotaped Deposition of Detective Mark Cannon, September 24, 2024 | No objection and adopts the exhibit. |
| Exhibit 8 - Sergeant Anna Ortiz's Sworn Statement | Objection 403 Hearsay |
| Exhibit 9 - Michael Anthony Dirden Expert Report | Objection 403 Hearsay |

## OBJECTIONS TO HARRIS COURTY MSJ EXHIBITS

| Exhibits | Objections |
|---|---|
| Affidavit - HCSO Business Records Affidavit (11-08-2024) [HC_MSJ0000001-3] | Objection under 403 as to any hearsay statement within |
| Declaration - Declaration Isis Garcia (11-11-2024) [HC_MSJ0000004-5] | Objection under 403 as to any hearsay statement within |
| Exhibit A - HC_Alaniz 00003-00013 Case Summary(redacted) [HC_MSJ0000006-16] | No objection |
| Exhibit B - HC_Alaniz00075 Confidential Deputy Cannon Body Worn Camera [HC_MSJ0000017] | No objection |
| Exhibit C - HC_Alaniz00048-00055 TCOLE Training Records for Deputy Mark Cannon (redacted) [HC_MSJ0000018-25] | No objection |
| Exhibit D - 231 Policy [HC_MSJ0000026-34] | No objection |
| Exhibit E - 301 Policy | No objection |

| | |
|---|---|
| [HC_MSJ0000035-45] | |
| Exhibit F - 302 Policy [HC_MSJ0000046-50] | No objection |
| Exhibit G - 303 Policy [HC_MSJ0000051-59] | No objection |
| Exhibit H - 501 Policy [HC_MSJ0000060-78] | No objection |
| Exhibit I - 506 Policy [HC_MSJ0000079-90] | No objection |
| Exhibit J - Certified copies of Criminal Case Dispositions from the list attached to the Second Amended Complaint [HC_MSJ0000091-1391] | No objection |

## EXHIBIT LIST

| | |
|---|---|
| **Exhibit A** | **Alaniz Deposition/Declaration** |
| **Exhibit B** | **Cannon Deposition** |
| **Exhibit C** | **Cannon BWC Video** |
| **Exhibit D** | **Alaniz Internal Affairs Complaint** |
| **Exhibit E** | **Alaniz Cell phone Video link** |
| **Exhibit F** | **Anna Ortiz BWC Video** |
| **Exhibit G** | **Alaniz Medical Records** |
| **Exhibit H** | **Harris County Public Records** |
| **Exhibit I** | **Harris County Policies-*Adopted for Dkt 97 7-12*** |

# SUMMARY OF THE FACTS

Plaintiff objects to the defendant's depiction of the facts that blatantly contradict the video evidence inviting the court not to trust its lying eyes. The court should ignore the defendant's deceitful portrayal of the events and rely on the visual evidence presented and analyze the video that clearly discredits the defendant's story. And the video shows he kept his left hand under his body and it took several officers to control him so he could be cuffed. There is no citation to the video to support this representation.

*Undisputed Facts*

1.     Mr. Alaniz was not a protester. Ex. A, B

2.     Mr. Alaniz was the only person on the scene using a bicycle.

3.     As a cyclist he is supposed to be on the road.[1]

4.     Mr. Alaniz was not a pedestrian blocking the roadway. Ex. A, B, C,F.

5.     Mr. Alaniz was detained by Cannon.Ex. B 1:16

6.     Cannon is unfamiliar with traffic laws related to cyclists, but agreed that they are to adhere to traffic laws like a vehicle. *Ex. B 1:16*

7.     Cannon never asked Alaniz if he was a part of the protest.*Ex. B 1:17*

---

[1] Generally, bikes are entitled to all rights and obligated to all duties of the road that apply to a motor vehicle. Tex. Transp. Code § 551.101, see also Tex. Transp. Code, Title 7, Subtitle C. Rules of the Road, Chapters 541 - 600. https://www.txdot.gov/safety/bicycle-pedestrian-safety/laws-regulations-faq.html

8. No bricks were being thrown at Cannon in the scene with Alaniz, or while he was downtown. *Ex B. 1:18, Ex.F 20:12*

9. Mr. Alaniz moved when told to move by Cannon during Cannon's count. *Ex. C,D,F*

10. Detective Cannon acknowledges that while Alaniz complied with some of the officers' commands by moving. *Ex. B*

11. The only command Mr. Alaniz did not follow was to ride off instead of walk off, and did not actually get on his bike as instructed. *Ex. B.*

12. Mr Alaniz was not standing behind Deputy Cannon. *Ex. B. 63: 10-15, C*

13. There were no people throwing items that can hurt Mr. Alaniz. *Ex. B*

**The excessive force preceded any resistance, passive or otherwise, by Alaniz when Cannon shoved him to the ground.**

14. Alaniz was detained for not obeying a lawful order to leave and get on his bike. *Ex. B 41: 1-16, 39: 19-20.*

15. Mr. Alaniz is a Latino male, with a disability. *Ex. B, G*

16. He has a diagnosed disability, a brain tumor that he has been living with that makes him prone to seizures, and the need for therapeutic daily bike rides. *Ex. A.* Alaniz Deposition.

17. Cyclists have to adhere to traffic laws. Mr. Alaniz did not violate any traffic laws until Ortiz made him get off the roadway and onto the sidewalk. *Ex. E, F. FN 1*

18.    He wears emergency medical alert disability bracelets on each wrist. He was wearing a bracelet on each wrist when he was arrested by Cannon, Friday, May 29, 2020. *Ex. A,C,E,F* Alaniz Deposition. Ex. B 34: 12-15

19.    He often rode his bike for therapeutic purposes. *Ex. A.*

20.    He usually rides his bike throughout his local community to help to calm, relax him, and cope with his disability. *Ex. A.*

21.    On the date of the incident, Mr. Alaniz rode his bicycle along the feeder road of I-10 (interstate ten) near Mckey and San Jacinto Street. *Ex. A,C,E,F*

22.    When he reached the area, he came upon a group of unknown individuals who were gathering and a group of Harris County Sheriff's Office ("HCSO") deputies and Houston Police Department (HPD) officers. *Ex. A,C,E,F*

23.    He stopped his bike to assess the situation. Without explaining what was going on, HCSO Sergeant Ortiz ordered Mr. Alaniz to move off the street <u>onto the sidewalk</u>. He complied. *Ex. A,F*

24.    Mr. Alaniz tried to keep his distance from everybody and remain safe as he filmed the historical event unfolding in Houston live on Facebook. *Ex. A,E.*

25.    Unbeknownst to Mr. Alaniz, the protestors and officers were gathered in the area due to the news and cell phone footage released of the killing of Houston native George Floyd by Minneapolis Police in Minneapolis, Minnesota. *Ex. A*

26.     Mr. Alaniz was unaware of the protest and had no intentions of participating. He did not connect the events in Minneapolis, Minnesota with what he was witnessing in Houston, Texas. *Ex. A*

27.     Mr. Alaniz kept a distance from everyone, including officers and protestors. He was very concerned about contracting the then new Covid-19 at a time when the vaccine was not available. *Ex. A , Alaniz d*epo 125-2-13

28.     Mr. Alaniz was confronted by Deputy Cannon. Deputy Cannon advised Mr. Alaniz to <u>leave the sidewalk</u> in conflict to the orders Alaniz received from HCSO Sergeant Ortiz.*Ex. A,B 45: 8-12*

29.     He was then asked to move by the sergeant and join a protest group, but Mr. Alaniz tried to explain that he was not with the group. *Ex. A*

30.     Cannon did not allow him to explain, cut him off, and expressed he did not care whether Mr. Alaniz was with the group or not. Alaniz had to go with the group. Ex. C.

31.     Cannon ordered Mr. Alaniz to "get on your bike" and ride away with the group. Ex. A,B at 79:15-19.

32.     41: 1-16 of the document. During this segment, Cannon indicates that Alaniz was detained for not obeying a lawful order to leave and get on his bike.

33.     As Mr. Alaniz tried to explain as he complied, he did not argue with the officers when they unlawfully demanded he leave from the open field. *Ex. A, C*

34.     Despite Mr. Alaniz being fully compliant as he attempted to leave as ordered, Cannon gave Alaniz five seconds to navigate tall grass, weeds, and large rocks to ride away. *Ex. C*

35.     Cannon began to aggressively count down, 5, 4, 3, 2, and when he got to the count of one, Mr. Alaniz's medical alert bracelets were visible but he did not consider that Mr. Alaniz could have any disabilities. *Ex. C.*

36.     He was never trained by Harris County to identify the medical alert bracelets or how to respond to a person with the bracelets identifying serious medical conditions and disabilities. *Ex.B 66:18-25.*



37.     Mr. Alaniz continued to move as instructed but since he did not get on his bike, but walked in instead Cannon ended his countdown and grabbed Mr. Alaniz and flung him to

the ground onto rocks, causing him to hit his head against a rock and land on his elbows and knees. *Ex. A,B,C.*

*4 Q Okay. Now, just to be clear, you said that*
*5 his -- the order that you gave that he failed to obey*
*6 was for him to get on his bike and to leave, the*
*7 combination. So the fact that he wouldn't get on his*
*8 bike and he was just simply leaving, … that*
*9 was him not obeying your lawful order,*
*10 correct?*
*11 A Correct. Ex. B 82:4-11*

38.     Mr. Alaniz was detained because he failed to obey a lawful order to leave and get on his bike after being instructed. Detective Cannon indicated that the *combination* of not leaving and not getting on his bike was the reason for the detention. *Ex. B 80:1-17.*

39.     But the camera clearly shows it is moving and Mr. Alaniz is holding it therefore he was moving also. The reality is is that Detective Cannon arrested Mr. Alaniz for moving too slow and filming him. *Ex. B 78.*

40.     Cannon did not give any warnings of the consequences of the ending of the countdown or failure to get on the bike to allow Mr. Alaniz to comply and avoid detention. *Ex. A,B,C.*

41.     Other unknown law enforcement personnel swarmed in and joined in using unnecessary force against Mr. Alaniz until the officers handcuffed and escorted him by his arms raised in a rough, uncomfortable, painful position, causing unbelievable pressure, tension and ultimate injury by tearing his right shoulder's rotator cuff. *Ex.A,B,C.* This action also caused the dislocation of his right shoulder. *Ex. A,G*

42.     Mr. Alaniz had trouble walking with the officer to a Harris County Sheriff's Office detention bus because the pace the officers were forcing him to walk was too fast in the position he was in. *Ex. C. 20:00*

43.     Cannon delivered Mr. Alaniz to a detention bus and placed him in a bus full of other arrestees. *Ex. C Cannon BWC.20:15*

44.      Mr. Alaniz blacked out and has no memory while on the bus. Likely due to a seizure. *Ex. A*

45.     Mr.. Alaniz suffered an injured shoulder and was diagnosed with a right acromioclavicular separation, Acute head injury; Contusion of multiple sites; Injury of shoulder or upper arm, (M25.511 Pain in right shoulder, M25.512, Pain in left shoulder, R53.1 Weakness). *Ex. G at 48,376,379*

46.

47.     His $2200.00 Trek bicycle, which contained his wallet inside the emergency kit, was left at the scene. These items should have been placed in his personal property. Ex. A, D.

48.     Fortunately, all of the items were recovered four to five hours later by a Facebook viewer, Isac Saenz, who saw where Mr. Alaniz was on the live videos and came to the location.

49.     Upon intake at the Harris County Joint Processing Center (JPC), Jail intake officers documented there was an "investigation hold" for Mr. Joe Alaniz, but no probable cause for any arrest. He was booked May 30, 2020. Ex. D

50.    Mr. Alaniz did not receive medical attention initially, nor was he ever explained the reason for his arrest.Ex. A. He reported his injuries and pain to Harris County.Ex. G



```
Historical Problem List:
Medical HX Comments: STATES BODY PAIN TO R ARM - 8/10

Current Medical Problems As Stated By patient:
Seizure
Recent Trauma that needs medical evaluation: No
Recent surgery that needs medical evaluation: No
Communicable Illness Symptoms: No
Previous Infectious Disease(s): No
Comments AMBULATES WITHOUT ASSISTANCE  STEADY GAIT
Dietary Needs or Concerns: No
Lice: No
Skin: Tattoos
Comments: STATES SCRATCHES AND BRUISES
WOUND TO L KNEE
```

51.    Mr. Alaniz was released a day later. Mr. Alaniz went to Herman Memorial Hospital Southeast Campus after his release. *Ex. A, D*

52.    Mr. Alaniz had a history of brain tumors and seizures. *Ex. A,G*

53.    When he was released from custody, he went to the hospital emergency room and complained of head injury, bilateral leg and arms pain, and soreness everywhere. *Ex. A*

54.    A radiology report dated June 1, 2020, indicated findings are consistent with right acromioclavicular separation. *Ex. A*

55.    The excessive unreasonable use of force was also the reason Cannon failed to document the use of force or submit a Report about the complaints of pain and injury by Mr. Alaniz. *Ex. I*

56.    Cannon described his use of force during the detainment as minimal, stating he only applied enough pressure to restrain Mr. Alaniz while he resisted handcuffing. *Goodson v. City of Corpus Christi,* 202 F.3d 730, 734, 740 (5th Cir. 2000) (finding a fact issue precluded summary judgment on qualified immunity grounds where officers tackled an individual who

pulled his arm away during arrest attempt, but was not fleeing); see also *Massey v. Wharton,* 477 F. App'x 256, 263 (5th Cir. 2012) (rejecting qualified immunity where an individual was arrested for disorderly conduct, was not a threat to officers, and was not attempting to flee). In the latter cases, we have affirmed grants of qualified immunity. See *Pratt v. Harris Cty.*, 822 F.3d 174, 182-85

57.     On Wednesday, June 3, 2020, after his release, Mr. Alaniz filed an Internal Affairs report, gave an interview, and provided a sworn statement which initiated an investigation. *Ex. A, D*

58.     The Sheriff's IAD Disciplinary Committee investigated Deputy Mark Cannon.

59.     Deputy Fosdick took pictures of Mr. Alaniz's injuries during the interview to document the scrapes, scratches, swelling, and bruises over his body. *Ex. A, D.*

60.     After nearly five months to investigate the concerns and take a statement from Ortiz on Friday, October 30, 2020, the report was concluded. IAD confirmed there was no arrest report generated or HCSO report generated, that the criminal magistrate did not arraign Mr. Alaniz because he did not commit a crime, and the magistrate could not arraign Mr. Alaniz since there was no paperwork completed.

61.      Alaniz's arrest and the use of force against him was completely undocumented. *Ex. D*

62.     During the time Cannon was engaging Mr. Alaniz his body camera did not capture any alleged protest violence, *Ex. B 2:25:11*

63.     Mr. Alaniz was not violent towards Cannon. *Ex. B, C*

64. He never attempted to flee the scene.*Ex. C*

65. Sgt. Ortiz told Mr. Alaniz to move [on the sidewalk] and he did[2].

66. Cannon told Mr. Alaniz to leave.

67. Cannon was never trained that he can tell somebody to lawfully move if it's for your safety or theirs. *Ex. B 2:33:33*

68. Cannon does not recall Mr. Alaniz resisting arrest after he was restrained with handcuffs. *Ex. B*

69. The Harris County Sheriff's Office also confirmed Deputy Cannon and Sergeant Ortiz both failed to document the use of force. *Ex. D.*

70. There was no discipline for this failure.

71. Sheriff Ed Gonzalez was Harris County's policymaker.

72. Even after an investigation and review of body-worn camera footage that is reviewed with the Sheriff Ed Gonzalez for approval or denial, there is no discipline, and a blind eye is turned to unconstitutional actions captured on video. *Ex. D*

73. Officers know their unconstitutional actions will not be reviewed unless reported. There is no policy in Harris County to review body worn cameras, dash cam for surveillance footage randomly, or routinely for misconduct. *Ex. I*

74. Additionally, supervisors are trained, pursuant to the HCSO policy, to review all deputies' statements on a significant incident scene and make sure the statements do not conflict before accepting the statements. *Ex. I-Dkt 97-7-11*

---

[2] Houston City Ordnance Sec. 45-302 prohibits bicycles on sidewalks with pedestrians.

75. The officer witness statements must be approved by a supervising officer before it is accepted and is often returned to the officers to make changes to correct contradictions.*Ex I.-Dkt 97-7-11*

76. The HCSO supervisors have the power to destroy camera footage, and have a practice of engaging in exactly those actions then alleging the video is no longer available.*Dkt 97-7-11*

77. Cannon was not trained by Gonzalez or Harris County to recognize, inquire, investigate or respond to a person with a disability and accommodate their special needs. *Ex. B*

78. It has a practice, custom, culture, procedure, and training of permitting and encouraging excessive force against suspects, inmates, and persons in their custody. *Ex. H, I.*

79. Harris County failed to supervise and discipline for the wrongful and illegal behavior of its agents, staff, officers, and employees; there was a culture of silence, concealment and toleration of such conduct, and there was a failure to train resulting in the unreasonable force and false arrest, as well as First Amendment violation for denying his right to speech, and record. *Ex. D,H,I. (Use of Force Review Committee to discuss patterns or trends involving the use of force which they believe may require additional training, equipment, or policy modifications, and they will report their findings to the Sheriff.) Ex. I at 48.*

80. Plaintiff withdrew the appendix attached to the Second Amended Complaint for arrest from 2016-2020 in September 2023. *Dkt 71,72.*

81. The following cases are officer self initiated arrests by Harris County Sheriff's

deputies made without probable cause.

82.     On March 7, 2018, Chase Roshad Brooks was falsely arrested by Deputy George Lopez for interference with public duties and on March 9, 2018, the Magistrate found no probable cause. *Ex. H.*

83.     On August 10, 2018, Nicholas Wayne Alvarez was falsely arrested by Deputy Desmond Spivery for interference with public duties. On April 24, 2019 Judge found no probable cause to believe a crime existed. *Id.*

84.     On August 11, 2018, Cora Yvonne Shores was falsely arrested by Deputy Roland Rodriguez for failure to ID on August 13, 2018 Magistrate found no probable cause. *Id.*

85.     On April 28, 2018, Maxim Ivshin was falsely arrested by Deputy Stepha Quintanilla for interference with public duties. On April 30, 2018, the magistrate found no probable cause and the case was dismissed. *Id.*

86.     On July 7, 2018, Travis Aaron Shumate was falsely arrested by Deputy Chris Wilkerson for evading arrest as the sole witness. The case was dismissed on July 9, 2018, after the magistrate found no probable cause. *Id.*

87.     On July 7, 2018, Denecia McCutcheon, was falsely arrested by Deputy Jordan Reinert for evading arrest as the sole witness the case was dismissed on July 9, 2018 Magistrate found no probable cause. *Id.*

88.     On July 15, 2018, Miguel Angel Albarran, was falsely arrested by Deputy Richard V Burgess for evading arrest as the sole witness the case was dismissed on July 16, 2018, Magistrate found no probable cause. *Id.*

89.     On March 6, 2018, Brandon James Milam, was falsely arrested by Deputy Gerardo N Tuerina for failure to ID. On July 3, 2018 Magistrate judge found no probable cause. Id.

90.     On March 3, 2018, Jamarcus Mcgilbray, was falsely arrested by Deputy Melynda Martinez for interference with public duties on March 9, 2018, the Magistrate judge found no probable cause. *Id.*

91.     On May 8, 2018, Jorge Roque Perez, was falsely arrested by Deputy Stephanie M Rios for interference with public duties on May 9, 2018, the Magistrate judge found no probable cause. *Id.*

92.     On February 14, 2018, Jorge Monzon, was falsely arrested by Deputy Susan Hernandez for failure to ID on February 15, 2018, the criminal court magistrate dismissed the case because no probable cause exists to believe the defendant committed the offense alleged by the arresting officers. *Id.*

93.     On July 7, 2018, Renoir Donyale Warner, was falsely arrested by Deputy Ruben Gonzalez for evading arrest as the sole witness the case was dismissed on July 9, 2018, the criminal court magistrate dismissed the case because no probable cause exists at the time to believe the defendant committed the offense alleged by the arresting officers. *Id.*

94.     On July 4, 2018, Stephen Aaron Thomas, was falsely arrested by Deputy Andre H Tran for evading arrest as the sole witness the case was dismissed on July 6, 2018, the criminal court magistrate dismissed the case because no probable cause exists at this time to believe the defendant committed the offense alleged by the arresting officers. *Id.*

95.     On February 7, 2018, Ramiro Ruiz Perez, was falsely arrested by Deputy Manuel

Martinez, IV For failure to ID on February 13, 2018, the criminal court magistrate dismissed the case because no probable cause exists to believe the defendant committed the offense .

*Id.*

96.     On May 8, 2018, Derek Hanson, was falsely arrested by Deputy Jose Paiz for interference with public duties on May 9, 2018, the criminal court magistrate dismissed the case because no probable cause exists to believe the defendant committed the offense. *Id.*

97.     On February 17, 2018, Shannill Monique Gipson, was falsely arrested by Deputy Rawltyn Hart for interference with public duties on February 19, 2018, the criminal court magistrate dismissed the case because no probable cause exists to believe the defendant committed the offense. probable cause found. *Id.*

98.     On July 5, 2018, Yvonne Lee Perez was falsely arrested by Deputy Clinton Nash for failure to ID on July 9, 2018, the criminal court magistrate dismissed the case because no probable cause exists to believe the defendant committed the offense. *Id.*

99.     On April 28, 2018, Israel Alejandro Wing was falsely arrested by Deputy Ronny Keener Jr for interference with public duties on April 30, 2018, the criminal court magistrate dismissed the case because no probable cause exists to believe the defendant committed the offense. *Id.*

100.    On March 7, 2018, Katie I. Jacobs was falsely arrested by Deputy Gerardo N Tuerina for failure to ID on July 3, 2018, the criminal court magistrate dismissed the case because no probable cause exists to believe the defendant committed the offense. probable cause found judge. *Id.*

101.     On April 28, 2018, Reginald Castillo-Flores, was falsely arrested by Deputy Dakota Ray Pennick for interference with public duties on April 30, 2018, the criminal court magistrate dismissed the case because no probable cause exists to believe the defendant committed the offense alleged by the arresting officers, according to the magistrate. *Id.*

102.     On March 2, 2018, Lillie R Echols was arrested by Deputy Braxton Turner for evading arrest as the sole witness the case was dismissed on March 5, 2018. The criminal court magistrate dismissed the case because no probable cause exists to believe the defendant committed the offense alleged by the arresting officers, according to the magistrate. *Id.*

103.     On March 11, 2018, Deputy Shamanada Harris arrested Keneau Laymond, Christopher Bonner, Akia Laymond for interference with public duties. On March 13, 2018 the case was dismissed because there was no probable cause existed at this time to believe the defendants committed offense. *Id.*

104.     In all these arrests, the officers are the "complaining witness" and after the officer initiated false arrest for crimes. *Id.*

105.     These retaliatory and malicious false arrests were committed by HCSO deputies and no complaint from a third party was made. *Ex. I*

106.     Where the arresting deputy and/or their partner is also the complaining witness after there is a finding of no probable cause there is also not a single instance of Harris county disciplining, training or retraining its officers for the false arrest to stop the practice of arrest without probable cause and is the moving force behind the constitutional violation. *Id.*

107.    After Harris County and its policymaker Ed Gonzalez became aware of the unlawful practices of the arrest without probable cause by its deputies, through the submission of the arrest reports, not only did it fail to discipline or make provision to prevent the practice, it ratified the actions.

**Deputy Cannon credibility concerns**

108.    Cannon alleged at one point that he did not have audio on his body camera because the battery was dying on the camera and it affected the microphone. *Ex. C. 38:19-25,39*

109.    Claimed his car was nowhere near the scene and was downtown but his car was at the scene. *Ex. C. 20:20*

110.    Claim to not know the name of the person helping him escort Mr. Alaniz, but ultimately identified him in the video deposition. *Ex. B 2:14, Ex. C BWC 20:17*

111.    Mr. Alaniz was at the protest for George Floyd. *Ex. D*

112.    It is disputed that the scene was violent, fast moving, officers were under attack, having things thrown at them way on the scene. *Ex. C,E,F*

113.    The level of force is disputed. Deputy Cannon admits to using force, although contrary to Mr. Alaniz's excessive force recollection. Cannon claimed the force was "minimum amount" to apply the handcuffs on Mr. Alaniz. 5 Each force is based off resistance. *Ex. B. 45:5-6, 20-24*

114.    It is disputed that the force used by Cannon was based on resistance. *Ex. B 45:5-6, 20-24.*

115.    The timeline shows the count down by Cannon occurred first, then the use of force, then the passive resistance. *Ex. C,E,F*

116.    While, Mr. Alaniz alleges Cannon maliciously pushed, dragged and pulled him despite his submission. Alaniz wanted to explain facts to Cannon. *Ex.A, D.*


## ARGUMENT AND AUTHORITIES

117.    summary judgment on his Fourth Amendment liability on excessive force, unlawful seizure claims, based on the defendant, Mark Cannon's conduct causing Mr. Alaniz's injuries and constitutional violations.

### *Summary Judgment Standard*

118.    By the express language of Rule 56, a party may move for summary judgment, identifying each claim or defense on which summary judgment is sought. A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims" and defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

### *Cannon is Not Entitled to Qualified Immunity*

To evaluate whether a government official is entitled to qualified immunity, "[w]e must determine (1) 'whether the facts that a plaintiff has alleged make out a violation of a constitutional right' and (2) 'whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct.'" *Darden v. City of Fort Worth, Tex.,* 880 F.3d 722, 727 (5th Cir. 2018) (ellipsis omitted) (quoting *Pearson v. Callahan,* 555 U.S. 223, 232 (2009)).

The evidence and facts above demonstrate that Cannon Violated Mr. Alaniz's Constitutional rights to be free of the use of excessive force and unlawful arrest. *Ex. A, B,C,E,F.*

### The Prohibition Against The Excessive Use of Force Was Clearly Established Law In May 2020, Constituting a Violation of The Fourth Amendment Under The United States Constitution.

119.    "Law is 'clearly established' for these purposes only if 'the contours of the right were sufficiently clear that a reasonable official would understand that what he was doing violated that right.'" *Perniciaro v. Lea,* 901 F.3d 241, 255 (5th Cir. 2018) (brackets omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

120.    "A right may be clearly established without 'a case directly on point,' but 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 727 n. 8 (5th Cir. 2018), cert. Denied, U.S., 139 S. Ct. 69 (2018) (quoting *Hanks v. Rogers*, 853 F.3d 738, 746-47 (5th Cir. 2017)).

121.    An excessive force complaint under § 1983 brought by a free citizen must be analyzed according to Fourth Amendment standards. See *Stroik v. Ponseti,* 35 F.3d 155, 157 (5th Cir.1994), cert. denied, 514 U.S. 1064, 115 S.Ct. 1692, 131 L.Ed.2d 556 (1995); *Reese v. Anderson,* 926 F.2d 494, 500 (5th Cir. 1991).

122.    The Fourth Amendment, applied to state actors through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *U.S. Const. amend.*

123.    In determining whether the state officer has crossed the constitutional line that would make the physical abuse actionable under Section 1983, we must inquire into the amount of force used in relation to the need presented, the extent of the injury inflicted, and the motives of the state officer.

124.    If the state officer's action caused severe injuries, was grossly disproportionate to the need for action under the circumstances, and was inspired by malice rather than merely careless or unwise excess of zeal so that it amounted to an abuse of official power that shocks the conscience, it should be redressed under Section 1983. *Hall v. Tawney*, 621 F.2d at 613; *Johnson v. Glick,* 481 F.2d [1028] at 1033 [(2nd Cir. 1973)]. *Jamieson v. Shaw*, 772 F.2d 1205, 1210 (5th Cir. 1985). The use of force by Officer Cannon was excessive and unreasonable, violating the clearly established standards of the Fourth Amendment. Mr. Alaniz has demonstrated that his constitutional rights, as protected by the Fourth Amendment, were infringed upon during the incident.

125.    Defendant Cannon grabbed and took Mr. Alaniz to the ground after a countdown that did not identify the consequences of reaching the end. *Ex. C,E,F* .Mr. Alaniz was never told that he was subject to arrest or detention if Cannon reached the end of the countdown, and most certainly never advised that force would be forthcoming. Before the countdown and Mr. Alaniz was tossed to the ground, the resistance was nothing more than passive, since he was not moving fast, although he complied with Cannon's orders.

126.    Deputy Cannon became aggressive when there was no force necessary to effectuate the detainment. *Ex. D,E,F*

127.    Alaniz was never given an opportunity to submit to the detainment.*Ex. D,E,F* The only reason Cannon detained and used any force on Mr. Alaniz was because he would not stop filming or *get on his bike* although he was moving as ordered. *Ex. B. 82:4-11 (order that you gave that he failed to obey was for him to get on his bike and to leave, the combination. So the fact that he wouldn't get on his bike and he was just simply leaving, that wasn't -- that was a -- that was him not obeying your lawful order, correct? A Correct.).*

128.    Mr. Alaniz was not attempting to flee or avoid detainment. Mr. Alaniz was no threat to officers or others. *Ex. A, B 109:20-23, C, E,F.* There are no officers around Mr. Alaniz besides Detective Cannon and Sergeant Ortiz and an HPD officer to show officers' safety was the basis for the detention. *Ex. B 109-10:23-3*

129.    The United States Supreme Court has instructed that courts determining the objective reasonableness of force must consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor,* 490 U.S. 386, 396 (1989).

130.    In *Bone v. Dunnaway* the Fifth Circuit also addressed the "clearly established law." The Plaintiff claimed that the officer, defendant Jones, violated her Fourth Amendment right to be free from excessive force. The right to be free from excessive force is clearly established, but the reasonable degree of force varies based on the totality of the circumstances. See *Hogan v. Cunningham*, 722 F.3d 725, 735 (5th Cir. 2013).

131.    "'To gauge the objective reasonableness of the force used by a law enforcement officer, we must balance the amount of force used against the need for force,' paying 'careful attention to the facts and circumstances of each particular case.'" *Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir. 2008) (quoting *Flores*, 381 F.3d at 399). Bone's allegation of injury could be characterized as de minimis—bruising and a swollen cheek—whether an injury is cognizable depends on the reasonableness of the force, not just the extent of injury. See *Freeman*, 483 F.3d at 416-17; see also *Williams v. Bramer*, 180 F.3d 699, 704 (5th Cir. 1999) ("What constitutes an injury in an excessive force claim is therefore subjective—it is defined entirely by the context in which the injury arises."); *Brown v. Lynch*, 524 F. App'x 69, 79 (5th Cir. 2013) ("Any force found to be objectively unreasonable necessarily exceeds the de minimis threshold..." (footnote omitted)).

132.    The Fifth Circuit has said that "minor, incidental injuries that occur in connection with the use of handcuffs to effectuate an arrest do not give rise to a constitutional claim for excessive force." *Freeman*, 483 F.3d at 417. Bone has alleged injuries that resulted from conduct that exceeded the use of handcuffs...To withstand Jones's motion for summary judgment, Bone must show that a genuine dispute of material fact exists as to whether: (1) Jones's use of force violated Bone's Fourth Amendment right to be free from excessive force; and (2) Jones's use of force was objectively unreasonable in light of then clearly established law. *Newman v. Guedry*, 703 F.3d 757, 766 (5th Cir. 2012). This is the case here. Mr. Alaniz suffered a torn rotator cuff, and other injuries.

133.     Bone's alleged crime was very minimal, and there is no evidence that she was a threat to the safety of others or even perceived as such. See *id*. Although the district court concluded that it was reasonable for Jones to believe Bone was "attempting to evade arrest by flight," this conclusion is based on Jones's version of the facts.

134.     Bone has shown a genuine dispute of fact as to both whether the officers were attempting to arrest her at the time she turned around and whether the refusal to sign and turning around constituted "flight."

135.     Bone testified that she was not told she was under arrest before she turned away from the officers and that the "slam against the window" occurred immediately after she turned away. Considering the facts in the light most favorable to Bone, there is a genuine dispute of material fact as to whether Bone was evading arrest when Jones acted.

136.     The only possible justification for the use of force in the Jones case was Jones's perception that Bone was "fleeing" at the time of the use of force (and his argument that the "slam" was accidental). We have distinguished, for purposes of qualified immunity, cases in which officers face verbal resistance but no fleeing suspect, from those in which officers face some form of verbal or physical resistance and a fleeing suspect. In previous cases, the Fifth Circuit has denied qualified immunity at the summary judgment stage. *Deville v. Marcantel*, 567 F.3d 156, 169 (5th Cir. 2009) (rejecting summary judgment on qualified immunity grounds where an individual was stopped for a minor traffic offense, did not attempt to flee, and did not engage in active resistance); *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) (rejecting qualified immunity where an individual was not resisting arrest or

attempting to flee); *Goodson v. City of Corpus Christi*, 202 F.3d 730, 734, 740 (5th Cir. 2000) (finding a fact issue precluded summary judgment on qualified immunity grounds where officers tackled an individual who *pulled his arm away* during arrest attempt, but was not fleeing); also *Massey v. Wharton*, 477 F. App'x 256, 263 (5th Cir. 2012) (rejecting qualified immunity where an individual was arrested for disorderly conduct, was not a threat to officers, and was not attempting to flee).

137.    This case like *Bone* does not involve a serious crime, any perception that the suspect posed a risk of injury to anyone or any active "physical" resistance. Mr. Alaniz was injured beyond handcuffing injuries. *Ex. A, G at 48,376,379.* He has met his burden to show that it was clearly established at the time of his arrest in 2020 that the Harris County deputy officer's use of force was unconstitutional. Also see *Tolan v. Cotton*, 573 F. App'x 330, 330 (5th Cir.) (no qualified immunity where officers shot suspect who was neither physically resisting officers nor attempting to flee), on remand from 134 S. Ct. 1861 (2014). On remand, the Fifth Circuit held that a genuine dispute of material fact existed that precluded qualified immunity at summary judgment for the son's excessive force claim. *Tolan*, 573 F. App'x at 330. At best, Mr. Alaniz's resistance was nothing more than failing to follow officers' verbal commands quickly enough. *Ex.C,E,F.* Mr. Alaniz has not resisted arrest beyond pulling his arm according to the defendant at the most, nor did he attempt to flee. The degree of force was clearly prohibited under Fifth Circuit precedent. See *Goodson*.

138.    If the court gives credit to Cannon's version that Mr. Alaniz did pull his arm away; it can only be construed as passive resistance, (as this Court determined based on the facts

pled. Dkt. 80[3]) that would not justify the officers' immediate use of physical force. *Joseph v. Bartlett*, 981 F.3d 319, 333 (5th Cir. 2020) ("As to a passively resisting suspect, an officer does not take measured and ascending action by immediately resort[ing] to taser and nightstick without attempting to use physical skill, negotiation, or even commands." (internal quotation marks and citation omitted)). See also *Trammell v. Fruge,* 868 F.3d 332, 341 (5th Cir. 2017) (stating that "force is not justified" for passive resistance). "Given this factual dispute, which turns on the credibility of Jones and Bone, we cannot resolve the qualified immunity question as a matter of law. Accordingly, we conclude that Jones is not entitled to summary judgment on qualified immunity grounds." However, here there is no factual dispute as to the material facts.

139.    In *Newman v. Guedry*, the Fifth Circuit reversed a grant of qualified immunity to an officer who beat a suspect with a nightstick thirteen times and then tasered him three times even though he obeyed commands, committed no crime, and posed no threat to anyone's safety. 703 F.3d 757, 759-60 (5th Cir. 2012). The Court found it dispositive that the officers immediately resorted to taser and nightstick before attempting to employ "physical skill, negotiation, or even commands." *Id.* at 763; see also *Deville*, 567 F.3d at 167 (reversing summary judgment for police officer who broke the window to suspect's car, dragged her from it, and then slammed her against it).

140.    Here, just as in *Bone, Newman,* and *Deville*, the versions of events are captured body camera footage (and cellphone footage). *Ex. C,E 1:20,F.*

---

[3]Plaintiff's objection to the video evidence at the motion to dismiss stage was only to prevent the conversion of the 12(b)(6) motion to a 12(d) motion, summary judgment that could fast track the discovery and other ramifications.

141.    Even if the court construed Mr. Alaniz's response as passive resistance, it still does not justify the officers' immediate use of physical force without warning or commands. "Where an individual's conduct amounts to mere 'passive resistance,' use of force is not justified."). *See Pena v. City of Rio Grande City, 816 Fed. Appx. 966, 2020.*

142.    BWC evidence shows that Officer Cannon "pushed Mr. Alaniz to the ground" causing the strike to his head, knees, and elbow. The body-worn camera and cellphone footage clearly shows Mr. Alaniz's constitutional rights were violated. *Ex.C,E 1:20,F.* In *Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008), the Fifth Circuit found that officers were not entitled to qualified immunity when they "forcefully slam[med] [the plaintiff's] face into a vehicle while she was restrained" in handcuffs. *Id.* at 501–02.

143.    In a similar case in which law enforcement hit the plaintiff once during a traffic stop in response to passive resistance, the court held that "a reasonable officer on the scene would have known that suddenly resorting to physical force as Officer Rogers did would be clearly excessive and clearly unreasonable." *Hanks v. Rogers*, 853 F.3d 738, 745 (5th Cir. 2017).

a.    The body-worn camera footage shows that officer Cannon forcefully pushed Mr. Alaniz to the ground. *Ex. C 1:20.* Mr. Alaniz was physically restrained by Cannon causing him physical and mental injuries.*Ex.A.* Cannon's BWC demonstrates Alaniz did not physically or verbally threaten the officers or others before he engaged in the use of force. He did not attempt to flee, on the contrary he was fully cooperative with the officer's demand to "move." *Ex. D*

b.      Cannon had sufficient notice that pushing Mr. Alaniz to the ground constituted excessive force and a violation of Mr. Alaniz's constitutional rights. *Aguirre v. City of San Antonio*, 995 F.3d 395, 415 (5th Cir. 2021) (internal quotation marks and citations omitted) ("The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights."). The evidence in body camera footage, deposition testimony, and investigative reports prove that the force used was unreasonably excessive and that Cannon would not be entitled to qualified immunity. *Ex.C.* Additionally, Harris County has an unenforced policy against excessive force.*Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 732 n. 8 (5th Cir. 2018), cert. denied, U.S., 139 S. Ct. 69 (2018) (noting that violations of department policies are relevant to a qualified immunity defense because the existence of policies and corresponding notice to officers becomes relevant in analyzing the reasonableness of an official's conduct). *Dkt. 97 7-12. Ex. I.*

### The Excessive Use of Force Against Joe Alaniz Was Objectively Unreasonable

144.    Given that the law was clearly established that the use of force must be reasonable at the relevant time, and his actions were objectively unreasonable Cannon is not entitled to qualified immunity based on the use of force against Mr. Alaniz.

***Arresting A Person Without Probable Cause Was Clearly Established Law In May 2020, as a Violation of The Fourth Amendment Under The United States Constitution***

145.    The Fourth Amendment requires that an arrest be supported by a properly issued warrant or probable cause. *Glenn,* 242 F.3d at 313. An arrest not supported by a properly issued warrant or probable cause is wrongful and a constitutional violation. *Dennis v. Warren,* 779 F.2d 245, 247 (5th Cir. 1985). A warrantless arrest is unlawful and in violation of the Fourth Amendment if it is unsupported by probable cause. *Flores v. City of Palacios*, 381 F.3d 391, 402 (5th Cir. 2004). Probable cause exists "when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Id.* (quoting *United States v. Levine*, 80 F.3d 129, 132 (5th Cir. 1996)). In *Devenpeck v. Alford*, 125 S. Ct. 588, 593 (2004), the Court held that a warrantless arrest by a law officer is reasonable under the Fourth Amendment if there is probable cause to believe that a criminal offense has been or is being committed. The Fourth Amendment prohibits government officials from making "unreasonable . . . seizures." U.S. Const. amend. IV. A warrantless arrest violates that Fourth Amendment right "if the arresting officer lacks probable cause to believe that the suspect has committed a crime." *Bodzin v. City of Dallas,* 768 F.2d 722, 724 (5th Cir. 1985). An officer "seizes" a person for purposes of the Fourth Amendment when he "restrains the freedom of a person to walk away." *Brower v. Cnty. of Inyo,* 489 U.S. 593, 109 S. Ct. 1378, 1380, 103 L. Ed. 2d 628 (1989).

146.     The Supreme Court has held that "[a] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980), or alternatively, if a reasonable person would not feel free "to decline the officer's requests or otherwise terminate the encounter," *Florida v. Bostick,* 501 U.S. 429, 436, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991). A seizure is unlawful under the Fourth Amendment, specifically for unlawful detainment, if specific and articulable facts to support a detention, or probable cause exist.

147.     Under the *Terry* standard, "a two-tiered reasonable suspicion inquiry: 1) whether the officer's action was justified at its inception, and 2) whether the search or seizure was reasonably related in scope to the circumstances that justified the stop in the first place." *United States v. Valadez,* 267 F.3d 395, 397-98 (5th Cir. 2001) (citing, inter alia, *Terry v. Ohio*, 392 U.S. 1, 19-20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Then, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* (quoting *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). Under this standard, if Cannon thought Alaniz was committing a traffic violation, then the first prong of Terry would be satisfied. *Allen v. Hays,* 63 F.4th 307, 316 (5th Cir. 2023). Cannon never articulated that they believed that Alaniz was committing a crime.

148.     A "seizure" under the Fourth Amendment must be "justified at its inception," we must determine when Hill was seized within the meaning of the amendment. *Hübel v. Sixth*

*Judicial Dist. Court,* 542 U.S. 177, 185, 124 S. Ct. 2451, 159 L. Ed. 2d 292 (2004). [**10] A seizure begins when "all the circumstances surrounding the incident" are such that "a reasonable person would have believed that he was not free to leave" *INS v. Delgado*, 466 U.S. 210, 215, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984) (citation omitted); *United States v. Mask,* 330 F.3d 330, 336 (5th Cir. 2003).

149.    Based on the facts and evidence, Cannon did not have probable cause to arrest the plaintiff for resisting a search under Tex. Penal Code § 38.03(a), and because no objectively reasonable officer would conclude that such probable cause did exist. Officers' use of force was objectively unreasonable. *Alexander v. City of Round Rock* 854 F.3d 298 (5th Cir. Tex. April 18, 2017).

150.    Seizure of defendant, who was sitting in a parked car outside an apartment complex, violated the Fourth Amendment; when a police officer ordered defendant out of the car to be frisked, the officer's suspicion that defendant was, or was about to be, engaged in a drug crime was not reasonable. *United States v. Hill* 752 F.3d 1029 (5th Cir. Miss.May 29, 2014).

151.    Accordingly, specific and articulable facts demonstrating that a crime has been or will be committed to justify the detainment or arrest of Mr. Alaniz is lacking. The absence of specific and articulable facts concerning Mr. Alaniz 'conduct makes it evident that his Fourth Amendment rights were violated when he was seized and unlawfully arrested by Cannon and Esqueda.

152.    The Fifth circuit in *Freeman v. Gore* held "Police detention constitutes an 'arrest,' such that it must be accompanied by probable cause, if a reasonable person in the suspect's

position would understand [**17] the situation to be a restraint on freedom of the kind that the law typically associated with a formal arrest. See *United States v. Corral-Franco,* 848 F.2d 536, 540-41 (5th Cir. 1988); *United States v. Bengivenga*, 845 F.2d 593, 596-97 (5th Cir. 1988) (en banc). *Freeman v. Gore,* 483 F.3d 404, 413.

153. Clearly established law, outlined herein, put Defendant, Detective Mark Cannon on notice that his action of detaining Mr. Alaniz without reasonable suspension or arrest without probable cause was unconstitutional without question on May 29, 2020.

**Arresting Joe Alaniz Was Objectively Unreasonable**

154. Mark Cannon arrested Mr. Alaniz without legal authority, no warrant, or no probable cause. The plaintiff's expert on police practices, Keith Howse, opined that the actions engaged in by Cannon was objectively unreasonable "[A] reasonable Police Officer would not have detained Mr. Joe Alaniz on May 29, 2020, as he did not commit a crime and was not connected to any criminal activity. *Ex.A,B,C,E,F.* Based on a review of the videos, facts, and testimony in this matter, that the Defendants did not have reasonable suspicion to detain Mr. Joe Alaniz as he did not commit a crime and was not connected to any criminal activity. *Ex. J-Expert Report*. Legal detention requires reasonable suspicion of criminal activity. *Johnson v. United States*, 333 U.S. 10, 15.

155. A temporary detention or stop is an assertion of authority by a peace officer that would cause a reasonable person to believe that they are not free to leave. *Ex.A,C,E,F.* Such a belief may result from physical restraint, unequivocal verbal commands, or other conduct by an officer. A detention of a person is limited in scope, intensity, and duration. It is less

than an arrest and more substantial than a consensual encounter. A detention must be temporary and last no longer than is necessary to resolve the reason for the stop. A detention is legal at its beginning and can become an illegal arrest if extended beyond what is reasonably necessary under the circumstances.

156.    Given that the law was clearly established that all arrests must be supported by probable cause at the relevant time, and his actions were objectively unreasonable Cannon is not entitled to qualified immunity for the unlawful detention and officer initiated arrest of Mr. Alaniz.

**Cannon Violated Mr. Alaniz's First Amendment Right to Record**

157.    The first amendment claim is not addressed in this motion summary judgment although alleged in the complaint. *Dkt. 39, 97,98*

158.    The right to record officers was clearly established by February 16, 2017. *Blakely v. Andrade,* 360 F.Supp.3d 453 (2019).

159.    In the Fifth Circuit the law is clearly established that Mr. Alaniz had a right to record officers and others in public. The Fifth Circuit has clearly established that individuals have a First Amendment right to record police officers performing their duties in public, subject to reasonable time, place, and manner restrictions. This was affirmed in *Turner v. Driver,* where the court concluded that the First Amendment protects the right to record the police (*Zinter v. Salvaggio*, 610 F.Supp.3d 919 (2022))[1], *(Blakely v. Andrade*, 360 F.Supp.3d 453 (2019))[2].

160.    The right was clearly established by February 16, 2017 (*Blakely v. Andrade*, 360 F.Supp.3d 453 (2019))[2].

161.    Deputy Cannon violated Mr Alaniz's rights under the First Amendment, stopping from recording. There were no safety concerns. Cannon left all Mr. Alaniz's items behind except his phone that he stopped from recording. *Ex.A, E.*

## RESPONSE TO HARRIS COUNTY'S SUMMARY JUDGMENT DKT. 97

### Harris County Disputed Facts

162.    It is disputed that Cannon arrested Plaintiff for impeding the roadway. Mr. Alaniz was a cyclist and authorized and required to be in the roadway as any other vehicle.



163.    It is disputed that Plaintiff was *charged* with resisting arrest. There is no evidence.

164.    Cannon asserts that Mr. Alaniz was never arrested, rather detained. *Ex. B. 39:4-6*

165.    It is disputed that Plaintiff was *arrested for* resisting arrest based on the timeline and the actions of supporting the resisting arrest. Cannon tossed Alaniz to the ground and attempted to detain him prior to any alleged resistance. *Ex. C,E,F.*

166.    The allegation of plaintiff resistance was passive resistance and based on him not giving his arm and the arm being under his body after he was tossed to the ground. (He was never asked by any officer to give his arm or to stop pulling his arm).*Ex. E,F.*

167.    It is disputed that Plaintiff's arrest report was lost, as a report was never generated (*also, Cannon asserts Mr. Alaniz was never arrested, rather only detained).Ex. B.1:08, Ex. B. 39:4-6*

168. It is undisputed that Cannon was never trained in recognizing citizens with disabilities other than mental health training. *Ex. B.TS-1:00-1:04*

169. It is undisputed that Cannon did not have any classes or courses on the subject of handling individuals with medical bracelets. *Ex. B.TS-1:00-1:04*

170. Mr. Alaniz was not standing behind the officers when Cannon began his countdown and orders.*Ex. B 20:09,Ex. F 20:11*.

171. There was nothing in the open field at all to cause Cannon to be concerned for an officer or Mr. Alaniz. *Ex. F 20:11, B*



172. Cannon had not witnessed any violence. *Ex. B 20:08*

173. It was before encountering Mr. Alaniz was not at the same location that Cannon was faced with individuals throwing things, although nothing was ever captured on camera. *Ex. B. 128-29:22-1*

174. The only resistance that Cannon described was Mr. Alaniz pulling his arm away. *Ex. B 46:15-17*. See *Goodman*.

175.    It is undisputed that Harris County never trained Cannon to recognize and respond to emergency medical bracelets or what to do if a medical alert bracelet is detected. *Ex. B 1:31*

176.    Cannon would have known that those bracelets are to indicate he was dealing with a disabled or a person with a serious medical condition had Harris County provided training. *Ex. A,B 1:31*

### Municipal Liability

177.    Harris County is a municipality and is not afforded the defense of qualified immunity. Municipalities "do not enjoy ... immunity from suit." See *Jinks v. Richland County*, 538 US 456, 466 (2003). Municipalities and local governments are persons subject to suit for damages and prospective relief also under federal law. *Monell v. Dept. of Social Services of New York*, 436 U.S. 658, 701 (1978). Sec. 37.001 of Texas Civil Practice and Remedies Code Title 2 Chapter 37, for the purpose of judgements, also defines a municipal corporation or municipality as a "person."

### Failure to Train

178.    The Fifth Circuit held that a plaintiff sufficiently alleged facts demonstrating that officers were deliberately indifferent to his deceased son's mental-health condition by disregarding his medical bracelets. *Partridge v. Two Unknown Police Officers of the City of Houston,* 791 F.2d 1182, 1184 (5th Cir. 1986).

179. Harris County deliberate indifference to the need for training its officers on recognizing and to not disregard emergency medical bracelets was the moving force behind Mr. Alaniz's constitutional rights being violated.

180. Mr. Alaniz's rights to be free from the use of excessive force and unlawful detainment being violated.

181. It is undisputed that Cannon was never trained to recognize and not disregard the emergency medical bracelets like Mr. Alaniz was wearing on both wrists when Cannon placed his handcuffs around Mr. Alaniz's wrists. Cannon saw the bracelets but was not familiar due to the lack of training by Harris County. *Ex. B 127:23-24*

**Cannon Had No Probable Cause To Detain Alaniz; Cannon Was Never Trained On The Constitutional Limits To Avoid Arrest Without Probable Cause.**

182. It is the usual routine and practice of Harris County to send Monday Morning Quarterback attorneys to review and dissect the event and contrive a crime to turn victims who complain into criminals, including attempts to discover crimes that officers would never have thought of even with every stretch of their imaginations.

183. Here, the Monday Morning Quarterbacking continues despite the defendant stating that he never arrested Mr. Alaniz. There is no fault in them for trying, but it is not appropriate. The facts must be in the officer's knowledge. *Devenpeck v. Alford*, 543 U.S. 146 (2004))

184. The Fifth circuit has held that an arrest is not unlawful if the officer incorrectly arrests a person for one crime but could have correctly arrested the person for another crime but chose not to.

185.    The problem with the Monday Morning Quarterbacking for crimes is there is no evidence from the officer that he arrested Mr. Alaniz for any crime at all he never contemplated a choice of crimes that he could have arrested him for and chose one over another.

186.    Deputy Cannon chose to arrest the disabled Mr. Alaniz because he did not get on his bike after the aggressive countdown demanding he get on his bike and move. Ex. 57:1-5 Mr. Alaniz moved as instructed but did not get on his bike.

187.    Cannon is not comfortable with the Fourth Amendment and none of his supervisors have ever gotten with him to inquire about his lack of comfort about his first or fourth amendment knowledge. Despite the fact that he admits he is not comfortable with the First or Fourth Amendment. *Ex. B. 32:1-25*

***County is liable for constitutional violations because a municipal practice, custom promulgated by a policy-maker with deliberate indifference was the "moving force" or direct cause of the injury complained of by Plaintiff***

188.    It is the HCSO policy to review each and every arrest. *Ex. I,Dkt 97 Ex. 7,8,12,10.* Dozens of individuals are subject to <u>officer initiated warrantless arrests</u> without probable cause by Harris County sheriff department officers. *Ex. H*

189.    Despite the disposition of case after case for lack of probable cause, and policy to review each officer's arrest made, Harris County has never disciplined an officer for arresting a person for lack of probable cause on officer initiated warrantless arrests.

190.    The problem with officer initiated warrantless criminal charges *without* probable cause is these particular arrests are unquestionably an abuse of the 4th amendment and the power vested in the officer to arrest individuals.

191.    Despite the dismissal of numerous cases due to a lack of probable cause and a policy requiring the review of every officer-initiated arrest, meaning these arrests and all arrests are reviewed by Harris County. *Ex. I.*

192.    Harris County has never taken disciplinary action against an officer for making an arrest without probable cause in officer-initiated arrests. This practice of officer-initiated criminal charges without probable cause undoubtedly violates the Fourth Amendment and the authority granted to officers to lawfully arrest individuals.

193.    The failure to discipline officers after officer-initiated arrests without probable cause is the moving force behind the pervasive practice by the Harris County Sheriff's officers.

194.    This complaint is not simply based on arrests without probable cause, but arrests that involve officers as the complainant and arresting officer on allegations they have initiated.

195.    This practice has always been dangerous and is primarily used to retaliate against individuals who they wish to cause a disruption in their lives.

*A causal link exists between Harris County's policy and the plaintiff's constitutional injury*

196.    Between January 2017, and the date of Joe Alaniz's arrest, Ed Gonzalez was the policymaker in the area of law enforcement for Harris County, according to the Texas Government Code as the elected sheriff of Harris County. "[T]hat the course of conduct warrants the attribution to the [City's] governing body of knowledge that the objectionable

conduct is the expected, accepted practice of city employees." *Webster v. City of Hous.*, 735

F.2d 838, 842 (5th Cir. 1984) (en banc) (per curiam)

197.    In *Canton v. Ohio,* The city's "'policy of inaction'" in light of notice that its program

will cause constitutional violations "is the functional equivalent of a decision by the city

itself to violate [*62] the Constitution." *Canton*, 489 U.S., at 395, 109 S. Ct. 1197, 103 L. Ed.

2d 412 (O'Connor, J., concurring in part and dissenting in part).

198.    Harris County failed to train its officer on identifying individuals with disabilities and

serious medical conditions wearing emergency bracelets. *Ex. B*

199.    Mr. Alaniz was detained because he failed to obey a lawful order to leave and get on

his bike after being instructed several times.

200.    Detective Cannon indicated that the *combination* of not leaving and not getting on his

bike was the reason for the detention. *Ex. B 80:1-17.*

201.    But he admits and the camera clearly shows it is moving and Mr. Alaniz is holding it

therefore he was moving also. *Ex. B 112:1-3*

202.    Mr Alaniz began to get confused and was unable to talk.  "I had a lot of negativity

with my communications.· It feels like I was a kid learning."

203.    The reality is is that Detective Cannon arrested Mr. Alaniz because he continued to

film although he knew individuals had a right to record. *Ex. A, Ex. B 26:17-20, 78*

**Harris County has not disciplined any officer for actions related to arrests without probable cause.**

204.    Harris County has a policy to review the body worn camera of its officers. *Ex. I.* 11-21, Of the numerous self-initiated arrests by Harris County Deputies that resulted in dismissals for lack of probable cause, nine have been investigated and disciplined by Harris County or its policymaker.

205.    Harris County has provided any disclosure or evidence to show that the allegations that it fails to discipline its officers for initiating arrest without probable cause.

206.    Harris County has an arrest policy but nothing prohibiting arrest without probable cause. More importantly there is no policy to discipline officers for arrests without probable cause. *Ex. J at 8*

*Ratification*

207.    The Fifth Circuit upheld a ratification claim where the police chief, a policymaker, failed to intervene in an officer's unlawful actions and covered up evidence during the investigation. This case demonstrates that ratification can be found when there is a direct connection between the policymaker and the unconstitutional conduct. *Covington v. City of Madisonville, Texas,* 812 Fed.Appx. 219 (2020))[3]. "Concerning ratification, if 'authorized policymakers approve a subordinate's decision and the basis for it, their ratification [is] chargeable to the municipality because their decision is final.'" *Sligh v. City of Conroe, Tex.*, 87 F.4th 290, 303 (5th Cir. 2023) (per curiam) (quoting *World Wide Street Preachers Fellowship v.*

*Twn. of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009) (quoting, in turn, *Praprotnik*, 485 U.S. at 127)).

**It is not within Harris County's Policies to Discipline Officers for Their Officer Initiates Arrests Without Probable Cause.**

208.   The unconstitutional practice of unlawful arrest without probable cause within Harris County Sheriff's office by its deputies is ratified and condoned by Harris and its policymaker in the area of law enforcement by defacto, by having a policy against, but no penalty or response to a violation of the policy against the unreasonable use of force or unlawful arrest. *Ex. I*

209.   Harris County deputies engage in the unconstitutional practice of self-initiated arrests of individuals without probable cause. Despite numerous arrests resulting in dismissals and severe disruptions to individuals' daily lives, Harris County has not disciplined a single officer for actions related to arrests without probable cause.

210.   If the city had a policy of arresting people without probable cause in retaliation for annoying-but-protected speech, such a policy would be unconstitutional. See *Reichle v. Howards*, 132 S. Ct. 2088, 2094, 182 L. Ed. 2d 985 (2012).

211.   Harris County has produced no evidence to show that any of its officers, including Mark Cannon have ever been disciplined after arrests have been made without probable cause. Harris County is notified of every arrest made by its officers since the officers must submit a report of each arrest to the agency. Ex. J, I

212.    In the instant case, Harris County conducted an investigation into the incident involving Mr. Alaniz. The investigation included a review of videos, arrest records, and medical records. Despite the investigation, Harris County failed to take disciplinary action against Cannon or any other officers for taking Mr. Alaniz into custody. It is not within their policy to discipline officers who arrest individuals without probable cause.

213.    The failure is prima facie evidence of ratification by Harris County. And the same practice related to past failures was the moving force that caused Mr. Alaniz's arrest because he did not mount his bicycle, as he moved as Cannon ordered an arrest of Mr. Alaniz without probable cause. Ex.A

### *Municipal Liability based on a Single Incident*

214.    "Single-incident liability" arises in those circumstances where a constitutional violation would result as "the highly predictable consequence" of the governmental body's inaction. *See id*; see also *Connick v. Thompson*, 563 U.S. 51, 61-64 (2011).

215.    The Supreme Court's decisions in *Canton, Leatherman v. Tarrant* [*17] Cnty. Narcotics Intelligence and Coordination Unit, 507 U.S. 163 (1993), and subsequent cases, make it clear that a plaintiff may adequately plead *Monell* liability under 42 U.S.C. § 1983 without pleading a pattern of similar constitutional violations. *Kitchen v. Dallas Cnty.*, 759 F.3d 468, 485 (5th Cir. 2014); *see also Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616 (5th Cir. 2018); *Hicks-Fields v. Harris Cnty.*, 860 F.3d 803, 811 (5th Cir.), *cert. denied sub nom. Hicks-Fields v. Harris Cnty.*, 138 S. Ct. 510 (2017); *Brown v. Bryan Cnty.*, 219 F.3d 450, 457 (5th Cir. 2000); *Schaefer v. Whitted*, 121

F. Supp.3d 701, 719-20 (W.D. Tex. 2015); *Hobart v. City of Stafford*, 784 F.Supp.2d 732, 749-55 (S.D. Tex. 2011).

216.    Thus, even when the plaintiff cannot identify a pattern of past constitutional violations similar to the complained-of violation, liability may nonetheless be demonstrated when the prospect of constitutional violations was "highly predictable" or "patently obvious."*Kitchen v. Dallas Cnty.*, 759 F.3d 468, 485 (5th Cir. 2014).

217.    There is sufficient evidence to show all of the following elements: (1) the municipality's training or supervision procedures were inadequate; (2) the municipality was deliberately indifferent in adopting its training or supervision policy; and (3) the inadequate policy directly caused the violations at issue. *Ratliff v. Aransas County, Tex.*, 948 F.3d 281, 285 (5th Cir. 2020); *Zarnow v. City of Wichita Falls, Tex.,* 614 F.3d 161, 170 (5th Cir. 2010).

218.    Where we differ with Defendants is a single incident may satisfy the Monell liability claim. The single-incident exception to the Monell liability test can be sufficient to find a municipality liable when Plaintiff can show that the highly predictable consequence of a failure to train would result in the specific injury suffered and that the failure to train represented the moving force behind the constitutional violation.

219.    This exception is applied only in extreme circumstances in order to not run afoul of the fact that municipalities cannot be held liable via respondeat superior. The high number of arrests made by officers on their own initiation without probable cause should have resulted in at least one instance of disciplinary action. However, even in cases where internal affairs has investigated, no such action has been taken. *Ex. D.*

220.    Although policymakers must be on notice of the unconstitutional policy, practice, or custom to be liable pursuant to Section 1983, notice may be proven by a number of methods. Thus, evidence of municipal policy or practice may be shown by post-conduct events demonstrating that an employee's conduct conformed to municipal policy. "When the official policymaker knows about misconduct yet allegedly fails to take remedial action, this inaction arguably shows acquiescence to the misconduct such that a jury could conclude that it represents official policy." *Sanchez v. Young Cty., Texas*, 956 F.3d 785, 793; see also *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985).

### Extreme Circumstances

221.    The combined conduct of several municipal employees acting pursuant to municipal policy may add up to a constitutional violation even if none of the named defendants individually violated the Constitution. *Barrett v. Orange County Human Rights Com'n*, 194 F.3d 341, 350 (2nd Cir. 1999) ("[U]nder Monell municipal liability for constitutional injuries may be found to exist even in the absence of individual liability, at least so long as the injuries complained of are not solely attributable to the actions of named individual defendants."); *Garcia v. Salt Lake County,* 768 F.2d 303, 310 (10th Cir. 1985) ("if the County had ten people working for it and following a pattern and practice of the County the jury could find all of them not guilty, and still the cumulative effect of what they did pursuant to the practice or policy of the County could be a violation of the Act by the County).

222.    Here the policymaker, Ed Gonzales, and Harris County are completely aware of the arrest made by their deputies based on the policy to review all arrests and complaints. *Ex. I*

## CONCLUSION AND PRAYER

223.    The law was clearly established that the use of force must be reasonable and arrest must be based on probable cause at the relevant time in May 2020. Cannon's actions were objectively unreasonable in the arrest and excessive force against Mr. Alaniz and he is not entitled to qualified immunity for the unlawful detention, arrest and use of force against Mr. Alaniz. Harris County failure to train its officers on recognizing medical alert bracelets individuals has a practice of allowing officers to engage in self initiating arrest of individuals without probable cause without discipline after learning the arrest were unlawful. Accordingly. Plaintiff prays that this court deny defendants' summary judgment on his Fourth Amendment liability on excessive force, and unlawful seizure claims, based on the defendant, Mark Cannon's conduct causing Mr Alaniz's injuries and deny qualified immunity and constitutional violations; and, deny Harris County's motion for summary judgment based on its failure to train, lack of policy, and failure to discipline its officers, and ratification of its officer's conduct.

Respectfully submitted,
THE LEWIS LAW GROUP PLLC
By: */s/U.A. LEWIS*
U.A. LEWIS
The Lewis Law Group
Federal Bar ID No. 1645666
State Bar No. 24076511
P.O. BOX 27353 HOUSTON, TX 77227
Phone: (713) 570-6555
Fax: (713) 581-1017
Myattorneyatlaw@gmail.com
ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

 I hereby certify that a true and correct copy of the foregoing has been forwarded to all

parties by ECF electronic filing service on December 6, 2024.

**/s/ U.A. Lewis**
**U.A. Lewis**